**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| MARVIN H. MAURRAS REVOCABLE TRUST, DERIVATIVELY AND ON BEHALF OF ACCRETIVE HEALTH, INC., | ) ) ) ) ) |
| PLAINTIFF, | ) ) |
| VS. | ) ) |
| EDGAR M. BRONFMAN, JR., J. MICHAEL CLINE, STEVEN N. KAPLAN, STANLEY N. LOGAN, DENIS J. NAYDEN, GEORGE P. SHULTZ, ARTHUR H. SPIEGEL, III, MARY A. TOLAN, MARK A. WOLFSON DEFENDANTS, | ) ) ) ) ) ) ) ) |
| AND | ) ) |
| ACCRETIVE HEALTH, INC. | ) ) ) |
| NOMINAL DEFENDANT. | ) ) |

Case No. 12-cv-03395

Judge: Hon. Gary Feinerman

Oral Argument Requested Pursuant to
Local Rule 47.1(b)

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE FACTS .......................................................................... 3

III.   APPLICABLE LEGAL STANDARDS ............................................................. 6

IV.   LEGAL ANALYSIS............................................................................................ 6

     A.    The Complaint Establishes That Demand Is Excused ............................ 6

           1.    There Is Reason To Doubt That A Majority Of the
                 Board Is Disinterested................................................................... 8

           2.    There Is Reason To Doubt That A Majority Of The
                 Board Is Independent ................................................................... 9

           3.    There Is Reason To Doubt Valid Business Judgment ................. 12

     B.    The Complaint States Claims For Breach Of Fiduciary Duty Of
         Loyalty And For Contribution And Indemnification .............................. 14

V.    CONCLUSION ................................................................................................. 15

## TABLE OF AUTHORITIES

<u>Case</u>                                                                                                                  <u>Page</u>

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ........................................................................ 7, 8, 12

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) .................................................................................... 14

*Beam ex rel Martha Stewart Living Omnimedia, Inc. v. Stewart,*
    833 A.2d 961, 977-78 (Del. Ch. 2003) ..................................................... 12 n. 20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 570 (2007) ............................................................................... 14

*Buck v. Hampton Twp. Sch. Dist.,*
    452 F.3d 256 (3d Cir. 2006) ...................................................................... 5 n. 11

*GE Capital Corp. v. Lease Resolution Corp.,*
    128 F.3d 1074 (7th Cir. 1997) ........................................................................ 6

*Grace Bros. v. UniHolding Corp.,*
    No. 17612, 2000 Del. Ch. LEXIS 101, at *32 (Del. Ch. July 12, 2000) .............. 12

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) ......................................................................... 7, 12

*In re Am. Int'l Group, Inc.,*
    976 A.2d 872875 (Del. Ch. 2009) ................................................................... 15

*In re Cendant Corp. Deriv. Action Litig.,*
    189 F.R.D. 117 (D. N..J. 1990) ..................................................................... 6, 9

*In re Countrywide Fin. Corp. Derivative Litig.,*
    554 F. Supp. 2d at 1080-82 ............................................................................ 9

*Mizel v. Connelly,*
    No. 16638, 1999 Del. Ch. LEXIS 157,
    at *9 (Del. Ch. July 22, 1999) ............................................................... 12 n. 20

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993) .................................................................... 7, 8, 9, 12

*Ryan v. Gifford,*
918 A.2d 341 (Del. Ch. 2007) ........................................................................... 7

*Sellers v. Boehringer Ingelheim Pharms., Inc.,*
No. 3:12-cv-00615-DRH-SCW, 2012 U.S. Dist. LEXIS 102959,
at *6 (S.D. Ill. July 25, 2012) ................................................................. 5, 6, 14

*Seminaris v. Landa,*
662 A.2d 1350 (Del. Ch. 1995) ...................................................................... 7, 9

*Stone v. Ritter,*
911 A.2d 362 (Del. 2006) ............................................................................. 9, 15

I.       INTRODUCTION

Utilizing what can only be characterized as system-wide unethical medical-collection techniques, Accretive Health, Inc. ("Accretive" or the "Company") placed its debt collectors in hospital emergency rooms, at patients' bedsides, and at hospital registration desks, demanding that patients pay before receiving treatment.  Accretive's services were performed in direct violation of federal and state law, as well as the Company's own "Code of Business Conduct and Ethics."  Indeed, upon discovery of the Company's corporate practices, the Minnesota Attorney General filed a complaint against Accretive for numerous violations of federal and state laws, including failure to provide emergency care regardless of ability to pay, failure to keep private patient data secure, and failure to identify debt collectors.

Further recognizing that the sanctioned, corporate practices outlined above were carried out in bad faith and without a sound business justification, Plaintiff filed this derivative lawsuit, seeking to recover for Accretive and its shareholders the hundreds of millions of dollars of financial and reputational damages caused by the Defendants' breaches of duties.   In response thereto, the Defendants (as defined below) have petitioned this Court to dismiss Plaintiff's case for failure to make a pre-suit demand on the Company's Board of Directors (the "Board").  However, Defendants' request must be denied because the circumstances in this action demonstrate that pre-suit demand on the Board would have been futile, and was therefore excused.

More specifically, notwithstanding the Board's obligation to control and manage Accretive in a fair, just, honest and lawful manner, the Defendants employed practices and programs that fostered a pressurized collection environment, provided debt collectors

1

access to private health and financial information to assist them in their collection endeavors, and provided financial incentives, in the form of gift cards, to debt collectors whose collection rates were high.[1] That the Board knew, or recklessly and in bad faith disregarded, that the Company was operating in ways that violated corporate ethical standards and applicable law is evidenced by internal documents that show that Accretive refused to correct, and continued to violate these laws, even after doctors informed the Company that their tactics were discouraging patients from seeking lifesaving treatments. This pattern of misconduct, which poses a substantial likelihood of liability to each Defendant, raises a reasonable doubt that the Board could have exercised disinterested business judgment in responding to a demand.

At the same time, the Director Defendants' professional and financial entanglements raise a reasonable doubt that a majority of the Board is independent. Indeed, the depth and extent of these interrelationships clearly demonstrate that a majority of the Board was prevented from objectively responding to a demand.

In any event, there is no valid business justification for the known violations of positive law. Thus, Plaintiff has adequately pled demand futility. Plaintiff has also sufficiently pled that the Individual Defendants intentionally engineered a corporate culture that severely compromised patients' health and privacy, failed to act in the face of known duties to act, exhibited a conscious disregard for their duties, and repeatedly violated applicable law, causing significant injury to Accretive and its shareholders. As such, Plaintiff has sufficiently pled a claim for breach of fiduciary duty. Consequently, this Court should deny Defendants' motion to dismiss.

---

1 *See, i.e.,* Compliance Review of Fairview Health Services' Management Contracts with Accretive Health, Inc. Vols. I-IV, attached to the Declaration of Tiffany Oldham ("Oldham Decl.") as Exs. I and J.

## II.    STATEMENT OF THE FACTS

Accretive is a company specializing in revenue cycle management services, services aimed at more efficiently managing healthcare providers patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation and collections.  (Complaint ¶ 7.)[2]  Beginning in 2010, Accretive initiated its "Quality and Total Cost of Care" program.   (Complaint ¶¶ 7, 27.)   Utilizing this distinctive operating model, Accretive managed and operated the "revenue cycles" of two, among others, Minnesota area hospitals, namely Fairview Health Services ("Fairview") and North Memorial Health Care ("North Memorial").   (Complaint ¶ 26.) Accordingly, Accretive controlled the registration, eligibility verification, admissions, documentation and coding, billing, and collection practices and processes at both Fairview and North Memorial at all relevant times hereto.  (Complaint ¶¶ 7, 26, 27.)  The importance of these inaugural contracts to Accretive is evidenced by the fact that the Fairview contract alone accounted for over 13% of Accretive's service revenue for the first three quarters of 2011, or over $75 million.[3]

Importantly, pursuant to Consent Decrees entered between the two Minnesota hospitals and the Minnesota Attorney General and filed in Ramsey County District Court (the "Consent Decrees") prior to association with Accretive, Fairview and North Memorial were required to adhere to certain collection standards and to have a zero tolerance policy for abusive, harassing, or oppressive conduct by its own employees and

---

2 *See also* Oldham Decl., Ex. A:  Accretive's 2010 Annual Report at p. 13 (breaking down the Accretive revenue cycle process structure into the following three categories:  (1) "front office," which includes scheduling, registration, and admissions), (2) "middle office," which includes documentation, coding, and billing, and (3) "back office," which includes collections)
3 *See* Oldham Decl., Ex. B:  Minnesota Attorney General's Amended Complaint at ¶¶ 3, 35.

by third party vendors engaged in collection activities.[4] As such, the terms of the revenue cycle agreement between Accretive and Fairview required Accretive to become familiar with and adhere to all requirements set forth in the Consent Decrees.[5]

Accretive performed its various tasks at the two hospitals by both managing hospital employees as well as positioning its own employees throughout the two hospitals. (Complaint ¶¶ 7, 34.) In this regard, Accretive trained every employee to focus on obtaining payment through revenue cycle operations. (*Id.*) As reported in a *New York Times* article dated April 24, 2012, the practices employed by Accretive created a pressurized collection environment that included daily meetings, with those employees with high collection rates receiving monetary incentives and those employees with low collection rates being threatened with termination. (Complaint ¶ 34.)[6] Indeed, internal documents reveal that Accretive was engaged in the following practices, among others: (1) stalling patients entering the emergency rooms until they had agreed to pay a previous balance, (2) asking patients to make "point of service" payments before they receive treatment, and (3) listing patients with outstanding balances on "stop lists". (*Id.*)[7] Despite doctors' complaints that such "strong-arm tactics" were discouraging patients from seeking lifesaving treatments, Accretive officials dismissed concerns over its aggressive practices as "county club talk". (*Id.*)[8] Tellingly, Accretive was receiving substantial incentive payments from the hospitals, which equaled a percentage of the

---

4 *See* Oldham Decl., Ex. B at ¶¶ 66-76 and Ex. H at pp. 2-3.
5 *See* Oldham Decl., Ex. B at ¶¶ 66-76, Ex. H at p. 4, and Ex. I, Vol. III at pp. 3-14.
6 *See also* Oldham Decl., Exs. H-J.
7 Importantly, Accretive's aggressive medical-collection techniques were not limited to Fairview and North Memorial, but, rather, used against patients at hospitals across the country.
8 *See also* Oldham Ex. I at Volume II (noting that numerous physicians lodged complaints with Accretive that its collection practices were disrupting the quality of care.)

hospital's incentive pay from insurance companies and HMOs, to cut patients' costs. (Complaint ¶ 27.)

Not surprisingly, Accretive amassed extremely sensitive and personal medical and financial information of patients of Fairview and North Memorial through its revenue cycle management services. (Complaint ¶ 28.) This sensitive and personal medical and financial information included, without limitation, the patient's Social Security number, insurance eligibility, medical diagnoses, payment history and ability to pay, information which clearly falls under the scope of the Health Insurance Portability and Accountability Act ("HIPAA"). (Complaint ¶¶ 24, 28, 34.) Notwithstanding, Accretive allowed its debt collectors access to this sensitive and personal medical and financial information. (Complaint ¶ 34.)[9] Indeed, in a May 11, 2012 report to the U.S. Senate, Accretive Health stated that upon entering into the revenue cycle contract with Fairview, its debt collectors had either full or partial access to Fairview's electronic health record system, called PASS, until early 2012.[10] Thus, Accretive failed to keep such data secure and private, violating HIPAA and other state consumer protection laws and spurring the Minnesota Attorney General to file suit.[11] (Complaint ¶¶ 24, 25, 28, 34.)

Based on the foregoing, Plaintiff derivatively initiated this litigation on May 30, 2012. Specifically, Plaintiff alleges that the Defendants (as defined below) breached their duties of loyalty by acting unfaithfully to Accretive and its shareholders. At the time this action was filed, the directors of Accretive were Edgar M. Bronfman, Jr.; J. Michael

---

9 *See also* Oldham Decl., Exs. H-J.
10 *See* Oldham Decl., Ex. B at ¶ 47.
11 In evaluating the sufficiency of a plaintiff's claims, a court may consider the allegations of the complaint as well as "documents that are attached to or submitted with the complaint," "matters incorporated by reference or integral to the claims, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Sellers*, 2012 U.S. Dist. LEXIS 102959, at *7.

Cline; Steven N. Kaplan; Stanley N. Logan; Denis J. Nayden; George P. Shultz;[12] Arthur Spiegel, III; Mary A. Tolan; and Mark A. Wolfson (collectively referred to as the "Director Defendants" or "Defendants"). (Complaint ¶¶ 9-17.)

## III. APPLICABLE LEGAL STANDARDS

In analyzing a motion to dismiss, a court must accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Sellers v. Boehringer Ingelheim Pharms., Inc.*, No. 3:12-cv-00615-DRH-SCW, 2012 U.S. Dist. LEXIS 102959, at *6 (S.D. Ill. July 25, 2012). Indeed, dismissal of an action is only "warranted if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief." *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Also, in resolving the issue of whether demand is excused, a court "must not rely on any one factor but examine the totality of the circumstances and consider all relevant factors." *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117 (D. N.J. 1990).

## IV. LEGAL ANALYSIS

### A. The Complaint Establishes That Demand Is Excused.

To sustain this derivative shareholder suit at the pleading stage, Plaintiff must adequately allege (1) that it contemporaneously owned Accretive stock at the time of the wrongful acts and continue to own stock through the suit,[13] (2) that it made a demand to the Board for corrective action or that demand was futile, and (3) adequate and particularized facts necessary to support its claims. Fed. R. Civ. Proc. 23.1.

---

12 Notably, Defendant Shultz is a director emeritus of Accretive Health, meaning he does not have voting powers. (Complaint ¶ 14.) Shultz is not a defendant in this action.
13 Defendants have not challenged Plaintiffs' holdings in this Action. Accordingly, this requirement is not at issue here.

Under Delaware law, demand futility must be determined under the standards articulated in either *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), or *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). Under the two-pronged *Aronson* test, which is used when the board considering the demand made the challenged decision(s), demand is excused if the derivative complaint pleads particularized facts creating a reason to doubt that "(1) the majority of the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007) (citing *Aronson*, 473 A.2d at 814). Importantly, the *Aronson* test is disjunctive. Thus, "[i]f a derivative plaintiff can demonstrate a reasonable doubt as to the first **or** second prong of the *Aronson* test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) (emphasis added). Reasonable doubt "is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence." *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996).

In contrast, the *Rales* test applies "where the board that would be considering demand did not make a business decision which is being challenged in the derivative suit." *Rales*, 634 A.2d at 933-34.[14] Under *Rales*, demand is excused if the particularized factual allegations create a reasonable doubt that at least half of the directors could have properly exercised their independent and disinterested business judgment in responding to the demand. *Id.*

Plaintiff initiated this litigation on May 30, 2012. As previously noted, the directors of Accretive at that time were Edgar M. Bronfman, Jr.; J. Michael Cline; Steven

---

14 Such situations arise in three principal scenarios: (1) where a majority of the directors who made the decision have been replaced; (2) where the subject of the suit is not a business decision of the board; and (3) where the challenged decision was made by the board of a different corporation. *Id.* at 934.

N. Kaplan; Stanley N. Logan; Denis J. Nayden; George P. Shultz; Arthur Spiegel, III; Mary A. Tolan; and Mark A. Wolfson. (Complaint at ¶¶ 9-17.) Importantly, demand in this Action is excused under either the *Aronson* or *Rales*[15] because, as alleged, no sound business judgment can be inferred from the alleged series of unethical and illegal events, a majority of the Director Defendants were disabled from considering such a demand because each faced a substantial likelihood of liability, and the directors' interrelationships not only impacted but effectively stripped each director of any claimed independence.

### 1. There Is Reason To Doubt Valid Business Judgment.

The *Aronson* case counsels that in some cases "a transaction may be so egregious on its face that board approval cannot meet the test of business judgment and a substantial likelihood of director liability therefore exists." *Aronson* 473 A.2d 815. If there was ever a situation that met this standard of egregiousness, this is it.

As detailed above, Accretive was not only engaged in, but actively promoting and rewarding, unsound and illegal collection and medical record privacy practices. In this regard, the Board failed to implement proper policies to ensure compliance with these fundamental laws and/or failed to deliver its services in accordance with applicable laws. More troubling, after being informed of egregious violations of positive law,[16] Accretive and the Board failed and refused to correct, and thereby continued to violate, these laws.

---

15 Defendants argue that the *Rales* test is applicable in this case. However, in doing so, Defendants mischaracterize Plaintiff's allegations. In truth, Plaintiff's Complaint alleges the following affirmative acts by the Director Defendants: (1) entering into revenue cycle agreements with Fairview and North Memorial, (2) agreeing to adhere to the Consent Decrees as a third party debt collector of Fairview and North Memorial, (3) implementing and facilitating business practices in direct violation of the terms of the revenue cycle agreements, Consent Decrees, and federal and state law. Thus, because the challenged conduct in this case was the business decision of the Board, the applicable test is the *Aronson* test. Regardless, as demonstrated herein, Plaintiff has demonstrated demand futility under either standard.
16 *See* Oldham Decl., Exs. H-J.

There is no valid business justification for these known violations of HIPAA and consumer protection laws.

### 2. There Is Reason To Doubt That A Majority Of The Board Is Disinterested.

The Complaint raises a reason to doubt that a majority of the Board is disinterested. A director is interested if he or she will be materially, beneficially or adversely impacted by a decision of the board in a manner not shared by the corporation or the shareholders. *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). A substantial likelihood of liability creates a reasonable doubt as to the disinterestedness of a director. *Rales*, 634 A.2d at 936.

In analyzing allegations of demand futility a court "must not rely on any one factor but examine the totality of the circumstances and consider all relevant factors." *In re Cendant Corp.*, 189 F.R.D. 117. Thus, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's disinterestedness, the totality of the plaintiff's allegations in combination may be sufficient to do so.

The Complaint alleges that a majority of the Board faces a substantial likelihood of liability for breaches of their fiduciary duties of loyalty for failure to act in good faith. Under Delaware law, examples of such faithlessness include: "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone v. Ritter*, 911 A.2d 362, 368 (Del. 2006); *see also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d at 1080-82 (finding a strong inference of deliberate recklessness by a majority of the

directors where complaint alleged directors' knowledge of adverse trends in mortgages and board committees were directly responsible for monitoring and company policy to push through improperly underwritten mortgages).

Here, the Complaint establishes a strong inference of deliberate recklessness on the part of all Director Defendants concerning the Company's debt collection practices and failure to comply with health privacy and consumer protection laws. As alleged, Accretive fostered a pressurized collection environment that included mandatory daily meetings at the hospitals. (Complaint ¶¶ 34.) The Company furthered its aggressive corporate culture and bottom-dollar driven policies by rewarding employees with high collection tallies with gift cards, while, at the same time, threatening those employees with low collection rates with termination. (*Id.*) That the Company's aggressive collection practices were known by, and in fact implemented and/or facilitated by Accretive's top management, is evidenced by (1) internal documents demonstrating that complaints by doctors at Fairview that Accretive's "strong-arm tactics" were discouraging patients from seeking lifesaving treatments were dismissed by Accretive officials as "country club talk" (*id.*), and (2) May and December 2011 audit reports prepared by Fairview and received by Accretive that identified numerous violations, by Accretive, of acceptable collection practices and of the Consent Decrees.[17]

Moreover, internal documents further reveal that Accretive's unidentified, staged debt collectors were following scripted dialogues and/or company-wide practices when they were engaged in such tasks as: (1) stalling patients entering the emergency rooms until they had agreed to pay a previous balance, (2) asking patients to make "point of service" payments before they receive treatment, and (3) listing patients with outstanding

---

17 *See* Oldham Decl., Ex. H at pp. 3-5.

balances on "stop lists". (Complaint ¶ 34.) In addition, Accretive's corporate policy improperly armed its debt collectors with sensitive and personal health and financial information of its patients. Indeed, in a May 11, 2012 report to the U.S. Senate, Accretive stated that upon entering into the revenue cycle contract with Fairview, its debt collectors had either full or partial access to Fairview's electronic health record system, called PASS, until early 2012.[18] As such, Accretive did not limit the access of protected health information to the persons in its workforce who needed it to carry out their duties under the respective contracts. Consequently, it is clear that the Board either knowingly permitted private medical information to be used as leverage against Fairview's and North Memorial's patients or consciously disregarded their duties and responsibilities.

Further, while Accretive's governance and reporting structures were designed such that its illegal collection activities necessarily were communicated to the Board (particularly because of the importance ascribed by these activities to the Company[19] and the fact that the Board was responsible for monitoring and ensuring compliance with applicable laws), the Board systematically violated patient's rights and applicable law, notwithstanding public touting to the contrary. (Complaint ¶¶ 21-23, 41.)

What is more, there can be no reasonable dispute that the Company sustained substantial injury as a result of the pattern of misconduct alleged. First, Accretive was forced to hand over the management of operations at Fairview to Fairview leadership, a transfer that Accretive estimates will impact revenue in the range of $62 to $68 million, or approximately 6% of the company's expected 2012 revenue. (Complaint ¶ 31.) Second, Accretive's stock price dramatically fell, declining $4.46 per share or 19%, when

---

18 *See* Oldham Decl., Ex. B at ¶ 47.
19 Indeed, Fairview accounted for over 13% of Accretive's service revenue for the first three quarters of 2011, or over $75 million. *See* Oldham Decl., Ex. B at ¶ 3.

this news was revealed to the public. (Complaint ¶ 32.) Third, Accretive has been forced to expend significant costs in regulatory fines and penalties, investigation costs and legal fees. (Complaint ¶ 30.) Consequently, because the Company's injuries came at the hands of the Director Defendants, a substantial likelihood of director liability exists.

Viewed in totality, these circumstances clearly demonstrate a reasonable doubt that the Director Defendants could have performed their fiduciary duties without being influenced by the strong likelihood of personal liability.

### 3. There Is Reason To Doubt That A Majority Of The Board Is Independent.

The Complaint also raises a reasonable doubt that a majority of the Board is independent. Independence refers to whether "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816; *Rales*, 634 A.2d at 935-37.

A lack of independence has been found where a director holds a position as an employee of the corporation. *Rales*, 634 A.2d at 937.[20] Independence may also be found lacking where familial, business, and employment relationships with an interested director created a reasonable doubt as to the director's independence. *Grace Bros. v. UniHolding Corp.*, No. 17612, 2000 Del. Ch. LEXIS 101, at *32 (Del. Ch. July 12, 2000); *Grimes*, 673 A.2d at 1216 (a "material financial or familial interest" can disable a director from considering a demand) (overruled on other grounds).

Here, Tolan is both a director and an officer of the Company. As an inside director, Tolan is neither disinterested nor independent. (Complaint at ¶ 16 (alleging

---

20 *See also Mizel v. Connelly*, No. 16638, 1999 Del. Ch. LEXIS 157, at *9 (Del. Ch. July 22, 1999); *Beam ex rel Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977-78 (Del. Ch. 2003) (director "Patrick has a material interest in her own continued employment" as an officer of the company), *aff'd*, 845 A.2d 1040 (Del. 2004).

Tolan serves as director, president, and chief executive officer)). Defendants concede as much by arguing that only seven of the eight Accretive Board members are independent. Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss at p. 10.

As to the remaining directors, each is dominated and controlled by Tolan and/or has significant interrelationships with each other such that their discretion was effectively sterilized, thereby making demand futile. In particular, Tolan is co-founder, along with Cline, of Accretive, and serves as Chief Executive Officer and director of the Company. In 2011 and 2012, Tolan individually owned approximately 14% and 13% of Accretive, respectively.[21] At the same time, Cline, Tolan's co-founder who also serves as managing partner of Accretive LLC, individually owned 19.4% and 7.5% of Accretive in 2011 and 2012, respectively.[22] Consequently, Tolan and Cline and the other Director Defendants, save Schultz, collectively owned approximately 46% and 37% of the Company in 2011 and 2012, respectively.[23] Notably as well, Accretive Investors SBIC, L.P., of which Cline is managing member, owned another 19.4% percent of Accretive Health in 2011.[24]

In addition to their professional and financial ties in Accretive and Accretive LLC, directors Cline, Bronfman, Nayden, Wolfson, and Spiegel have significant interactions arising out of other business and employment relationships. For example, Cline and Bronfman both serve as directors at Endeavor Global Incorporated,[25] while Cline and Spiegel both serve as directors at Accolade Incorporated.[26] Similarly, Nayden, as managing partner of Oak Hill Capital Partners since 2003, and Wolfson, as Senior

---

21 *See* Oldham Decl., Ex. C: Company's 2011 Proxy Statement at p. 10, and Ex. D: 2012 Proxy Statement at p. 9.
22 *Id*.
23 *Id*.
24 *See* Oldham Decl., Ex. C at p. 10.
25 *See* Oldham Decl., Ex. E.
26 *See* Oldham Decl., Ex. F.

Advisor to Oak Hill Capital Partners and Managing Partner of Oak Hill Investment Management[27], have intertwined employment and financial interests.[28] Thus, because Tolan dominated and controlled the Company and directors Tolan, Cline, Bronfman, Spiegel, Nayden, and Wolfson have significant business, employment and financial interrelationships, there is sufficient reason to doubt that a majority of the Board could have objectively considering a demand.

**B.  The Complaint States Claims For Breach Of Fiduciary Duty Of Loyalty And For Contribution And Indemnification.**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555. In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Sellers*, 2012 U.S. Dist. LEXIS 102959, at *6.

Count I alleges that Defendants were faithless toward the Company. The Delaware Supreme Court has given the following examples of fiduciary faithlessness: when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable

---

27 Importantly, Oak Hill Investment Management L.P. owns 8,101,774 shares of Accretive Health, or 8.2%. *See* Oldham Decl., Ex. D at p. 9.
28 *See* Oldham Decl., Ex. G.

positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone*, 911 A.2d at 368. All of these examples are implicated in this case.

As discussed above, the Complaint establishes a substantial likelihood of liability on the part of the Director Defendants. Moreover, the Complaint pleads with plausibility that the Defendants acted with a purpose other than advancing the best interests of the Company. The Complaint also pleads with plausibility that the Defendants acted to violate applicable positive law. *See In re Am. Int'l Group, Inc.*, 976 A.2d 872875 (Del. Ch. 2009) ( "[i]t is irrelevant whether that behavior […] was inspired at least in substantial part by a desire to increase the corporation's profits or stock price. Rather, in a situation where faithless fiduciaries cause the corporation to break the law, the corporation should have the chance to recover against the officials who caused the corporation to put its charter at risk, suffer legal penalties, and incur other harm."). Additionally, the Complaint pleads with plausibility that the Defendants failed to act in the face of known duties to act, demonstrating conscious disregard for their duties. As a result, all categories of the Individual Defendants' faithless conduct have caused and will cause damage to the Company. *See* Section IV(A)(1), *supra*.

Count II alleges a claim for contribution and indemnification. Because the Complaint sufficiently states that the Individual Defendants were faithless to the Company, the Court should deny the motion to dismiss Count II.

## V. CONCLUSION

Based on the foregoing, this Court should deny Defendants' Motion to Dismiss.

Dated:  August 17, 2012          Respectfully submitted,

         /s/ Amy E. Keller
         Edward A. Wallace
         Amy E. Keller
         WEXLER WALLACE LLP
         55 West Monroe, Suite 3300
         Chicago, Illinois 60603
         Telephone:  (312) 346-2222
         Fax:  (312) 346-0022
         kaw@wixlerwallace.com
         eaw@wixlerwallace.com
         aek@wixlerwallace.com

         and

         Allen Carney
         Randall K. Pulliam
         CARNEY WILLIAMS BATES PULLIAM
                 & BOWMAN PLLC
         11311 Arcade Dr., Suite 200
         Little Rock, AR 72212
         Telephone: (501) 312-8500
         Fax: (501) 312-8505
         acarney@carneywilliams.com
         rpulliam@carneywilliams.com

         and

         Sam Strange
         HOSTO & BUCHAN, P.L.L.C.
         P.O. Box 3316
         Little Rock, AR 72203
         Telephone: (501) 320-0259
         Fax: (501) 482-0259
         sstrange@hosto.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 17, 2012, I filed the following documents with the Clerk of the Court using CM/ECF.  I also certify that the following documents are being served this day by Notice of Electronic Filing generated by CM/ECF on all counsel of record entitled to receive service.

**OPPOSTION TO DEFEDANT'S MOTION TO DISMISS**
**DECLARATION OF TIFFANY OLDHAM**

                     /s/ Amy E. Keller