*Audit Committee*

The members of our audit committee from January 2011 until April 2011 were Mr. Kaplan (chair) and Mr. Wolfson. In April 2011, Mr. Logan joined our audit committee and replaced Mr. Kaplan as chair. The current members of our audit committee are Messrs. Logan (chair), Kaplan and Wolfson. Our board of directors has determined that each of the members of our audit committee satisfies the requirements for financial literacy under the current requirements of NYSE rules and regulations. Our board of directors has further determined that Mr. Logan is an "audit committee financial expert" as such term is defined in Item 407(d)(5) of Regulation S-K. Our audit committee assists our board of directors in its oversight of our accounting and financial reporting process and the audits of our financial statements. The audit committee met seven times during 2011.

Our audit committee's responsibilities include:

- appointing, evaluating, retaining, terminating the engagement of, setting the compensation of and assessing the independence of our independent registered public accounting firm;

- overseeing the work of our independent registered public accounting firm, including the receipt and consideration of reports from the firm and reviewing with the firm audit problems, internal control issues and other accounting and financial reporting matters;

- coordinating the board's oversight of our internal control over financial reporting, disclosure controls and procedures, code of business conduct and ethics, and internal audit function;

- establishing procedures for the receipt, retention and treatment of accounting related complaints and concerns;

- reviewing and discussing with management and our independent registered public accounting firm our annual and quarterly financial statements and related disclosures;

- periodically meeting separately with our independent registered public accounting firm, management and internal auditors;

- discussing generally the type and presentation of information to be disclosed in our earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others;
- reviewing our policies and procedures for approving and ratifying related person transactions, including our related person transaction policy;

- establishing policies regarding the hiring of employees or former employees of our independent registered public accounting firm;

- discussing our policies with respect to risk assessment and risk management;

- preparing the audit committee report required by SEC rules;

- in coordination with the compensation committee, evaluating our senior financial management; and

- at least annually, evaluating its own performance.

All audit services to be provided to us and all non-audit services, other than de minimis non-audit services, to be provided to us by our independent registered public accounting firm must be approved in advance by our audit committee.

*Compensation Committee*

The members of our compensation committee from January 2011 until April 2011 were Messrs. Nayden (chair), Bronfman, Cline and Spiegel. In April 2011, Mr. Kaplan joined our compensation committee and replaced Mr. Nayden as chair. The current members of our compensation committee are Messrs. Kaplan (chair), Bronfman, Cline, Nayden and Spiegel. Our compensation committee assists our board of directors in the discharge of its responsibilities relating to the compensation of our executive officers. The compensation committee met two times during 2011.

The compensation committee's responsibilities include:

- approving corporate goals and objectives relevant to the compensation of our chief executive officer, evaluating our chief executive officer's performance in light of those goals and objectives and, either as a committee or together with the other independent directors (as directed from time to time by the board of directors), determining and approving our chief executive officer's compensation;

- reviewing in consultation with our chief executive officer, and approving or making recommendations to the board of directors with respect to, compensation of our executive officers (other than our chief executive officer);

- overseeing the evaluation of our senior executives, in consultation with our chief executive officer in the case of all senior executives other than the chief executive officer and in conjunction with the audit committee in the case of our senior financial management;

- reviewing and making recommendations to the board of directors with respect to incentive-compensation and equity-based plans that are subject to board approval;

- administering our equity incentive plans, including the authority to delegate to one or more of our executive officers the power to grant options or other stock awards to employees who are not directors or executive officers of our company, but only if consistent with the requirements of the applicable plan and law;
- reviewing and making recommendations to the board of directors with respect to director compensation;

- reviewing and discussing with management the compensation discussion and analysis required by SEC rules;

- preparing the compensation committee report required by SEC rules; and

- at least annually, evaluating its own performance.

The processes and procedures followed by our compensation committee in considering and determining executive and director compensation are described below under the heading "Executive and Director Compensation Processes."

*Nominating and Corporate Governance Committee*

The members of our nominating and corporate governance committee from January 2011 until April 2011 were Messrs. Shultz (chair), Bronfman and Kaplan. In April 2011, Mr. Cline joined our nominating and corporate governance committee and Mr. Bronfman replaced Mr. Shultz as chair. In September 2011, the Company elected Mr. Shultz to serve as director emeritus, and accordingly, Mr. Shultz no longer has the powers or responsibilities of a director of the Company. The current members of our Nominating and Corporate Governance Committee are Messrs. Bronfman (chair), Cline and Kaplan. The nominating and corporate governance committee met one time during 2011.

The nominating and corporate governance committee's responsibilities include:

- recommending to the board of directors the persons to be nominated for election as directors or to fill vacancies on the board of directors, and to be appointed to each of the board's committees;

- applying the criteria for selecting directors approved by the board, and annually reviewing with the board the requisite skills and criteria for new board members as well as the composition of the board of directors as a whole;

- developing and recommending to the board corporate governance guidelines applicable to our company;

- overseeing an annual evaluation of the board of directors;

- at the request of the board of directors, reviewing and making recommendations to the board relating to management succession planning; and

- at least annually, evaluating its own performance.

The processes and procedures followed by the nominating and corporate governance committee in identifying and evaluating director candidates are described above under the heading "Director Nomination Process."

## Communicating with the Directors

The board will give appropriate attention to written communications that are submitted by stockholders, and will respond if and as appropriate. The chairman of the nominating and governance committee, with the assistance of our corporate secretary, is primarily responsible for monitoring communications from stockholders and for providing copies or summaries to the other directors as he or she considers appropriate.

Communications are forwarded to all directors if they relate to important substantive matters and include suggestions or comments that our corporate secretary considers to be important for the directors to know. In general, communications relating to corporate governance and corporate strategy are more likely to be forwarded than communications relating to ordinary business affairs, personal grievances and matters as to which we tend to receive repetitive or duplicative communications.

Stockholders who wish to send communications on any topic to the board of directors should address such communications to Board of Directors, c/o Accretive Health, Inc., 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, Attention: Corporate Secretary.

## Code of Business Conduct and Ethics

Our board of directors has adopted a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code of business conduct and ethics is posted on the Investor Relations section of our website.

## Report of the Audit Committee of the Board of Directors

The audit committee has reviewed our audited financial statements for the fiscal year ended December 31, 2011 and has discussed these financial statements with our management and our independent registered public accounting firm.

The audit committee has also received from, and discussed with, our registered public accounting firm various communications that our registered public accounting firm is required to provide to the audit committee, including the matters required to be discussed by the Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the Public Company Accounting Oversight Board (the "PCAOB") in Rule 3200T.

Our independent registered public accounting firm also provided the audit committee with the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent auditor's communication with the audit committee concerning independence. The audit committee has discussed with the registered public accounting firm their independence from our company.

Based on its discussions with management and the registered public accounting firm, and its review of the representations and information provided by management and the registered public accounting firm, the audit committee recommended to our board of directors that the audited financial statements be included in our Annual Report on Form 10-K for the year ended December 31, 2011, which we filed with the SEC on February 29, 2012.

By the Audit Committee of the Board of Directors of Accretive Health, Inc.

Stanley N. Logan (chair)
Steven N. Kaplan
Mark A. Wolfson

## DIRECTOR COMPENSATION

Prior to our initial public offering, we did not pay compensation to any director for his or her service as a director. However, non-employee directors were reimbursed for reasonable travel and other expenses incurred in connection with attending our board and committee meetings. Prior to January 1, 2009, we granted restricted stock and options to purchase shares of our common stock to our non-employee directors who were not affiliated with our 5% stockholders. Ms. Tolan has never received any compensation in connection with her service as a director.

*Cash Compensation.* We pay each non-employee director a $60,000 annual retainer. The chairs of the board of directors and the audit committee receive an additional annual retainer of $20,000, and the chairs of the compensation committee and the nominating and corporate governance committee receive an additional annual retainer of $10,000. There are no additional fees for attending board or board committee meetings. Cash fees are paid quarterly in arrears to the non-employee directors who were serving as directors at the end of a quarter.

In lieu of cash fees, non-employee directors may elect to receive fully-vested options to purchase shares of our common stock. Elections must be received by the 75th day of a quarter and apply to all subsequent quarterly cash fees until a new election is received. Such options are granted on the first trading day of each quarter with respect to the fees payable for the preceding quarter, and the exercise price equals the fair market value of the common stock on the date of grant. The number of shares subject to such options is calculated by dividing the dollar amount of the cash fees for the quarter by the Black-Scholes option value we used for purposes of determining the share-based compensation expense that we recognized for financial statement reporting purposes in that quarter.

*Stock Options.* Unless a different arrangement is specifically agreed to, any non-employee director who joins our board in the future will be granted a stock option on the date of such director's first board meeting. The option will have a total Black-Scholes value of $520,000 (based on the target value of $130,000 per year), and the exercise price will equal the fair market value of the common stock on the date of grant. Each such option will vest in four equal annual installments, based on continued service as a director.

The number of shares of common stock subject to the stock option granted to each such non-employee director was selected by our board of directors based on the recommendation of the compensation committee and the input of the independent consulting firm referenced below under the "Competitive Market Data and Use of Compensation Consultants". These option grants reflect the board's view, based on its business judgment and collective experience as well as the input of the independent consulting firm, that the market value for compensation for service as a non-employee is $130,000 per year. These grants also reflect the board's view that a longer term grant provides a better correlation with the interests of stockholders and, as a result, these grants vest over four years based on continued service as a director. On June 3, 2011, in connection with joining the board in April 2011, Mr. Logan was granted a stock option to purchase 43,283 shares of common stock at an exercise price of $23.95 per share (the fair value of our common stock as of such date, as determined by the board of directors). These options vest in four equal annual installments beginning on June 3, 2012.

*Expenses.* We reimburse each non-employee director for ordinary and reasonable expenses incurred in attending board and board committee meetings.

*2011 Director Compensation.* The following table sets forth, for each of our independent directors, information concerning compensation earned or paid for services in all capacities during the fiscal year ended December 31, 2011.

| Name | Fees Earned or Paid in Cash $(1) | Option Awards $(2)(3) | Total $ |
|---|---|---|---|
| Edgar Bronfman, Jr. | 65,000 | 98,354 | 163,354 |
| J. Michael Cline | 80,000 | 98,354 | 178,354 |
| Steven N. Kaplan | 75,000 | 98,354 | 173,354 |
| Stanley N. Logan | 40,000 | 74,960 | 114,960 |
| Denis J. Nayden | 65,000 | 98,354 | 163,354 |
| George P. Shultz(4) | 65,000 | 98,354 | 163,354 |
| Arthur H. Spiegel, III | 60,000 | 98,354 | 158,354 |
| Mark A. Wolfson | 60,000 | 98,354 | 158,354 |

(1)  Each of our independent directors, with the exception of Mr. Logan, elected to receive fully-vested options to purchase shares of our common stock in lieu of his cash retainers.

(2)  Valuation of these option awards is based on the dollar amount of share-based compensation expense that we recognized for financial statement reporting purposes in 2011 computed in accordance with ASC 718. These amounts do not represent the actual amounts paid to or realized by the named director during 2011. The assumptions used by us with respect to the valuation of option awards are the same as those set forth in Note 9 to our financial statements included in our annual report on Form 10-K.

(3)  The aggregate unexercised option awards (whether or not exercisable) outstanding at December 31, 2011, are as follows:

| Name | Aggregate Option Awards Outstanding as of December 31, 2011 |
|---|---|
| Edgar Bronfman, Jr. | 63,198 |
| Michael Cline | 66,269 |
| Steven N. Kaplan | 65,838 |
| Stanley N. Logan | 43,283 |
| Denis J. Nayden | 64,087 |
| George P. Shultz | 64,087 |
| Arthur H. Spiegel, III | 62,768 |
| Mark A. Wolfson | 62,768 |

(4)  In September 2011, the Company elected Mr. Shultz to serve as director emeritus, and accordingly, Mr. Shultz no longer has the powers or responsibilities of a director of the Company. His compensation includes 1,556 option awards for service as a director emeritus in 2011.

## EXECUTIVE COMPENSATION
## COMPENSATION DISCUSSION AND ANALYSIS

This section discusses the principles underlying our executive compensation policies and decisions and the most important factors relevant to an analysis of these policies and decisions. It provides qualitative information regarding the manner and context in which compensation is awarded to and earned by our named executive officers and is intended to place in perspective the data presented in the tables and narrative that follow.

In 2010, our compensation committee performed a thorough review of all elements of our executive compensation program, including the function and design of our annual cash incentive and equity incentive programs. The compensation committee will continue to evaluate the need for revisions to our executive compensation program to ensure it is competitive with the companies with which we compete for superior executive talent.

### Overview of Executive Compensation Process

*Roles of Our Board, Compensation Committee and Chief Executive Officer in Compensation Decisions.* Our compensation committee oversees our executive compensation program, and has done so historically. In this role, the compensation committee has reviewed all compensation decisions relating to our named executive officers and has made recommendations to the board. Our compensation committee has the authority, without approval of the board of directors, to retain and terminate any independent, third-party compensation consultant to assist in the evaluation of executive officer compensation. Our chief executive officer annually reviews the performance of each of our other executive officers, and, based on these reviews, provides recommendations to the committee and the board with respect to salary adjustments, annual cash incentive bonus targets and awards and equity incentive awards. Our compensation committee meets with our chief executive officer annually to discuss and review her recommendations regarding executive compensation for our executive officers, excluding herself. These recommendations are forwarded to the board, which typically meets in executive session to discuss those recommendations and to consider the compensation of the chief executive officer. Our chief executive officer is not present for board or committee discussions regarding her compensation. Our chief executive officer may grant options to employees who are not directors or executive officers of the company and determine the number of shares covered by, and the timing of, option grants. The board has, and it exercises, the ability to materially increase or decrease amounts of compensation payable to our executive officers pursuant to recommendations made by our chief executive officer.

*Considerations Regarding Non-Binding Advisory Proposal on Executive Compensation.* Our stockholders approved the non-binding advisory proposal on the compensation of our named executive officers with a 99.8% favorable vote at our 2011 annual meeting of stockholders. The compensation committee and our management believe this high level of approval provides strong support to our existing executive compensation philosophy, principles and overall program design.

Also at our 2011 annual meeting of stockholders, our stockholders voted to adopt the recommendation of our board of directors to conduct future advisory votes on the compensation of our named executive officers every three years. Accordingly, the next stockholder advisory vote on the compensation of our named executive officers will be held at the 2014 annual meeting of stockholders.

*Competitive Market Data and Use of Compensation Consultants.* In 2010, our compensation committee engaged an independent compensation consulting firm to provide advice regarding our executive compensation

program and general information regarding executive compensation practices in our industry. Although the compensation committee and board consider the compensation consulting firm's advice in considering our executive compensation program, the compensation committee and board ultimately make their own decisions about these matters.

At the compensation committee's request, the independent compensation consulting firm has conducted a number of compensation analyses to provide information regarding competitive pay and practices for executives of technology, business process outsourcing and healthcare services companies comparable to us in terms of revenue and growth rate, and/or which are anticipated to be comparable to us in terms of market capitalization.

In 2010, this peer group, which will be periodically reviewed and updated by the compensation committee, consisted of:

| | | |
|---|---|---|
| Akamai Technologies | Genpact | Metavante (now known as "FIS Global") |
| athenahealth | Global Payments | Nuance Communications |
| Blackboard | HLTH Corp (now known as "WebMD") | Quality Systems |
| Cerner | Huron Consulting | salesforce.com |
| Cognizant Technology Solutions | MAXIMUS | SXC Health Solutions |
| Eclipsys (now known as "Allscripts") | MedAssets | WNS Holdings |

Although the board and compensation committee considers peer group data in determining the competitiveness of executive compensation, to date, they have not benchmarked total executive compensation or most compensation elements against this peer group, and they do not aim to set total compensation, or any compensation element, at a specified level as compared to the companies in our peer group.

**Objectives and Philosophy of Our Executive Compensation Program**

Our primary objective with respect to executive compensation is to attract, retain and motivate highly talented individuals who have the breadth and experience to successfully execute our business strategy. Our executive compensation program is designed to:

- reward the achievement of our annual and long-term operating and strategic goals;

- recognize individual contributions; and

- align the interests of our executives with those of our stockholders by rewarding performance that meets or exceeds established goals, with the ultimate objective of increasing stockholder value.

To achieve these objectives, our executive compensation program ties a portion of each executive's overall compensation to key corporate financial goals, primarily adjusted EBITDA targets, as well as to individual performance. We also provide a portion of our executive compensation in the form of equity incentive awards that vest over time, which we believe helps to retain our named executive officers and aligns their interests with those of our stockholders by allowing them to participate in our long-term performance as reflected in the trading price of shares of our common stock.

**Risk Considerations in our Compensation Program**

We believe that risks arising from our compensation policies and practices for our employees are not reasonably likely to have a material adverse effect on our business. In addition, the compensation committee believes that the mix and design of the components of executive compensation do not encourage management to assume excessive risks.

25

**Elements of our Executive Compensation Program**

The primary elements of our executive compensation program are:

- base salaries;

- annual cash incentive bonuses;

- equity incentive awards; and

- other employee benefits.

Our compensation committee has not adopted any formal or informal policies or guidelines for allocating compensation between these elements.

*Base Salaries.* We use competitive base salary to attract and retain qualified candidates to help us achieve our growth and performance goals. Base salaries are intended to recognize an executive officer's immediate contribution to our organization, as well as his or her experience, knowledge and responsibilities.

From time to time, in its discretion, our compensation committee and board evaluate and adjust executive officer base salary levels based on factors determined to be relevant, including:

- the executive officer's skills and experience;

- the particular importance of the executive officer's position to us;

- the executive officer's individual performance;

- the executive officer's growth in his or her position;

- market level increases;

- base salaries for comparable positions within our company; and

- inflation rates.

In determining base salaries for our named executive officers for 2010, our compensation committee considered the results of a market analysis of the compensation for executives at comparable companies performed by the independent compensation consulting firm retained by the compensation committee. Based on this analysis, the compensation committee determined that a market adjustment was warranted in the compensation of our chief executive officer, and set her 2010 base salary at $700,000 and her 2010 bonus target at $950,000. The compensation committee also elected to increase the 2010 base salaries for Messrs. Gillette, Staton and Kazarian by 2.7% each, reflecting the rate of inflation, to $256,750, $330,000 and $288,850, respectively.

In determining base salaries for our named executive officers for 2011, our compensation committee elected to increase the 2011 base salaries for Ms. Tolan and Messrs. Staton and Kazarian by 1.5% each, reflecting the rate of inflation, to $710,500, $334,950 and $293,183, respectively. Mr. Gillette's 2011 base salary was increased to $300,000 to adjust his pay to the market level compensation being paid to senior executives with comparable responsibility and experience.

In determining base salaries for our named executive officers for 2012, our compensation committee elected to increase the 2012 base salaries for Ms. Tolan and Mr. Appel by 3% each, reflecting the rate of inflation, to $731,815 and $618,000. Additionally, the compensation committee elected to increase the base salaries of Messrs. Staton, Gillette and Kazarian to $400,000, $400,000, and $400,000, respectively, to adjust their pay to the market level compensation being paid to senior executives with comparable responsibility and experience. Our compensation committee made this determination based on market insight gained through our recruitment of several key executive hires over the past year.

*Annual Cash Incentive Bonuses.* We maintain an annual cash incentive bonus program in which each of our named executive officers participates. These annual cash incentive bonuses are intended to compensate our named executive officers for our achievement of corporate financial goals, primarily adjusted EBITDA targets, as well as individual performance in the areas of:

- economic and financial contributions;

- operations;

- customer satisfaction;

- business development; and

- organizational and leadership development.

Our annual cash incentive bonuses have varied from year to year, and we expect that they will continue to vary, depending on actual corporate and individual performance results.

Historically, our board has set our corporate financial goals and our named executive officers' individual cash incentive bonus targets each year in advance and it has worked with our chief executive officer to develop aggressive goals to be achieved by the company and our named executive officers. The goals established by the board have been based on our historical operating results and growth rates, as well as our expected future results, and are designed to require significant effort and operational success on the part of our named executive officers and the company. However, during the course of the year, the board and our compensation committee, based on recommendations of our chief executive officer (with respect to our other named executive officers), may adjust such goals as they deem appropriate.

Each named executive officer's initial target annual bonus is set upon commencement of employment as part of the executive's overall compensation package. The target annual bonus amount is then reviewed and adjusted in each subsequent year, generally so that it is equal to the higher of the executive's prior year actual bonus and his or her prior year target bonus. The updated targets reflect strong growth and performance assumptions which correlate to our annual plans. When these growth and performance expectations are exceeded, bonuses above target can be awarded. These higher performance-based awards, and our continued strong growth and performance expectations, are considered when setting target bonuses for subsequent years. We believe this helps to calibrate incentive compensation with our growth and performance. The board believes that this approach supports our pay-for-performance philosophy and encourages the achievement of growth and performance goals. The board approves actual annual cash incentive bonuses, based on the recommendations of our compensation committee, with input from our chief executive officer in the case of named executive officers other than herself. There are no minimum or maximum payout levels, and our board has broad discretion to make adjustments to the awards.

For each of the years ended December 31, 2009, 2010 and 2011, our corporate financial goals were based on adjusted EBITDA. The corporate financial goals were developed prior to the beginning of the year by management in consultation with the compensation committee, and then reviewed, refined and approved by our board of directors. Our compensation committee believes that adjusted EBITDA is an appropriate measure of our business performance because it emphasizes the addition of new customers and expansion of services with existing customers, as well as improvements in our operating efficiency, and it is reflective of stockholder value creation. In 2009, we met our adjusted EBITDA target of $32.8 million. In 2010, our actual adjusted EBITDA of $45.0 million exceeded our target by $2.5 million. In 2011, our actual adjusted EBITDA of $81.6 million was in the range of our adjusted EBITDA plan.

For the years ended December 31, 2009, 2010 and 2011, each named executive officer's target bonus awards were set as follows:

| Named Executive Officer | Target Annual Cash Incentive Bonus | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | 2009 | 2010 | 2011 |
| Mary A. Tolan | $600,000 | $950,000 | $950,000 |
| John T. Staton | $258,000 | $258,000 | $258,000 |
| Andrew M. Appel | — | — | $200,000 |
| Richard E. Gillette | $196,800 | $197,000 | $244,000 |
| Gregory N. Kazarian | $202,250 | $202,250 | $202,250 |

Although our adjusted EBITDA for the year ended December 31, 2009 exceeded the plan established by our board, it fell short of more aggressive goals established by Ms. Tolan. Therefore, Ms. Tolan's recommendation to the compensation committee and board, which was accepted, was to reduce the bonus pool for 2010 pay-outs. The allocation of bonuses for 2009 among our named executive officers was based on the compensation committee's subjective assessments of individual contributions by our named executive officers in their respective areas of primary responsibility. In making its assessments regarding incentive compensation, the compensation committee considered the following: in the case of Ms. Tolan, her success in driving our growth, increasing our operating margins, recruiting key talent for the organization and identifying new business opportunities; in the case of Mr. Gillette, his contributions in the area of organizational excellence; in the case of Mr. Staton, his contributions to our financial performance, the development of our financial systems and controls and the recruitment and development of our finance team; and in the case of Mr. Kazarian, his oversight of several of our operating sites and his contributions in the area of organizational build-out and development. For our named executive officers other than Ms. Tolan, the compensation committee also considered Ms. Tolan's recommendations regarding incentive compensation and her assessment of each named executive officer's contributions to our performance during 2009. For the actual 2009 amounts that we paid to each named executive officer under our annual cash incentive bonus program, see the Summary Compensation Table below.

Although our adjusted EBITDA for the year ended December 31, 2010 exceeded the plan established by our board, it fell short of internal goals established for the named executive officers. The allocation of bonuses for 2010 among our named executive officers was based on the compensation committee's subjective assessments of individual contributions by our named executive officers in their respective areas of primary responsibility. In making its assessments regarding incentive compensation, the compensation committee considered the following: in the case of Ms. Tolan, her success in driving our growth, increasing our operating margins, recruiting key talent for the organization and identifying new business opportunities; in the case of Mr. Gillette, his contributions in the area of company-wide operational excellence; in the case of Mr. Staton, his contributions to our financial performance, the development of our financial systems and controls and the recruitment and development of our finance team; and in the case of Mr. Kazarian, his oversight of several of our operating sites and his contributions in the area of organizational build-out and development. For our named executive officers other than Ms. Tolan, the compensation committee also considered Ms. Tolan's recommendations regarding incentive compensation and her assessment of each named executive officer's contributions to our performance during 2010. For the actual 2010 amounts that we paid to each named executive officer under our annual cash incentive bonus program, see the Summary Compensation Table below.

Although our adjusted EBITDA for the year ended December 31, 2011 was in the range of the plan established by our board, it fell short of internal goals established for the named executive officers. The allocation of bonuses for 2011 among our named executive officers was based on the compensation committee's subjective assessments of individual contributions by our named executive officers in their respective areas of primary responsibility. In making its assessments regarding incentive compensation, the compensation committee considered the following: in the case of Ms. Tolan, her success in driving our growth, increasing our operating margins, recruiting key talent for the organization and identifying new business opportunities; in the

28

case of Mr. Staton, his contributions to our financial performance, the development of our financial systems and controls and the recruitment and development of our finance team; in the case of Mr. Gillette, his contribution to the company-wide operational excellence; in the case of Mr. Appel, his contribution to the development of potential new service offerings; and in the case of Mr. Kazarian, his oversight of several of our operating sites and his contributions in the area of organizational build-out and development. For our named executive officers other than Ms. Tolan, the compensation committee also considered Ms. Tolan's recommendations regarding incentive compensation and her assessment of each named executive officer's contributions to our performance during 2011. For the actual 2011 amounts that we paid to each named executive officer under our annual cash incentive bonus program, see the Summary Compensation Table below.

The 2012 bonus targets are $950,000 for Ms. Tolan, $300,000 for Mr. Staton, $200,000 for Mr. Appel, $300,000 for Mr. Gillette, and $300,000 for Mr. Kazarian.

Our board uses our unaudited financial results to make financial target performance determinations under our annual cash incentive bonus program, and those results may be adjusted in connection with the preparation of our audited consolidated financial statements. As described above, the purpose of these targets was to establish a method for determining the payment of cash incentive bonuses. You are cautioned not to rely on these performance goals as a prediction of our future performance.

From time to time, we may make special cash bonus awards to our employees, including our named executive officers. In August 2009, we determined to award special cash bonuses of approximately $143,000 to Mr. Staton contemporaneously with the cash dividend we declared on all outstanding capital stock in each of those years. Mr. Staton was not entitled to participate in those cash dividends with respect to his vested but unexercised stock options. However, because Mr. Staton is primarily responsible for our financial management and is deeply involved in helping to achieve our strategic goals, and in light of the connection between Mr. Staton's contributions and our ability to pay these cash dividends, the board determined to award him special cash bonuses in amounts that represented the payments he would have received as cash dividends if he had owned such number of shares equal to the vested portion of his option on the record date for the applicable dividend. As stockholders, our other named executive officers participated directly in these cash dividends and therefore did not receive any special bonus in either year relating to this aspect of our financial performance.

*Equity Incentive Awards.* Our equity incentive award program is the primary vehicle for offering long-term incentives to our named executive officers. To date, equity incentive awards to our named executive officers have been made in the form of restricted stock awards and stock options, and our compensation committee currently intends to continue this practice. Although we do not have any equity ownership guidelines or requirements for our named executive officers, we believe that equity incentive awards:

- provide our named executive officers with a strong link to our long-term performance, including by enhancing their accountability for long-term decision making;

- help balance the short-term orientation of our annual cash incentive bonus program;

- create an ownership culture by aligning the interests of our named executive officers with the creation of value for our stockholders; and

- further our goal of executive retention.

Employees who are considered essential to our long-term success are eligible to receive equity incentive awards, which typically vest over four years. In determining the size of equity incentive awards to named executive officers, our compensation committee generally considers the executive's experience, skills, level and scope of responsibilities and internal comparisons to other comparable positions in our company. As of December 31, 2009, all equity incentive awards granted to our named executive officers had fully vested. Accordingly, in connection with its evaluation of the need for revisions to our executive compensation program, on February 3, 2010 our board of directors, on the recommendation of the compensation committee, granted

stock options to purchase 1,176,000, 450,800, 282,240 and 282,240 shares of our common stock, respectively, to Ms. Tolan and Messrs. Staton, Gillette, and Kazarian. These options have an exercise price equal to $14.71 per share (the fair value of our common stock as of such date, as determined by the board of directors). These options vest in four equal annual installments based on continued employment, and were immediately exercisable, provided that upon exercise the shares issued are subject to the same vesting and repurchase provisions that applied before exercise.

*Other Employee Benefits.* We maintain broad-based benefits that are provided to all employees, including our 401(k) retirement plan, flexible spending accounts, a medical care plan, vacation and standard company holidays. Our named executive officers are eligible to participate in each of these programs on the same terms as non-executive employees; however, we do not provide a matching 401(k) contribution for any of our named executive officers.

We also provide for each of our chief executive officer and chief financial officer supplemental disability income protection that provides income replacement in the event of a qualifying disability.

*Severance and Change of Control Arrangements.* We have an employment agreement with Ms. Tolan, our chief executive officer, that provides a combination of "single trigger" and "double trigger" benefits in connection with a change of control of our company and/or termination of her employment. We believe a combination of "single trigger" and "double trigger" vesting along with severance payments maximizes stockholder value because it limits any unintended windfalls to executives in the event of a friendly change of control, while still providing executives appropriate incentives to cooperate in negotiating any change of control, including a change of control in which they believe they may lose their jobs. We also have an employment agreement with Mr. Staton, our chief financial officer, and offer letters with Messrs. Appel and Kazarian, our senior vice presidents, each of which provides for specified salary continuation, and in the case of Messrs. Staton and Appel, benefits continuation, in the event of specified employment terminations.

See "— Potential Payments upon Termination or Change in Control" and "Employment Agreements" for a more detailed description of these arrangements.

**Deductibility of Executive Compensation**

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction for compensation in excess of $1.0 million paid to our chief executive officer and our four other most highly paid named executive officers, except our chief financial officer. Qualifying performance-based compensation is not subject to the deduction limitation if specified requirements are met. We periodically review the potential consequences of Section 162(m) and we generally intend to structure the performance-based portion of our executive compensation, where feasible, to comply with exemptions in Section 162(m) so that the compensation remains tax deductible to us. However, our board or compensation committee may, in their judgment, authorize compensation payments that are not exempt under Section 162(m) when they believe that such payments are appropriate to attract and retain executive talent.

**Summary Compensation Table**

The following table sets forth information regarding compensation earned by our chief executive officer, our chief financial officer and the three most highly compensated named executive officers (other than our chief executive officer and chief financial officer) who were serving as named executive officers at the end of our fiscal year ended December 31, 2011. We refer to these individuals as our named executive officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Mary A. Tolan . . . . . . . . . . | 2011 | 710,500 | — | — | 2,291,892 | 855,000 | 5,866 | 3,863,258 |
| *Founder, President and* | 2010 | 700,000 | — | — | 1,928,015 | 760,000 | 4,883 | 3,392,898 |
| *Chief Executive Officer(4)* | 2009 | 515,000 | — | — | — | 600,000 | 5,219 | 1,120,219 |
| John T. Staton . . . . . . . . . . | 2011 | 334,950 | — | — | 878,558 | 232,200 | 4,083 | 1,449,791 |
| *Chief Financial Officer* | 2010 | 330,000 | — | — | 739,073 | 206,400 | 3,404 | 1,278,877 |
| *and Treasurer* | 2009 | 321,360 | 143,492 | — | 100,221 | 258,000 | 3,640 | 826,713 |
| Andrew M. Appel(5) . . . . . | 2011 | 295,769 | — | — | 834,403 | 90,000 | — | 1,220,172 |
| *Senior Vice President* | 2010 | — | — | — | — | — | — | — |
| | 2009 | — | — | — | — | — | — | — |
| Richard E. Gillette . . . . . . . | 2011 | 300,000 | — | — | 971,438 | 219,600 | — | 1,491,038 |
| *Senior Vice President* | 2010 | 256,750 | — | — | 637,781 | 244,000 | — | 1,138,531 |
| | 2009 | 250,000 | — | — | 143,127 | 197,000 | — | 590,127 |
| Gregory N. Kazarian . . . . . | 2011 | 293,183 | — | — | 550,054 | 182,025 | — | 1,025,262 |
| *Senior Vice President(6)* | 2010 | 288,850 | — | — | 462,724 | 160,000 | — | 911,574 |
| | 2009 | 281,250 | — | — | — | 202,250 | — | 483,500 |

(1)  Represents the special cash bonus intended to approximate Mr. Staton's participation in our 2009 cash dividends.

(2)  Valuation of these option awards is based on the dollar amount of share-based compensation expense that we recognized for financial statement reporting purposes in 2009, 2010 and 2011 computed in accordance with ASC 718, excluding the impact of estimated forfeitures related to service-based vesting conditions. These amounts do not represent the actual amounts paid to or realized by the named executive officer during 2009, 2010 and 2011. The assumptions used by us with respect to the valuation of option awards are the same as those set forth in Note 9 to our financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2011.

(3)  For Ms. Tolan and Mr. Staton, these amounts represent long-term disability insurance premiums paid by us on behalf of each such named executive officer.

(4)  Ms. Tolan is also a member of our board of directors but does not receive any additional compensation in her capacity as a director.

(5)  Mr. Appel's 2011 bonus payout was pro-rated for the year ended December 31, 2011 because he joined our company in July 2011.

(6)  Mr. Kazarian was also our general counsel and secretary until November 2009.

**Grants of Plan-Based Awards in 2011**

The following table sets forth information for 2011 regarding grants of compensation in the form of plan-based awards made during 2011 to our named executive officers.

| Name | Payouts Under Non-Equity Incentive Plan Awards Target ($)(1)(2) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards ($)(3) |
|---|---|---|---|---|
| Mary A. Tolan | 855,000 | — | — | — |
| John T. Staton | 232,200 | — | — | — |
| Andrew M. Appel | 90,000 | 500,000 | 30.14 | 7,470,950 |
| Richard E. Gillette | 219,600 | 100,000 | 27.08 | 1,384,660 |
| Gregory N. Kazarian | 182,025 | — | — | — |

(1) Annual cash incentive bonuses paid under the annual cash incentive bonus program for 2011 are also disclosed in the "Summary Compensation Table".

(2) There are no minimum or maximum payout levels, and our board has broad discretion to make adjustments to the awards.

(3) Valuation of these option awards is computed in accordance with ASC 718, excluding the impact of estimated forfeitures related to service-based vesting conditions. The assumptions used by us with respect to the valuation of option awards are the same as those set forth in Note 9 to our consolidated financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2011.

**Outstanding Equity Awards at Year End**

The following table sets forth information regarding outstanding stock options held by our named executive officers as of December 31, 2011. None of our named executive officers exercised any stock options and no restricted stock awards held by our named executive officers became vested during 2009, 2010 or 2011.

| Name | Option Awards | | | |
|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date |
| Mary A. Tolan | 1,176,000(1) | — | 14.71 | 2/3/2020 |
| John T. Staton | 781,236(2) | — | 0.77 | 9/1/2015 |
| | 450,800(1) | — | 14.71 | 2/3/2020 |
| Andrew M. Appel | — | 500,000(3) | 30.14 | 8/2/2021 |
| Richard E. Gillette | — | 100,000(3) | 27.08 | 4/4/2021 |
| | 282,240(1) | — | 14.71 | 2/3/2020 |
| | 78,400(1) | — | 4.43 | 10/15/2017 |
| | 78,400(1) | — | 13.02 | 4/1/2019 |
| Gregory N. Kazarian | 282,240(1) | — | 14.71 | 2/3/2020 |

(1) These options vest in four equal annual installments based on continued employment, and were immediately exercisable, provided that upon exercise the shares issued are subject to the same vesting and repurchase provisions that applied before exercise.

(2) This stock option was immediately exercisable upon grant, and as of September 1, 2009, was fully vested.

(3) These options vest in four equal annual installments based on continued employment. None of the options are exercisable before vesting.

**Option Exercises and Stock Vested**

Our named executive officers did not exercise any stock options during 2011. Our named executive officers did not hold any shares of restricted stock during 2011, so no restricted stock held by our named executive officers vested in 2011.

**Potential Payments Upon Termination or Change of Control**

The table below summarizes the potential payments to each of our named executive officers if he or she were to be terminated on December 31, 2011 under the circumstances described in the footnotes below.

| Name | Severance Payments(1) | Medical/Welfare Benefits(2) | Total Benefits |
|---|---|---|---|
| Mary A. Tolan | $710,500(3) | — | $710,500 |
| John T. Staton | $599,994(4) | $18,252(4) | $618,246 |
| Andrew M. Appel | $600,000(1)(5) | $10,355(5) | $610,355 |
| Richard E. Gillette | — | — | — |
| Gregory N. Kazarian | $293,183(5) | — | $293,183 |

(1)  Amounts subject to a reduction for compensation earned by the named executive officer from any new employment during the severance period.
(2)  Calculated based on the estimated cost to us of providing these benefits.
(3)  Represents amounts payable for termination due to death or "disability" or termination without "cause" or for "good reason" pursuant to the employment agreement described below.
(4)  Represents amounts payable for termination without "cause" or for "good reason" pursuant to the employment agreement described below.
(5)  Represents amounts payable for termination without "cause" pursuant to the offer letter described below.

**Employment Agreements**

*Mary A. Tolan.* We entered into an at-will employment agreement with Mary A. Tolan, our president and chief executive officer, effective January 2004. Pursuant to the agreement, Ms. Tolan is entitled to an annual base salary of at least $400,000, subject to adjustment by our board of directors. Ms. Tolan's annual base salary is currently $731,815. Pursuant to the agreement, Ms. Tolan earned a one-time cash performance bonus of $200,000 based on customer procurement during 2004 consistent with our business plan. Pursuant to the agreement, in March 2004, our board of directors granted Ms. Tolan 11,760,000 shares of restricted stock, which vested in equal monthly installments over four years ending November 2007.

If Ms. Tolan's employment is terminated due to her death or "disability", if we terminate Ms. Tolan's employment without "cause" or if Ms. Tolan terminates her employment for "good reason", as those terms are defined in her employment agreement, (1) Ms. Tolan will be entitled to receive her base salary paid in accordance with our payroll practices during the 12 months following such termination, subject to a reduction for any compensation she earns from any new employment during the severance period, and (2) Ms. Tolan's outstanding stock-based awards will continue to vest until the earlier of 12 months following her termination or the end of the applicable award's vesting period. In the event of a "change in control", as such term is defined in her employment agreement, 50% of all unvested shares of Ms. Tolan's stock-based awards will accelerate and vest in full as of the effective date of the "change in control". If Ms. Tolan's employment is terminated without "cause" or if Ms. Tolan terminates her employment for "good reason" within 12 months after a "change in control", the remaining 50% of all unvested shares of Ms. Tolan's stock-based awards will accelerate and vest in full. If Ms. Tolan is terminated for "cause", she has agreed to execute a limited stock power transferring all rights to vote the 11,760,000 shares of restricted stock granted to her pursuant to the employment agreement to a person we designate in our sole discretion. Ms. Tolan's employment agreement restricts her from engaging in activities competitive with us, soliciting our employees and consultants, and diverting business from us for a period of 12 months following her termination.

33

*John T. Staton.* We entered into an at-will employment agreement with John T. Staton, our chief financial officer and treasurer, effective June 2005. Pursuant to the agreement, Mr. Staton is entitled to an annual base salary of at least $300,000, subject to adjustment by our board of directors and our chief executive officer. Mr. Staton's annual base salary is currently $400,000. Mr. Staton is eligible to earn an annual performance bonus of up to $100,000 per year, with the full $100,000 guaranteed for each of his first two years of employment. Pursuant to the agreement, in September 2005, our board of directors granted Mr. Staton an option to purchase 1,173,236 shares of our common stock at an exercise price of $0.77 per share, vesting in equal monthly installments over four years ending September 2009.

If we terminate Mr. Staton's employment without "cause" or if Mr. Staton terminates his employment for "good reason", as those terms are defined in his employment agreement, Mr. Staton will be entitled to receive $33,333 per month during the 18 months following such termination, subject to a reduction for any compensation he earns from any new employment during the severance period. If Mr. Staton's employment is terminated without "cause" or if Mr. Staton terminates his employment for "good reason", Mr. Staton and his family will be entitled to continue to participate in our health insurance plan during the 18 months following termination to the extent of his participation prior to termination, and we will pay the premiums that we paid prior to termination. Mr. Staton's employment agreement restricts him from engaging in activities competitive with us, soliciting our employees and consultants, and diverting business from us for a period of 18 months following his termination.

*Andrew M. Appel.* We entered into an offer letter with Andrew Appel, our senior vice president, in July 2011. Pursuant to the offer letter, Mr. Appel is entitled to an annual base salary of $600,000 with an annual bonus target of $200,000. Mr. Appel's annual base salary is currently $618,000. Pursuant to the offer letter, the board of directors granted Mr. Appel an option to purchase 500,000 shares of our common stock at an exercise price of $30.14 per share, vesting in equal annual installments over four years ending July 2015. If we terminate Mr. Appel's employment without cause, Mr. Appel will be entitled to receive his current monthly base salary and benefits during the 12 months following such termination, subject to mitigation upon re-employment and an obligation to pursue re-employment options with reasonable diligence.

*Richard E. Gillette.* We entered into an offer letter with Richard E. Gillette, our senior vice president, in November 2004. Pursuant to the offer letter, Mr. Gillette is entitled to an annual base salary of $190,000 with an annual bonus target of $60,000. Mr. Gillette's annual base salary is currently $400,000. Pursuant to the offer letter, our board of directors granted Mr. Gillette an option to purchase 352,800 shares of our common stock at an exercise price of $0.29 per share, vesting in equal annual installments over four years ending December 2008.

*Gregory N. Kazarian.* We entered into an offer letter with Gregory N. Kazarian, our senior vice president, in December 2003. Pursuant to the offer letter, Mr. Kazarian is entitled to an annual base salary of $225,000. Mr. Kazarian's annual base salary is currently $400,000. Pursuant to the offer letter, Mr. Kazarian earned a one-time cash performance bonus of $75,000 based on customer procurement, and was entitled to receive an option to purchase shares of our common stock then representing 1.5% of our common stock. In lieu of the option, in June 2004, our board of directors awarded Mr. Kazarian 980,000 shares of our common stock, then representing 1.5% of our common stock, which vested in equal monthly installments over four years ending before January 2008. If we terminate Mr. Kazarian's employment without cause, Mr. Kazarian will be entitled to receive his current monthly base salary during the 12 months following such termination, subject to a reduction for any compensation he earns from any new employment during the severance period.

**Confidentiality and Non-Disclosure Agreements**

As a condition to employment, each named executive officer entered into a confidentiality and non-disclosure agreement with us. Under these agreements, each named executive officer has agreed:

- not to solicit our employees and customers during his or her employment and for a period of 18 months after the termination of employment;

- not to compete with us during his or her employment and for a period of 12 months after the termination of employment;

- to protect our confidential and proprietary information; and

- to assign to us intellectual property developed during the course of his or her employment.

**Compensation Committee Report**

The compensation committee has reviewed and discussed the Compensation Discussion and Analysis included in this proxy statement with the company's management. Based on such review and discussion with management, the compensation committee recommended to the board of directors that the Compensation Discussion and Analysis be included in this proxy statement and incorporated by reference in our Annual Report on Form 10-K for the year ended December 31, 2011.

By the Compensation Committee of the Board of Directors of Accretive Health, Inc.

Steven N. Kaplan (chair)
Edgar Bronfman, Jr.
J. Michael Cline
Denis J. Nayden
Arthur H. Spiegel, III

**Compensation Committee Interlocks and Insider Participation**

From January 2011 until April 2011, the compensation committee consisted of Messrs. Nayden (chair), Bronfman, Cline and Spiegel. In April 2011, Mr. Kaplan joined our compensation committee and replaced Mr. Nayden as chair. None of Messrs. Kaplan (chair), Bronfman, Cline, Nayden and Spiegel has ever been an officer or employee of Accretive Health. No member of the compensation committee had any relationship with us during fiscal 2011 requiring disclosure under Item 404 of Regulation S-K under the Exchange Act.

None of our executive officers serves as a member of the board of directors or compensation committee, or other committee serving an equivalent function, of any entity that has one or more executive officers who serve as members of our board of directors or our compensation committee.

## RELATED PERSON TRANSACTIONS

**Policies and Procedures for Related Person Transactions**

Our board of directors has adopted a written related person transaction policy to set forth policies and procedures for the review and approval or ratification of related person transactions. This policy covers any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships, in which we were or are to be a participant, the amount involved exceeds $120,000, and a related person had or will have a direct or indirect material interest, including, without limitation, purchases of goods or services by or from the related person or entities in which the related person has a material interest, indebtedness, guarantees of indebtedness, and employment by us of a related person. Our related person transaction policy contains exceptions for any transaction or interest that is not considered a related person transaction under SEC rules as in effect from time to time.

Any related person transaction proposed to be entered into by us must be reported to our general counsel and will be reviewed and approved by the audit committee in accordance with the terms of the policy, prior to effectiveness or consummation of the transaction whenever practicable. If our general counsel determines that advance approval of a related person transaction is not practicable under the circumstances, the audit committee will review and, in its discretion, may ratify the related person transaction at the next meeting of the audit committee.

Alternatively, our general counsel may present a related person transaction arising in the time period between meetings of the audit committee to the chair of the audit committee, who will review and may approve the related person transaction, subject to ratification by the audit committee at the next meeting of the audit committee.

In addition, any related person transaction previously approved by the audit committee or otherwise already existing that is ongoing in nature will be reviewed by the audit committee annually to ensure that such related person transaction has been conducted in accordance with the previous approval granted by the audit committee, if any, and that all required disclosures regarding the related person transaction are made.

Transactions involving compensation of executive officers will be reviewed and approved by the compensation committee in the manner specified in the charter of the compensation committee.

A related person transaction reviewed under this policy will be considered approved or ratified if it is authorized by the audit committee in accordance with the standards set forth in the policy after full disclosure of the related person's interests in the transaction. As appropriate for the circumstances, the audit committee will review and consider:

- the related person's interest in the related person transaction;

- the approximate dollar value of the amount involved in the related person transaction;

- the approximate dollar value of the amount of the related person's interest in the transaction without regard to the amount of any profit or loss;

- whether the transaction was undertaken in the ordinary course of business of our company;

- whether the transaction with the related person is proposed to be, or was, entered into on terms no less favorable to us than the terms that could have been reached with an unrelated third party;

- the purpose of, and the potential benefits to us of, the transaction; and

- any other information regarding the related person transaction or the related person in the context of the proposed transaction that would be material to investors in light of the circumstances of the particular transaction.

The audit committee will review all relevant information available to it about the related person transaction. The audit committee may approve or ratify the related person transaction only if the audit committee determines that, under all of the circumstances, the transaction is in, or is not inconsistent with, our best interests. The audit committee may, in its sole discretion, impose such conditions as it deems appropriate on us or the related person in connection with approval of the related person transaction.

Since January 1, 2011, we have engaged in the following transactions with our directors, executive officers and holders of more than 5% of our voting securities, and affiliates of our directors, executive officers and 5% stockholders:

**Transactions with Ascension Health**

In October 2004, Ascension Health became our founding customer. Since then, in exchange for its initial start-up assistance, operational laboratory services and related consulting services relative to the services we were developing, we have issued common stock and granted warrants to Ascension Health, as a result of which Ascension Health holds more than 5% of our voting securities. Ascension Health is the nation's largest Catholic and largest non-profit health system. It is dedicated to its mission of serving all, with special attention to those who are poor and vulnerable. Our work on behalf of Ascension Health is done in compliance with its charity care guidelines and billing and collection policies, which recognize the human dignity of each individual and our

responsibility to treat all patients with respect. A key element of our work for Ascension Health is qualifying patients for charity care and identifying potential payment sources for patients who are uninsured or underinsured. Since January 1, 2011, we have engaged in the following transactions with Ascension Health:

*Customer Relationship.* In October 2004, we and Ascension Health entered into a master services agreement with an initial term through November 1, 2007. In December 2007, we and Ascension Health renewed and extended the agreement through December 31, 2012 pursuant to an amended and restated master services agreement, which will automatically renew for successive one-year terms unless terminated by us or Ascension Health upon 180 days prior written notice.

Pursuant to the amended and restated master services agreement, we provide our revenue cycle service offering to hospitals affiliated with Ascension Health that execute separate managed service contracts with us and thereby become our customers. In rendering our services, we must comply with each hospital's policies and procedures relating to billing, collections, charity care, personnel, risk management, good corporate citizenship and other matters; the ethical and religious directives for Catholic healthcare services; and all applicable federal, state and local laws and regulations. Ascension Health's affiliated hospitals are not obligated to execute a managed service contract with us or to use our services. Each managed service contract with a hospital affiliated with Ascension Health incorporates the provisions of the master services agreement and provides that the hospital will be bound by all amendments, modifications and waivers that we and Ascension Health agree to under the master services agreement. With certain discrete exceptions, we are the exclusive provider of revenue cycle services to the hospitals affiliated with Ascension Health that execute managed service contracts with us. Our managed service contracts with hospitals affiliated with Ascension Health require us to consult with such hospitals before undertaking services for competitors specified by such hospitals in their contracts with us. As a result, before we can begin to provide services to a specified competitor, we are required to inform and discuss the situation with the hospital that specified the competitor but are not required to obtain the consent of such hospital. We do not believe the existence of this consultation obligation has materially impaired our ability to obtain new customers.

The term of each managed service contract with a hospital affiliated with Ascension Health is five years and will automatically renew for successive one-year terms unless terminated by us or Ascension Health upon 210 days prior written notice. By mutual agreement, we and Ascension Health can terminate the managed service contracts between us and hospitals affiliated with Ascension Health upon 180 days prior written notice after the second anniversary of the effective date of the applicable contract. Upon 30 days prior written notice, Ascension Health can terminate the affected portion of any applicable managed service contract if we are unable to provide services to a hospital for 30 days out of any 45-day period due to any cause beyond our reasonable control. We can terminate any applicable managed service contract if a hospital is excluded from participation in the federal Medicare, state Medicaid or other specified federal or state healthcare programs, and Ascension Health can terminate the master services agreement if we are excluded from participation in any such program. A hospital cannot terminate its managed service contract with us but it can determine not to renew its contract with us. All managed service contracts between us and hospitals affiliated with Ascension Health will terminate automatically when the master services agreement between us and Ascension Health terminates or expires.

The amended and restated master services agreement provides, among other things, that:

- we assume full responsibility for the management and cost of the revenue cycle operations of each hospital that executes a managed service contract with us, including the payroll and benefit costs associated with the hospital's employees conducting revenue cycle activities (and who remain hospital employees for all purposes), and the agreements and costs associated with related third-party services;

- we are required to supply, at our cost, a sufficient number of our own employees on each hospital's premises and the technology necessary to implement and manage our services;

37

- each hospital must provide us with the facilities, standard office furnishings and services, pre-existing revenue cycle assets and authority to provide our services;

- in general, each hospital pays us:

- base fees equal to a specified amount, subject to annual increases under an inflation and wage increase formula;

- incentive fees based on achieving agreed-upon benchmarks; and

- management and technology fees;

- our fees are subject to adjustment in the event specified performance milestones are not met, which would result in a reduction of future fees payable to us;

- we are required to offer to Ascension Health's affiliated hospitals fees for our services that are at least as low as the fees we charge any other similarly-situated customer receiving comparable services at comparable volumes;

- we must implement our services and technology at each hospital in a manner that does not cause an unplanned material disruption in the hospital's operations;

- we are required to work to qualify patients for charity care and identify potential payment sources for patients who are uninsured and underinsured;

- we are required to maintain patient and employee satisfaction levels as compared to specified baseline performance measurements;

- a joint review board consisting of an equal number of senior executives from us and Ascension Health oversees the obligations and performance of the parties and hears fee disputes and other disputes, with any unresolved disputes submitted to binding arbitration (provided that hospitals cannot withhold base fees for any reason);

- the parties provide various representations and indemnities (subject to a specified cap) to each other;

- following termination or expiration of the master services agreement or any managed service contract between us and a hospital affiliated with Ascension Health, if requested by Ascension Health, we must:

- provide termination assistance, in return for reasonable compensation, for three months;

- continue to provide our services for up to one year in return for compensation equal to a specified percentage of the then-applicable base fees; and

- provide reasonable assistance to Ascension Health in seeking bids from other parties to provide similar services; and

- following termination or expiration of the agreement, we must grant to the applicable hospitals a license to continue using all software and applications we used to provide our services, in exchange for payments and fees that vary depending on whether the agreement is terminated for cause or for any other reason.

The amended and restated master services agreement may not be terminated by hospitals affiliated with Ascension Health. The agreement may only be terminated by Ascension Health or us in the following circumstances:

- either party may terminate the agreement if the other party materially breaches the agreement and fails to cure the breach in accordance with specified cure provisions; and

38

- Ascension Health may terminate the agreement (1) if we undergo a change in control, (2) if Ascension Health receives an opinion of qualified legal counsel, after consultation with our qualified legal counsel, in which it concludes that the agreement presents a material risk of causing Ascension Health or any affiliated hospital to violate any applicable laws, regulations or rules related to its operations, and that risk cannot be reasonably mitigated by the parties following good faith consultations and consideration of reasonable amendments and modifications to the agreement, or (3) if we become excluded from participation in the federal Medicare, state Medicaid or other specified federal or state healthcare programs, or if we fail to promptly remove from providing services to Ascension Health and its affiliates any of our staff or related entities that become excluded from participation in the federal Medicare, state Medicaid or other specified federal or state healthcare programs.

In 2011, net services revenue from hospitals affiliated with Ascension Health represented 40.8% of our total net services revenue. As of December 31, 2011, we had $33.5 million of accounts receivable from hospitals affiliated with Ascension Health.

*Initial Stock Issuance and Protection Warrant Agreement.* In October and November 2004, we issued 3,537,306 shares of our common stock to Ascension Health, then representing a 5% ownership interest in our company on a fully-diluted basis, and entered into a protection warrant agreement, under which we granted Ascension Health the right to purchase additional shares of our common stock from time to time for $0.003 per share when Ascension Health's ownership interest in our company declines below 5% due to our issuance of additional stock or rights to purchase stock. The protection warrant agreement, and all purchase rights granted thereunder, expired on the closing of our initial public offering. In 2008 and 2009, we granted Ascension Health the right to purchase 91,183 and 136,372 shares of our common stock for $0.003 per share, respectively, pursuant to the protection warrant agreement. No such rights were earned in 2010. In 2008 and 2009, Ascension Health purchased 261,275 and 164,396 shares of our common stock, respectively, from us for $0.003 per share, pursuant to the protection warrant agreement. As of December 31, 2010, there were no protection warrants outstanding and no additional warrant rights may be earned under this agreement.

*Supplemental Warrant Agreement.* Pursuant to a supplemental warrant agreement that became effective in November 2004, Ascension Health had the right to purchase up to 3,537,306 shares of our common stock based upon the achievement of specified milestones relating to its sales and marketing assistance. In May 2007, we amended and restated the supplemental warrant agreement to reduce the number of shares covered by the agreement to 1,749,064 shares. In September 2007, we further amended and restated the supplemental warrant agreement to modify the purchase right milestones. Under the supplemental warrant agreement, the purchase price is equal to the most recent common stock-equivalent price per share paid in a capital raising transaction or, if we have not had a capital raising transaction within the preceding six months, the exercise price of the employee stock options we have most recently granted. Based on Ascension Health's achievement of specified milestones relating to its sales and marketing assistance, Ascension Health earned the right to purchase all 1,749,064 shares under the supplemental warrant agreement. No warrants were earned during year ended December 31, 2011. Ascension Health was issued 615,649 shares of common stock as a result of cashless exercise of outstanding supplemental warrants during the year ended December 31, 2010. The supplemental warrant with respect to 437,264 shares of common stock expired in connection with our initial public offering. As of December 31, 2010, there were no supplemental warrants outstanding; no additional warrant rights may be earned under the Supplemental Warrant Agreement.

## Certain Employment Arrangements

We employ Kyle Hupach, the brother-in-law of Gregory N. Kazarian, our senior vice president, as a director of revenue cycle operations. Mr. Hupach's current annual base salary is $125,100, and he also participates in our standard employee benefits package. In 2011, Mr. Hupach's total compensation, including salary, bonus and the amount of share-based compensation expense that we recognized for financial statement reporting purposes for stock options previously granted to him, was $216,668.

**Registration Rights**

We are a party to a stockholders' agreement with certain of our stockholders, including the following directors, executive officers and holders of more than 5% of our voting securities and their affiliates: Mary A. Tolan, Etienne H. Deffarges, Gregory N. Kazarian, Irrevocable 2009 Kazarian Children's Trust, Irrevocable 2009 Gregory N. Kazarian Trust, John T. Staton Declaration of Trust, Steven N. Kaplan, The Shultz 1989 Family Trust, Kazarian Family, LLC, and Spiegel Family LLC. Pursuant to the stockholders' agreement, we are required to pay all registration fees and expenses, including the reasonable fees and disbursements of one counsel for the participating stockholders, and indemnify each participating stockholder with respect to each registration of registrable shares that is effected. In March 2011 in connection with the public offering of shares of the company by certain selling stockholders of the company, we agreed to provide Ascension Health, Michael E. Zimmerman and his related trusts, The Anne T. and Robert M. Bass Foundation and Knight Foundation, with the indemnification rights set forth in the stockholders' agreement, and each agreed to be bound by the associated obligations, to the extent it was participating in the offering.

**Indemnification**

Our restated certificate of incorporation provides that we will indemnify our directors and officers to the fullest extent permitted by Delaware law. In addition, we have entered into indemnification agreements with each of our directors and executive officers that are broader in scope than the specific indemnification provisions contained in the Delaware General Corporation Law.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires our directors, executive officers and the holders of more than 10% of our common stock to file with the SEC initial reports of ownership of our common stock and other equity securities on a Form 3 and reports of changes in such ownership on a Form 4 or Form 5. Officers, directors and 10% stockholders are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file. To our knowledge, based solely on a review of our records and written representations by the persons required to file these reports, during the year ended December 31, 2011, the reporting persons complied with all Section 16(a) filing requirements.

## STOCKHOLDER PROPOSALS FOR 2013 ANNUAL MEETING

**Stockholder Proposals Included in Proxy Statement**

To be considered for inclusion in the proxy statement relating to our Annual Meeting of Stockholders to be held in 2013, stockholder proposals must be received at our principal executive offices no later than November 30, 2012, which is no less than 120 calendar days before the date our proxy statement was released to stockholders in connection with the prior year's annual meeting of stockholders. If the date of next year's annual meeting is changed by more than 30 days from the anniversary date of this year's annual meeting on May 2, then the deadline is a reasonable time before we begin to print and mail proxy materials. Upon receipt of any such proposal, we will determine whether or not to include such proposal in the proxy statement and proxy in accordance with regulations governing the solicitation of proxies.

**Stockholder Proposals Not Included in Proxy Statement**

We must receive other proposals of stockholders (including director nominations) intended to be presented at the 2013 Annual Meeting of Stockholders but not included in the proxy statement by February 1, 2013, but not before January 2, 2013, which is not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting. However, if the date of the 2013 annual meeting is held before April 12,

2013 or after July 1, 2013, then we must receive the required notice of a proposal or proposed director candidate no earlier than the 120th day prior to the 2013 annual meeting and no later than the close of business on the later of (1) the 90th day prior to the 2013 annual meeting and (2) the 10th day following the date on which notice of the date of the meeting was mailed or public disclosure was made, whichever occurs first. Any proposals we do not receive in accordance with the above standards will not be voted on at the 2013 Annual Meeting. In certain cases, notice may be delivered later if the number of directors to be elected to the board of directors is increased.

Each stockholder's notice for a proposal must be timely given to our corporate secretary at the address of our principal executive offices. Each notice generally is required to set forth as to each matter proposed to be brought before an annual meeting certain information and must meet other requirements specified in our bylaws, as determined by us, including (1) a brief description of the business the stockholder desires to bring before the meeting, (2) the text of the proposal, (3) the reasons for conducting such business at the meeting, (4) the name and address, as they appear on our stock transfer books, of the stockholder proposing such business, (5) the class and number of shares beneficially owned by the stockholder making the proposal, (6) a description of any material interest of such stockholder and the respective affiliates and associates of, or others acting in concert with, such stockholder in such business, (7) a description of all agreements, arrangements or understandings between such stockholder and any other persons in connection with the proposal, (8) a description of all agreements, arrangements or understandings entered into by, or on behalf of, such stockholder to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of, such stockholder with respect to shares of our stock, (9) any other information relating to such stockholder that would be required to be disclosed in a proxy statement or other filings required to be made pursuant to the rules of the SEC, (10) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting and (11) a representation whether the stockholder intends or is part of a group which intends to deliver a proxy statement or form of proxy to holders of at least the percentage of our outstanding capital stock required to approve or adopt the proposal or otherwise to solicit proxies from stockholders in support of such proposal.

For nominations, a stockholder's notice to our corporate secretary generally must set forth information specified in our bylaws, as determined by us, as to each person proposed to be nominated, including (1) the name, age, business address and residence address of such person, (2) the principal occupation or employment of such person, (3) the class and number of our shares which are beneficially owned by such person on the date of such stockholder notice, (4) a description of all direct or indirect compensation and other material monetary agreements, arrangements and understandings during the past three years between such stockholder and each proposed nominee, his or her respective affiliates and associates, or others acting in concert with such nominee(s), (5) any other information concerning such nominee(s) that must be disclosed as to nominees in proxy solicitations pursuant to the rules of the SEC. The notice must also set forth as to the stockholder giving the notice (1) the name and address, as they appear on our transfer books, of such stockholder and of any beneficial owners of our capital stock registered in such stockholder's name and the name and address of other stockholders known by such stockholder to be supporting such nominee(s), (2) the class and number of our shares held of record, beneficially owned or represented by proxy by such stockholder, (3) a description of all arrangements or understandings between such stockholder and any other persons in connection with the nomination, (4) a description of all agreements, arrangements or understandings entered into by, or on behalf of, such stockholder to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of, such stockholder with respect to shares of our stock, (5) any other information relating to such stockholder that would be required to be disclosed in a proxy statement or other filings required to be made pursuant to the rules of the SEC, (6) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to nominate the person(s) named it its notice and (7) a representation whether the stockholder intends or is part of a group which intends to deliver a proxy statement or form of proxy to holders of at least the percentage of our outstanding capital stock required to elect the nominee or otherwise to solicit proxies from stockholders in support of such nomination.

The foregoing time limits also apply to determining whether notice is timely for purposes of rules adopted by the SEC relating to the exercise of discretionary voting authority. These rules are separate from and in addition to the requirements a stockholder must meet to have a proposal included in our proxy statement. In addition, stockholders are required to comply with any applicable requirements of the Exchange Act and the rules and regulations thereunder.

## HOUSEHOLDING OF PROXIES

The SEC has adopted rules that permit companies and intermediaries such as brokers to satisfy delivery requirements for annual reports and proxy statements with respect to two or more stockholders sharing the same address by delivering a single annual report and/or proxy statement addressed to those stockholders. This process, which is commonly referred to as "householding," potentially provides extra convenience for stockholders and cost savings for companies. We and some brokers household annual reports and proxy materials, delivering a single annual report and/or proxy statement to multiple stockholders sharing an address unless contrary instructions have been received from the affected stockholders.

Once you have received notice from your broker or us that they or we will be householding materials to your address, householding will continue until you are notified otherwise or until you revoke your consent. You may request to receive at any time a separate copy of our annual report or proxy statement, by sending a written request to Accretive Health, Inc., 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, Attention: Investor Relations.

If, at any time, you no longer wish to participate in householding and would prefer to receive a separate annual report and/or proxy statement in the future, please notify your broker if your shares are held in a brokerage account or us if you hold registered shares. You can notify us by sending a written request to Accretive Health, Inc., 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, Attention: Investor Relations. If, at any time, you and another stockholder sharing the same address wish to participate in householding and prefer to receive a single copy of our annual report and/or proxy statement, please notify your broker if your shares are held in a brokerage account or us if you hold registered shares. You can notify us by sending a written request to Accretive Health, Inc., 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, Attention: Investor Relations.

## OTHER MATTERS

The board of directors knows of no other matters to be brought before the Annual Meeting. However, if other matters do properly come before the Annual Meeting or any adjournments thereof, the persons named in the proxies will vote upon such matters in accordance with their best judgment.