# EXHIBIT H

## Minnesota Attorney General Lori Swanson's

## Statement to the United States Senate HELP Committee

## May 30, 2012 Field Hearing

### I.    Introduction.

I thank the Senate Committee on Health, Education, Labor & Pensions ("HELP") and Senator Al Franken, for convening this Committee hearing today on the important issue of ensuring patients' access to health care and protecting the privacy of patients' medical information.

### II. The Attorney General and Charitable Organizations.

Charitable health care organizations in Minnesota benefit from tens of millions of dollars annually through exemptions on property taxes, sales taxes, and income taxes and their ability to issue tax-exempt bonds.  The Minnesota Attorney General regulates charitable organizations in the State of Minnesota.  Most hospitals and health care organizations in Minnesota are charitable institutions; as a result, the Minnesota Attorney General's Office has had a strong historical focus on whether Minnesota charitable hospitals and health care organizations operate in a manner consistent with their charitable, tax-exempt status, mission, and duties.

For example, one of the more significant cases in the history of the Minnesota Attorney General's Office involved a compliance examination and report on the Sister Elizabeth Kenny Foundation.  The Sister Kenny Foundation operated a nonprofit hospital in Minnesota to treat and research polio.  Former Minnesota Attorneys General Miles Lord and Walter Mondale commenced a review and issued a report exposing, among other things, that a Chicago-based third party vendor had overcharged and misledthe charitable hospital.  The report eventually

1

ledto prosecutions of certain officers of the vendor and the charitable organization. More recently, the Minnesota Attorney General's Office issued compliance review reports of Allina Health System, Medica Health Plans, HealthPartners, Blue Cross and Blue Shield of Minnesota, and Fairview Health Services. A 2001 Compliance Review of Allina Health System eventually led to the divestiture of Medica Health Plans (an HMO) from its parent organization, Allina, and the removal of directors and officers of the organization.

**III. The 2005 Fairview Compliance Review Report.**

In 2005, the Office conducted a Compliance Review of Fairview Health Services (Fairview). Among other things, the Compliance Review Report found that Fairview had engaged in inappropriate and overly aggressive collection practices. Like other hospitals at the time, it also charged up to three times more for medical treatment to uninsured patients than it charged to insurance companies for the same services. After the Report was published, the Office entered into an agreement with Fairview to modify its billing and collection practices. The agreement required Fairview to adhere to certain collection standards, to develop internal collection and charitable giving policies at the Board of Directors level consistent with the obligations of a charitable organization receiving tax-exempt benefits, and for the Board to annually review the hospital's collection and charity care activities. The agreement requiredFairview to have a zero tolerance policy for abusive, harassing, or oppressive conduct, both by its own employees and by third party vendors engaged in collections activity. The agreement also required Fairview to charge uninsured patients no more than it charged to the insurance company delivering the most revenue to the hospital (e.g. which is typically the insurer that negotiates the lowest prices from the hospital). The agreement was filed as a Consent Decree in Ramsey County District Court. The Consent Decree was renewed in 2007.

2

In 2005 and 2007, North Memorial Health Care ("North Memorial") signed similar Consent Decrees with the Minnesota Attorney General.

### IV. The 2012 Fairview Compliance Review Report; The North Memorial Compliance Review; and the Accretive Health Lawsuit.

In January, 2012, the Office filed a lawsuit against a vendor of Fairview and North Memorial named Accretive Health, Inc., a Chicago-based debt collection management company. The lawsuit relates to violation of patient privacy rights and unlicensed and unlawful debt collection activities. The lawsuit is in its early stages.

The Attorney General's Office also initiated compliance reviews of Fairview and North Memorial to determine, among other things, if they were in compliance with the Ramsey County District Court Consent Decree and if their conduct was otherwise consistent with the duties and responsibilities of a tax-exempt charitable health care organization in the State of Minnesota.

As part of the Compliance Review of Fairview, the Office reviewed over 100,000 pages of documents from Fairview and Accretive. While the Compliance Review of Fairview has been completed, we are still conducting the review of North Memorial. North Memorial entered into a revenue cycle agreement with Accretive in March, 2011.

### V. The 2012 Compliance Review Findings Relating to Accretive's Management Culture.

The Fairview Compliance Review focused on the delegation of management activities by a charitable hospital organization to Accretive, a for-profit company. Fairview paid Accretive approximately $100 million in 2011 to manage the Fairview employees who collect money from patients and insurance companies and to provide certain administrative services such as coding and transcription. Accretive both assumed day-to-day management responsibility over the Fairview employees who performed so-called "revenue cycle" functions and embedded its own

3

employees into Fairview facilities. Through its embedded workforce, Accretive managed the hospital patient registrars.

The Compliance Review Report makes numerous findings. Among them is that Accretive repeatedly ignored the Consent Decree between Fairview and the Minnesota Attorney General.

In April, 2011, about one year after Accretive entered Fairview, an Accretive manager had Accretive collectors sign an acknowledgment that they received a copy of the Consent Decree's requirements. The Accretive manager then said: "Very little of this will drive collector behavior – it's just so we can all say we have it."

The same month, Fairview prepared an "issues log" of problems with Accretive. Among other things, the log noted that Accretive had tried to collect money from patients who were current on their payment plans, referred 6,000 accounts to collections without ever having sent the patient a letter requesting payment, and failed to timely credit 300 patient payments.

The next month, in May, 2011 Fairview published an audit of Accretive's lack of compliance with the Consent Decree. The audit found numerous violations by Accretive, including that the company was not familiar with the Consent Decree and Fairview's charity care policy, did not halt collection efforts when patients asked for more documentation, and did not send itemized statements to patients who requested them. Accretive was copied on the audit.

In September, 2011 Fairview again advised Accretive that it did not comply with the Consent Decree or Fairview's charity care policies, that Accretive targetedpatients in payment plans with collection notices and phone calls, and that Accretive's actions were "resulting in numerous patient complaints and confusion for patients." Fairview told Accretive: "Fairview cannot continue this relationship…."

In December, 2011, Fairview again audited Accretive. The audit showed that Accretive continued to ignore the Consent Decree. The audit noted violations of the Consent Decree, federal debt collection laws, state debt collection laws, and patient privacy laws.

It is apparent from the Compliance Review that: (1) Accretive thought it was above the law, (2) Accretive's management contract unduly incentivized Accretive to ignore the culture, mission, and duties of a charitable hospital organization, and (3) the charitable hospital organization was unable to restrain Accretive.

Because of the limited time allotted for testimony, I will focus on just two areas of the Compliance Review Report:

**1. PATIENTS ARE NOT TOLD THAT THEIR MEDICAL DATA IS BEING ACCESSED IN OTHER COUNTRIES OR BEING USED TO PREDICT THEIR PROFITABILITY.**

Medical privacy is a bedrock principle of the doctor-patient relationship. Over 2,500 years ago, the early Hippocratic Oath for physicians provided: "All that may come to my knowledge in the exercise of my profession...I will keep secret and will never reveal." Patient confidentiality encourages a full and frank exchange of information between patients and their doctors.

The Minnesota Supreme Court has recognized the right to privacy like this:

> "The right to privacy is an integral part of our humanity; one has a public persona, exposed and active, and a private persona, guarded and reserved. The heart of our liberty is choosing which parts of our lives shall become public and which parts we shall hold close."

*Lake v. Walmart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998.)

Accretive's treatment of patient privacy is disturbing. Its own records describe "Common Accretive HIPAA Incidents" to include "[l]aptops, unencrypted emails, too much access."

5

In the fall of 2011 Minnesota newspapers reported that a laptop with patient data was stolen out of a car in the Seven Corners district of Minneapolis. The laptop belonged to an Accretive employee and was left in his rental car. The laptop had patient data on over 23,000 patients of Fairview and North Memorial, as well as data from St. John's Hospital in Detroit, Michigan (part of Ascension Health).

The Compliance Review Report includes a copy of a screen shot provided to a Fairview patient who asked what information about her was on the stolen laptop. The information on the laptop included, among other things, her name, social security number, a numeric score to predict the "complexity" of the patient, a numeric score to predict the probability of an inpatient hospital stay, the dollar amount "allowed" to the patient's provider, whether the patient is in a "frail" condition, and fields to denote whether the patient had any of 22 chronic medical conditions, including bipolar disorder, depression, HIV, or schizophrenia.

Accretive employees embedded at hospital facilities operate largely on laptop computers, some of which are left in the plain sight in cars and some of which were never encrypted. Accretive acknowledges that its laptops often contain "tons of patient health and financial information."

As it turns out, a year before the Accretive employee described above left his laptop(with information on 23,000 Minnesota patients) in the car, another Accretive employee working for Fairview also had a laptop stolen out of his rental car while having dinner at a restaurant. Accretive did not notify Fairview at the time that the laptop had been stolen. Fairview learned of the compliance breach through anonymous tips. Fairview questioned whether the second stolen laptop containing its patient data could have been prevented if Accretive had informed Fairview about the first stolen laptop 13 months earlier.

In February, 2011 Accretive management stated that there had been four "smash and grabs," or computers stolen out of employee cars, in the last three months alone.

On May 11, 2012 Accretive told Senator Franken's office that the company had experienced nine stolen laptops.

It told my office in March, 2012 that it found 32 unencrypted laptops.

The Compliance Review Report documents other troubling findings about how Accretive handles private medical data.

Patients were not told that their patient data is being used and accessed by Accretive.

A Fairview audit from December, 2011 found that Accretive did not properly encrypt emails that contained patients' private information.

Fairview patient health information was accessed and used by Accretive collectors in Kalamazoo, Michigan. It was accessed by Accretive "revenue cycle" employees embedded at Fairview.

Accretive also engaged in extensive "data mining" and "consumer behavior modeling" using patient data. For instance, company indicates that it develops a "Willingness to Pay" score about patients using approximately 140 "data elements" obtained from client hospitals. An email from one company manager stated that the "Willingness to Pay" score containsvarious elements, including patients' religion, gender, and marital status.

Accretive allowed employees at its business office in New Delhi, India to access Fairview patient data. One of Accretive's clients uncovered a password sharing breach in India, according to the company's records.

Patients are not aware that their data was being sent to Accretive offices or that it was accessed out-of-state in Michigan or overseas in India. Patients were not advised that Accretive

7

would use their patient health data for collection purposes, to calculate the likely profitability of their future treatment, or to develop "Willingness to Pay" scores.

Mr. Chairman, the American people deserve better.

2. **ACCRETIVE TURNED THE ATTORNEY GENERAL CONSENT DECREE ON ITS HEAD BY ORCHESTRATING BEDSIDE COLLECTION VISITS IN HOSPITAL EMERGENCY ROOMS AND USING SURPRISE "STOP LISTS" TO COLLECT MONEY FROM MEDICALLY DISTRESSED PATIENTS ON THE MORNING OF THEIR SURGERY.**

An estimated twenty percent of Americans face a life-changing event in the Emergency Room. It is a place where husbands lose wives, wives lose husbands, parents lose children, and children lose parents. It is a place of medical trauma and emotional suffering, both for patients and their families. It is and should be a solemn place.

The Compliance Review Report includes a document prepared by Accretive which identifies how it differentiates itself from other companies. Encapsulating the culture of Accretive, the chart refers to its method as the "Accretive Secret Sauce," saying on the cover page: "Check out our ASS!" and "You've never seen ASS like ours!"

The "Accretive Secret Sauce" concedes that "a typical hospital" does not collect money from patients in the Emergency Room. By contrast, one of Accretive's "Secret Sauce" devices is to place collectors into Emergency Rooms.

Our Compliance Review Report found a culture clash between Accretive's "Secret Sauce" and its self-described "numbers driven culture," on the one hand, and the mission and duties of a charitable hospital, on the other hand. Accretive—which was responsible for day-to-day management of the hospital revenue cycle employees—publicized quotas for how much money hospital registration staff had to collect from patients, publicized who among individual patient registrars was ahead and who was behind in the "race" to collect, incentivized hospital

8

employees to collect more money with prizes and gifts, and promised to dress up as clowns or turkeys or to shave their head if hospital patient registrars met their collection quotas.

The "Secret Sauce" drove a culture of aggressive collections from medically distressed patients. As one Fairview employee said in a 2010 survey finding 40 percent of Fairview staff to be uncomfortable with the collection activity: "As far as the Accretive initiatives, all we really know is that it is about money and how much we can collect."

We have heard from patients who had insurance, but were still asked to take out their credit cards or checkbooks while sufferingon Emergency Room gurneys.

We've heard from patients who were overcharged because the Accretive "Secret Sauce" aimed high and demanded that patients pay too much money.

We've heard from patients who had to fight for refunds.

We've from patients who were surprised to be stoplisted in the early morning hours before their surgery, hit up to pay while weak and suffering before their treatment at a time of medical distress and high angst.

We've heard from patients who received a bedside collection visits in the Emergency Room. Some of these patients were asked to pay money while writhing in pain. Others were asked to pay money while disoriented on pain medication. Most of these patients were on a gurney in various stages of undress. In some cases, the collectors had to bring them their wallet from their pants, and in other cases patients had to haggle over their ability or need to pay the bill.

As noted above, the Ramsey County District Court Consent Decree requires Fairview to have a zero tolerance policy for abusive, harassing, or oppressive collection conduct, whether by its own employees or by third parties engaged in collections activity. When three doctors said in

March, 2011 that the collection activity was generating complaints and turning patients away, a top Accretive executive at Fairview trivialized their concerns as "country club" talk.

Our Office does not enforce the Emergency Medical Treatment and Active Labor Act (EMTALA). We do enforce the charitable organization laws in Minnesota. Accretive's management contract unduly incentivized the company to ignore the culture, mission, and duties of the charitable hospital. It is not consistent with the mission and duties of a charitable hospital organization that receives tax exemptions from the citizens of Minnesota for a management company to orchestrate this type of collection conduct toward Minnesota patients.

Senator, I thank you for hosting this hearing. I am particularly pleased that the hearing was located in St. Paul, where Minnesotans can participate and see their government at work.

10