# EXHIBIT I

# STATE OF MINNESOTA

## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

### Volume 1
**The Accretive Management Contracts**



## LORI SWANSON

### ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME ONE

# THE ACCRETIVE MANAGEMENT CONTRACTS

Executive Summary ......................................................................................................1

I.  Accretive's "Revenue Cycle" Agreement Empowers a Wall Street For-Profit Corporation to "Infuse" Its Employees into Fairview, Usurping Management Control of the Charitable Organization.

    1.1  Fairview Health Services ...............................................................................1

    1.2  Accretive Health, Inc. ...................................................................................2

    1.3  The Revenue Cycle Agreement ("RCA")......................................................3

II.  The Revenue Cycle Agreement Unnecessarily Places at Risk the Assets of a Minnesota Charitable Organization and Places the Interests of Accretive, a For-Profit Company, Ahead of the Mission of Fairview as a Charitable Organization.

    1.4  The Revenue Cycle Agreement Inappropriately Places at Risk Tens of Millions of Dollars of Fairview Assets ...................................................4

    1.5  The Revenue Cycle Agreement Inappropriately Places at Risk Tens of Millions of Minnesota Charitable Dollars by Requiring that Incentive Payments be Advanced to Accretive on a Quarterly Basis Even Though the Parties Have Not Yet Agreed that Accretive Has Earned These Incentive Payments ....................................................6

    1.6  The Revenue Cycle Agreement Undermines the Reciprocity of the State of Minnesota and Its Citizens with Its Charitable Organization by Outsourcing Portions of Its Administration to Another Country............................7

III.  The "Quality Total Cost of Care" Contract Empowers a Wall Street Company to Improperly Assert Control over Fairview's Health Care Delivery.

    1.7  The "Quality Total Cost of Care" Contract and Risk Scoring................................9

    1.8  Accretive May Want to Gain Advantage from Fairview's Business Opportunities and Transfer Them to Ascension Health or Intermountain Health Care ..........................................12

1.9     Accretive Has a Strategy to, by 2015, Reduce Health Care Costs by
        Almost $500 Million as it Relates to Treatment of Fairview Patients...................14

1.10    Charitable Organizations ......................................................................................15

Conclusion ..............................................................................................................................20

# VOLUME ONE

# THE ACCRETIVE MANAGEMENT CONTRACTS

**Executive Summary:** Fairview Health Services is registered as a charitable organization under Chapter 309 of the Minnesota Statutes, and its assets are held in charitable trust under Chapter 501B. The State of Minnesota and its citizens have given Fairview exemption from paying property taxes, income taxes, and sales taxes, and investors who buy its bonds receive tax-exempt status on the dividends. Accretive's management activities jeopardize the mission of Fairview as a charitable organization.

I.     Accretive's "Revenue Cycle" Agreement Empowers a Wall Street For-Profit Corporation to "Infuse" Its Employees into Fairview, Usurping Management Control of the Charitable Organization.

    **1.1.    Fairview Health Services.** Fairview Health Services ("Fairview") owns ten hospitals and directly or indirectly employs 2,500 physicians based at many Fairview-owned clinics, including through Fairview Physician Associates and the University of Minnesota physician group. (Ex. 1.) In 2010, Fairview had revenue of approximately $2.8 billion. (Ex. 2.)

    Fairview is registered as a charitable organization with the Attorney General's Office pursuant to Minnesota Statutes section 303.52 (2010). It is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. Fairview's mission statement is:

> "To improve the health of the communities we serve. We commit our skills and resources to the benefit of the whole person by providing the finest in health care, while addressing the physical, emotional and spiritual needs of individuals and their families. We further pledge to support the research and education efforts of our partner, the University of Minnesota, and its tradition of excellence."

(Ex. 3.)

    On March 29, 2010, Fairview entered into a Revenue Cycle Operations Agreement ("RCA") with Accretive Health, Inc. ("Accretive"). (Ex. 4.) On November 9, 2010, Fairview entered into an Infrastructure Services Agreement with Accretive, which Accretive calls the Quality and Total Cost of Care ("QTCC") agreement. (Ex. 5.)

1

**1.2     Accretive Health, Inc.**  Accretive Health, Inc. was originated by principals of Accretive, LLC, a New York private equity fund, in 2003.  Accretive began principally as a consultant for Ascension Health, a national non-profit health system.  (Ex. 6, p. 11.)  In 2009, the Minnesota Attorney General shut down, directly or indirectly, the activities of three affiliates of Accretive, LLC that engaged in disreputable collections activity:  National Arbitration Forum (an arbitration company based in Minnesota), Axiant (a debt collection agency), and Mann Bracken (the nation's largest debt collection law firm).  (*See, e.g.*, Ex. 7.)  Over the last five years, Accretive Health has rapidly expanded its operations and is now a public company.  (Ex. 6.)

Accretive provides "revenue cycle" management services to hospitals.  Accretive claims in its Annual Report that:

"We are not a traditional outsourcing company focused solely on cost reductions."

(*Id.*, p. 4.)

A review of over 100,000 pages of documents produced by Accretive and Fairview indicates that Accretive is, in essence, an India-outsourced über-collection agency.  Accretive has two offices in India.  (Ex. 8, p. 3.)  A majority of its employees are located in India.  (Ex. 9.)  The work of Accretive's India staff includes insurance authorizations, medical coding, transcription services, cash posting, correspondence, Medicaid eligibility, small balance collections, secondary billing, and posting of late charges.  (Ex. 8, p. 3.)  In management meetings, Accretive states that the function of the India office is to "[l]ower labor factor costs [and] allow for more incremental functions to be performed and lower dollar thresholds to be worked" (as a collection agency).  (*Id.*, p. 4.)  In December, 2011, Accretive prepared an overview of its work, noting that Fairview receives a portion of the 25% in cost savings that are produced from outsourcing or slashing the Fairview workforce.  (Ex. 10, p. 5.)

In late 2010, Accretive announced to its investors that it entered into an "inaugural" "Quality and Total Cost of Care" ("QTCC") contract with Fairview.  (Ex. 11, p. 2.)  The QTCC contract has not been accepted by any other hospital.  Up until the time Fairview hired Accretive to perform QTCC services, Accretive had only performed the über-collections-type revenue cycle functions.

    **1.3**    **The Revenue Cycle Agreement ("RCA").**  Accretive generated approximately $826 million of revenue in 2011.  (Ex. 12, p. 49.)  About 12%, or approximately $100 million, was from the Fairview RCA.  (*Id.*, p. 23.)  Approximately $█ million of the $100 million paid by Fairview is for "round tripped" payroll.  Fairview pays Accretive in advance for the quarterly payroll of Fairview "revenue cycle" employees.  Accretive then repays Fairview its payroll cost before each pay period.  (Page 7 of exhibits to Ex. 4.)

    Accretive describes its role as a managed-service contractor of hospitals in this way:

> "[W]e assume responsibility for the management and cost of the customer's revenue cycle or population health management operations…."

(Ex. 6, p. 19.)

    Pursuant to the RCA, Fairview pays Accretive:

- a base technology fee of $█ million per year, which increases each year thereafter, up to $█ million per year.  (Page 17 of exhibits to Ex. 4.)

- ███████ of the "dormant receivables" (*e.g.*, patient bills older than one year) collected.  (Page 20 of exhibits to Ex. 4.)

- a fee for Accretive's Physician Advisory Service (PAS), which consults with physicians regarding the characterization of treatment.  (Pages 19-20 of exhibits to Ex. 4.)

- savings realized from reduced payroll and expenditures.  Fairview pays an annual base fee (prepaid on a quarterly basis), which is equivalent to Fairview's baseline expenditures for revenue cycle operations, such as costs related to labor, technology, and third-party services.  (Page 21 of the exhibits to Ex. 4.)  Accretive takes control of these functions, and earns █% of any reduction in payroll and

██ % of any reduction in expenditures. (*Id*.) This total base fee is about $ ██ million, of which approximately $ ██ million is payroll.

Accretive told its investors that it would receive over $100 million from Fairview in 2011 from just the RCA. (Ex. 12, p. 23.)

Under the RCA, Fairview delegates to Accretive the authority to manage all day-to-day aspects of the revenue cycle operations, going so far as to execute a power of attorney to fully empower Accretive to make billing decisions for the hospital as it relates to Medicaid, Medicare, and third-party insurers. (Page 6 of exhibits to Ex. 4.) Accretive emphasizes in its financial reports that it directs the work of its client hospitals' "revenue cycle [operations] teams." (Ex. 6, pp. 11-12.) For example, Fairview delegates management authority to Accretive as it relates to patient scheduling, preregistration, eligibility verification, patient registration, authorization, admitting, coding, transcription, medical record retention, chart analysis, billing, secondary billing, underpayment review, denial management, third-party collections, collection of dormant receivables, lost charge capture, and analytical support. (Pages 1, 7 of exhibits to Ex. 4.) Accretive also manages clinical documentation, patient records, insurance, benefit verification, medical records documentation, and billing follow-up. (*Id*.)

The RCA recognizes that the contract poses regulatory risks. The RCA may be terminated if a nationally recognized law firm determines that its continuation would violate any laws or regulations, or jeopardize the hospital's non-profit status. (Ex. 4, p. 21.)

**II.     The Revenue Cycle Agreement Unnecessarily Places at Risk the Assets of a Minnesota Charitable Organization and Place the Interests of Accretive, a For-Profit Company, Ahead of the Mission of Fairview as a Charitable Organization.**

**1.4     The Revenue Cycle Agreement Inappropriately Places at Risk Tens of Millions of Dollars of Fairview Assets.**  The RCA requires Fairview to pay its base fees on a

quarterly basis. (Ex. 4, p. 6.) As noted above, the base fees include "round tripped" payroll of the hospital. In Fairview's case, Accretive has stated that the annual base fee is approximately $██ million, of which about $██ million, or ██%, is "round tripped" payroll. The quarterly payment is made at the beginning of the quarter. (*Id.*) This means that Fairview prepays approximately $██ million in advance to Accretive, of which about $██ million is for Fairview's payroll.

Thus, if Accretive files for bankruptcy, becomes insolvent, or has a regulatory or civil lien filed against its assets, the hospitals may place at risk tens of millions of dollars.

Under the terms of the "round trip" payroll provision between Accretive and Fairview, the charitable organization entrusts up to $██ million each quarter in advance payroll costs. Accretive appears not to deposit these funds in an escrow or trust account. Rather, it appears that Accretive simply records the base fees as deferred income. (Ex. 6, p. F-8, n. 2.)

As a matter of prudent business practice, employers who advance payroll, as sometimes occurs in the employee leasing industry, generally require the advance payments to be deposited in an escrow or trust account in order to be secure from creditors.

Accretive has RCAs with over 60 hospitals. (Ex. 6, p. 4.) Fairview represents about twelve percent of Accretive's 2011 revenue, according to its 2011 Annual Report. (Ex. 12, p. 23.) Assuming that Accretive has revenue cycle relationships with the other 60 hospitals that are similar to Fairview, and Fairview's "round tripped" advance fees are paid by the other hospitals, it is conceivable that Accretive has custody of up to $150 million in advanced fees (for payroll) from charitable organizations at the beginning of each quarter. It appears that this money is not deposited in an escrow or trust account, and there is an issue of how much of this prepayment is identified as a liability on Accretive's balance sheet. (Ex. 12.)

Simply put, the RCA entered into with Accretive by Fairview appears to unnecessarily put at risk significant assets of a large Minnesota charitable organization.

**1.5     The Revenue Cycle Agreement Inappropriately Places at Risk Tens of Millions of Minnesota Charitable Dollars by Requiring that Incentive Payments be Advanced to Accretive on a Quarterly Basis Even Though the Parties Have Not Yet Agreed that Accretive Has Earned These Incentive Payments.**     The RCA also requires Fairview to pay an incentive fee (called a "gain-sharing fee") to Accretive each quarter, before the fee is even earned.  (Pages 13-16 of exhibits to Ex. 4.)  Fairview must pay an advance incentive fee, or bonus, of $█ million in each quarter during the first year of operation, which increases to $█ million per quarter in the third contract year.   (Page 16 of exhibits to Ex. 4.)   The pre-pay amounts were apparently based on what Accretive alleges to be its historical performance with other hospitals.

The RCA also provide that, at the end of each contract year, Fairview and Accretive will "true-up" the incentive fees for the year.  (Pages 15-16 of exhibits to Ex. 4.)  That is, the parties will analyze Accretive's actual performance to ensure that Accretive has actually earned the pre-paid incentive payments.  By the time the Fairview RCA was entering its third year, it did not appear that Accretive had yet attempted to "true-up" the incentive fees.   Rather, Accretive appears to simply accept the quarterly advance bonuses and deposit them in its general accounts.

Fairview has noted that Accretive has been paid $█ million in gain share fees (bonuses). Fairview has questioned whether Accretive's performance under the RCA has resulted in any gain-share.  Accretive disputes this and believes that it has earned the gain-share fees.

A footnote to Accretive's Annual Statement indicates that incentive fees are not recognized as revenue unless the parties agree to the amount of the gain-share. (Ex. 6, pp. F-8-9,

n. 2.)  Even though Fairview has not yet agreed that Accretive earned the incentive payments, Accretive's financial statements (Ex. 12, p. 49) do not appear to make reference to "reserving" the $█ million in advance gain share fees paid by Fairview.  Assuming that the other hospitals have similar arrangements and incentive pre-payments, the accounts payable of Accretive for pre-paid gain share fees could be as high as $150 million.  There does not appear to be a reference to such a category on Accretive's 2011 financial statements.

A charitable organization should not put millions of dollars of charitable assets at risk by pre-paying advance bonuses to a for-profit company, particularly when it questions whether the fees have been earned.

**1.6     The Revenue Cycle Agreement Undermines the Reciprocity of the State of Minnesota and Its Citizens with Its Charitable Organization by Outsourcing Portions of Its Administration to Another Country.**  Under the RCA, Accretive has the authority to control and direct the activities of the hospital employees.  (Ex. 4, p. 5.)  As stated in Accretive's financial reports:  "We have the right to control and direct the work activities of the[] staff persons and are responsible for paying their compensation out of the base fees…."  (Ex. 12, p. 22.)  Accretive acknowledges its control over management of the Fairview functions as follows:

> "We refer to our management and staff employees that we devote on-site to customer operations as infused management."

> "Under our contracts with customers, we directly manage our customers' employees engaged in the activities we have contracted to manage for our customers."

(*Id*., pp. 42, 26.)

Accretive may fire or reassign a hospital employee, determine whether a departing employee will be replaced, and determine if her pay is increased.  (Ex. 4, p. 5.)  Accretive has the

authority to hire Fairview employees and to promote them. (*Id.*) The only restriction (required by personnel laws) is that the hospital must give its approval. (*Id.*)

Accretive is aware that this arrangement exposes Fairview to considerable regulatory review. In its security prospectus, Accretive acknowledges:

> "Under our contracts…we directly manage our customers' employees engaged in revenue cycle activities. Our management service contracts establish the division of responsibilities between us and our customers for various personnel management matters, including compliance with and liability under various employment laws and regulations. We could…have liability…under various employment laws and regulations…."

(Ex. 14, p. 15.)

Accretive's control over Fairview is breathtaking. For instance, in 2011, Accretive advised Fairview that it would charge an additional $3 million in base fees because Fairview did not obtain prior approval to hire more than 20 mental health and home and other health care employees. (Ex. 15.)

Accretive's control over Fairview personnel appears to be one of the most significant profit centers for Accretive. Accretive earns profits in part by down-sizing Fairview staff and by out-sourcing work to Accretive's operations in India. Over one-half of Accretive's employees are in India. (Ex. 9.) Accretive's India staff appears to be the fastest growing segment in the company. (*Id.*) For various hospitals, Accretive staff in India perform medical transcription, medical coding, medical billing, and pre-registration of patients; obtain insurance pre-approvals; calculate deductibles, co-pays, and patient shares of bills; register patients; maintain accounts receivable; conduct underpayment analytics (collections); audit; and develop software and perform other analytics. (Ex. 13.) Accretive notes in its Annual Report that:

- "[W]e are able to reduce operating costs further by transferring selected internal operations to our centralized shared services centers located in the United States and India." (Ex. 6, p. 8.)

8

- "Any slowdown or reversal of existing industry trends towards offshore outsourcing would increase the cost of delivering our services if we had to relocate aspects of our services from India to the United States where operating costs are higher." (*Id.*, p. 36.)

As a for-profit, private corporation, Accretive may boost its stock value by off-shoring jobs to India. It is troubling, however, for Accretive to do so with the assets of a Minnesota charitable organization. As discussed in Section 1.10, Minnesota taxpayers significantly subsidize charitable organizations by paying their share of property taxes, sales taxes, and income taxes. Minnesota taxpayers also subsidize the tax-exempt status of the bonds which fund a hospital's capital infrastructure. The effect of the Accretive RCA is that Minnesota taxpayers end up subsidizing a for-profit corporation that makes substantial sums of money by reducing Minnesota employment, including by outsourcing it to India. This does not seem consistent with the mission of a Minnesota charitable organization.

## III. The "Quality and Total Cost of Care" Contract Empowers a Wall Street Company to Improperly Assert Control over Fairview's Health Care Delivery.

As set forth below, Accretive, a for-profit company whose executives appear to mostly be business types without training in the healing arts, entered into a "cost of care" contract with Fairview to profit from cutbacks to health care and potentially the corporate opportunities of Fairview.

**1.7    The "Quality and Total Cost of Care" Contract and Risk Scoring.**   On November 11, 2010, Accretive heavily touted to its investors that it entered an "inaugural" contract with Fairview relating to the "Quality and Total Cost of Care." (Ex. 11, p. 2.) No other hospital anywhere in the country has entered into a QTCC contract with Accretive. Under the QTCC contract, Accretive works with Fairview to negotiate contracts with HMOs and insurance companies. (Ex. 5, pp. 7-9.) Pursuant to the terms of the QTCC contract, under these negotiated

managed-care agreements, Fairview receives incentive pay of █% of all cost reductions in treatment from the prior year.  The insurer or HMO, in turn, keeps █% of the cost reductions. Fairview divides up its █%, with █% going to Accretive, █% to Fairview, and █% to the physicians.  (Ex. 16, p. 5.)

The history of the QTCC program is brief.  One of the earliest conferences between Accretive and Fairview regarding the QTCC contract occurred on December 9, 2009.  (Ex. 17.) The meeting notes indicate that the participants concluded that non-profit health systems like Fairview are hesitant to talk about "cost savings" because of concern that it affects quality.  (*Id.*, p. 1.)  The attendees accordingly determined that on any occasion that Accretive brings up "cost savings," it must also use the term "quality":

> "*At all times, in both discussions and written materials, quality and cost should be linked and any discussion of cost should always be conjoined with quality.*"

(*Id.*, p. 1, emphasis in original.)

From this discussion, the name of the program was created:  "Quality and Total Cost of Care."  The attendees primarily discussed whether AccretiveQ, a computer program prepared by Accretive to analyze patient data, could assist physicians to manage health care costs.  (*Id.*, pp. 3-4.)  The attendees discussed how AccretiveQ could assess the problem of "*patient leakage*," or the referral by Fairview-affiliated physicians of patients to specialists outside Fairview's network.  (*Id.*, p. 5.)  After the meeting, it was concluded that there was division between the University of Minnesota physicians and the Fairview physicians and that AccretiveQ might be able to contain the "leakage."  (*Id.*, p. 8.)

By March 11, 2010, the national debate on the Patient Protection and Affordable Care Act highlighted the concept of hospital-based "Accountable Care Organizations."  (Ex. 18, p. 8.) With this debate as a backdrop, Accretive presented AccretiveQ to Fairview as the infrastructure

of an Accountable Care Organization, or ACO. (*Id*., p. 13.) The ACO would have the goal of reducing emergency care usage, increasing formulary care compliance, providing incentives for alternative care, and keeping treatment inside the Fairview provider network. (*Id*., pp. 14-15.) Accretive represented to Fairview that its analytics would apply a *Six Sigma* approach to processing data to analyze the scheduling, treatment, and referral data of physicians and patients. (*Id*., p. 22.) The administration of the analytics would be undertaken by Accretive. (*Id*.)

Accretive continued to refine its presentation to Fairview about the purpose of the QTCC. For instance, it represented that AccretiveQ develops "risk scores" on individual patients and develops or manages health risk assessments, automated care plans, care and pharmacy management, and duration of hospital stays. (Ex. 19, pp. 6-8.) The "risk score" is developed by feeding the patient's health data into a computer program that purportedly predicts each patient's risk, or cost of care, for the year. (*Id*., p. 9.) An average patient is assigned a risk score of 1.0. (*Id*.) A higher risk patient is assigned a risk score above 1.0, and a lower risk patient is assigned a risk score below 1.0. (*Id*., p. 6.) The computer model is supposed to identify "high priority" patients, who Accretive states are the sickest 5% of the population that cause 50% of the costs. (*Id*., p. 7; Ex. 26.)

Accretive also planned for its "risk modeling" management system to address "patient leakage" and measure the efficiency of each Fairview primary care physician ("PCP"). (Ex. 19, pp. 3-6.) PCPs—such as family practitioners, internists, pediatricians, and OB/GYNS—would be measured by the "efficiency" of their referrals to specialists in and out of the Fairview network. Their rankings would be modified by the risk score of each patient treated by the PCP. (*Id*., p. 5.) In the end, the "efficiency" of the PCP would define the outcome of any "gain-share" to be paid to the PCP.

While a risk modeling score may seem benign in the abstract, the application of the system has troubling implications.  In July of 2011, an Accretive employee had a laptop stolen with data on over 23,000 Minnesota patients.  There was detailed information about patients' diagnostics and treatment costs.  The screen shot below was provided to a Fairview patient after she demanded to know what information was disclosed about her:

| First Name | Last Name | Mid. Initial | HMO ID | Patient ID | Group Number | Subscriber Number | Dependent Code | Gender | Date of Birth |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | 0 | ▮ | ▮ |

| Age | Months Enrolled | Active Last Day | Address 1 | Address 2 | City | State | Zip Code | Phone Number | Attributed TIN |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | 12 | Yes | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

| Attributed Clinic | Attributed Provider | Provider (Short) | Predicted Complexity | Total Provider Allowed | Probability of IP Stay | Frail Condition | # Hospital Dominant Conditions | # Chronic Conditions | Macular Degeneration |
|---|---|---|---|---|---|---|---|---|---|
| FAIRVIEW ▮ | ▮ | ▮ | 2.287 | $4,984.90 | 0.06 | No | 0 | 4 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | COPD | Renal Failure | Low Back Pain |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | | Good | -- | | Good | | Good | |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | Predicted Complexity (SORTED) | Total Provider Allowed | Probability of IP Stay |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | | | | | | 1600 | 2136 | 1206 |

| # Hospital Dominant Conditions | # Chronic Conditions | Top - Complexity | Top - Allowed Amt | Top - Both Complexity & Allowed Amount | Top - Either Complexity & Allowed Amount |
|---|---|---|---|---|---|
| 243 | 366 | 0 | 0 | 0 | 0 |

The screen shot indicates that the patient has four chronic conditions, including diabetes, a seizure disorder, bipolar disorder, and a metabolic disorder.  It indicates that she has a complexity score of 2.287, a probability of an inpatient stay of 0.6, and that the total "allowed" to the provider is $4,984.90.

## 1.8 Accretive May Want to Gain Advantage from Fairview's Business Opportunities and Transfer Them to ▮▮▮▮▮▮.  On

October 21, 2010, Fairview agreed to sign the QTCC contract, becoming Accretive's "inaugural" QTCC client. (Ex. 5.)

Within two weeks, on November 2, 2010, Accretive's Board of Directors was told that Accretive would receive a $██ million annual administrative fee, plus ██% of the cost savings attributed to the QTCC contract. (Ex. 20, p. 3.) The Accretive Board was told that the QTCC contract would reduce Fairview treatment costs by $██ million in 2011, and that Accretive would receive ██% of the savings, or $██ million, in addition to the $██ million base fee. (*Id.*, p. 5.)

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

**1.9     Accretive Has a Strategy to, by 2015, Reduce Health Care Costs by Almost $500 Million as it Relates to Treatment of Fairview Patients.**  On January 18, 2011, the QTCC program was presented to Fairview as a means to have "shared distribution" savings, where physicians (Ex. 22, p. 8) and patients (*id.*, p. 7) are individually and collectively measured on treatment utilization.  Any cost savings would then be divided among the physicians, with a 5% reduction in treatment costs resulting in a distribution to each provider of approximately $26,000 (*id.*, p. 15), or ultimately, $60,000.  (*Id.*, p. 16.)  If a 20% savings were attained on a system-wide basis, the distribution to each provider would vary between $94,000 and $241,000. (*Id.*, pp. 15-16.)

Accretive projected a potential reduction of $482 million in treatment costs at Fairview by 2015, of which Accretive would receive $██ million.  (Ex. 20, p. 6.)  Accretive CEO Mary Tolan claimed at an investor conference in August of 2011 that Accretive's QTCC program will reduce health care treatment costs by 25% over a three-year period.  (Ex. 23, p. 4.)  In August of 2011, Accretive advised the Fairview physicians that the target for reduced treatment costs is 10% for 2011.  (Ex. 16, p. 9.)

Accretive has alternatively described various measures that would be taken to reduce heath care treatment costs:

- On February 9, 2012, Accretive prepared a major QTCC initiative to reduce Emergency Room admissions by 20%.  (Ex. 24, p. 8.)  The reduction would be made by distributing a registry of "frequent flyer"

14

patients by name and thereafter devising a protocol that "improve[s] care planning" for the frequent flyer patients. (*Id.*)

- On November 29, 2010, it was claimed that patients who called for physician appointments would be offered a telephone consultation with a nurse practitioner. (Ex. 25.)

- On May 4, 2011, an Accretive memorandum states that Accretive would identify the 5% of the population that consumes 50% of the health care and then target efforts on that population to reduce health care costs. (Ex. 26.)

- On August 10, 2011, Mary Tolan, the CEO of Accretive, told Wall Street investors that Accretive has reduced re-admission rates at Fairview by 30% and that total charges were reduced by 8%. (Ex. 23, p. 11.)

While it appears that Accretive's QTCC program has not yielded any profits to Accretive,[1] Accretive's Board was told that the company would receive $▮ million per year from Fairview to maintain the project. (Ex. 20, p. 3.) Similarly, in its 2011 Annual Report, Accretive told Wall Street that it expected to make $60 million per year off the Fairview QTCC contract, including up to $10 million in base fees. (Ex. 12, p. 41.)

Fairview may terminate the QTCC contract for any number of reasons. For example, Fairview may terminate the QTCC contract if a national law firm opines that the contract would violate any laws or regulations or would jeopardize Fairview's nonprofit tax-exempt status. (Ex. 5, pp. 25-26.) Fairview may also terminate the QTCC agreement if Accretive is sanctioned or under investigation by a government agency for material violations of law that would impact Fairview's reputation. (*Id.*, p. 25.)

**1.10    Charitable Organizations.**  Fairview is a 501(c)(3) tax-exempt public charity and is registered with the Minnesota Attorney General as a charitable organization under Minnesota Statutes section 309.52. Fairview has benefited from significant tax exemptions from

---

[1] *See, e.g.*, Accretive Q4 2011 Earnings Conference Call, p. 10.

the State of Minnesota and its citizens. Fairview does not pay income taxes (Minn. Const. Art. X, § 1), property taxes (Minn. Stat. § 272.02, subd. 7), or sales taxes on its purchases (Minn. Stat. § 397A.70, subd. 7). Fairview does not pay federal income tax and donations to it are tax-deductible. 26 U.S.C. § 501(a) and (c); 26 U.S.C. § 170. Fairview may issue tax-exempt bonds. 26 U.S.C. § 145 (qualified 501(c)(3) bonds); 26 U.S.C. § 103(a) (tax-exempt bonds).

In exchange for these benefits, Fairview has strict obligations regarding the administration and use of its charitable assets under Minnesota and federal law. A hospital is not automatically eligible for tax-exempt status. *Sonora Cmty. Hosp. v. IRS*, 46 T.C. 519, 525 (1966). The United States Supreme Court has held that qualification for tax-exempt status "depends on meeting certain common law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983). In other words, "charities were to be given preferential treatment because they provide a benefit to society." *Id.* at 589. As one court has explained: "[C]haritable exemptions from income taxation constitute a *quid pro quo*: the public is willing to relieve an organization from paying income taxes because the organization is providing a benefit to the public." *Geisinger Health Plan v. Comm'r of Internal Revenue*, 985 F.2d 1210, 1215 (3rd Cir. 1993). Or, as another court recently put it in upholding the denial of a nonprofit hospital's property tax exemption: "[E]ach tax dollar lost to a charitable exemption is one less dollar affected governmental bodies will have to meet their obligations directly. If a charitable institution wishes to avail itself of funds which would otherwise flow into a public treasury, it is only fitting that the institution provide some compensatory benefit in exchange." *Provena Covenant Med. Ctr. v. Dep't of Revenue*, 925 N.E.2d 1131, 1148 (Ill. 2010).

The assets of Fairview are held in charitable trust under Minnesota law. Minn. Stat. § 501B.35, subd. 3; *In re Peterson's Estate*, 277 N.W. 529, 532 (Minn. 1938) (charity takes a charitable devise "not beneficially, but as trustee, to use the funds in furtherance of [its] charitable purpose."); *In re Quinlan's Estate*, 45 N.W.2d 807, 810 (Minn. 1951) (gift to "an institution whose sole reason for existence is charitable is a charitable trust"); *People v. Orange County Charitable Servs.*, 87 Cal. Rptr. 2d 253, 268 (Cal. Dist. Ct. App. 1999) (impressing charitable trust upon charitable corporation's assets). All assets held in charitable trust, including all revenue generated from fees for services, must be used for charitable purposes. Minn. Stat. § 501B.35, subd. 3.

The Attorney General's broad common law authority to regulate charitable organizations and charitable trusts, including the authority to seek appropriate relief to redress their improper administration, has a long history. As one court stated:

> "In England the records show that even before the enactment of the Statute of Charitable Uses in 1601 suits were brought by the Attorney General to enforce charitable trusts. The community has an interest in the enforcement of such trusts and the Attorney General represents the community is seeing that the trusts are properly performed. [citations omitted.] The state, as parens patriae, superintends the management of all public charities or trusts, and in these matters acts through her attorney general."

*Brown v. Mem'l Nat'l Home Found.*, 329 P.2d 118, 132 (Cal. Dist. Ct. App. 1958), *cert. denied*, 358 U.S. 943 (1959). *See also, Longcor v. City of Red Wing*, 289 N.W. 570, 574 (Minn. 1940) ("purpose of vesting in some public official like the Attorney General the exclusive power to begin proceedings to enforce charitable trusts is obvious"); *In re Quinlan's Estate*, 45 N.W.2d at 812 ("attorney general has not only the right but the duty to enforce charitable trusts"); *Schaeffer v. Newberry*, 35 N.W.2d 287, 288 (Minn. 1948) ("attorney general is entrusted with the duty of representing the beneficiaries of a charitable trust, and it is his duty to enforce such trusts").

17

The Attorney General also has extensive statutory authority to regulate charitable organizations and trusts under Chapters 309 and 501B of the Minnesota Statutes. Under Minnesota Statutes section 501B.40, subd. 1, the Attorney General may conduct investigations for purposes of "determining whether property held for charitable trust is properly administered." The Attorney General may pursue an action for breach of trust to secure compliance with Minnesota law, including injunctive relief, recovery of damages, removal of trustees, and other remedies. Minn. Stat. § 501B.4l. Under Minnesota Statutes section 309.57, the Attorney General may petition the district court for relief to restrain, enjoin, and redress violations, including injunctions, restitution, appointment of a receiver, and suspension of an organization's registration. The failure to "administer and manage property held for charitable purposes in accordance with the law or consistent with fiduciary obligations constitutes a breach of trust." Minn. Stat. § 501B.41, subd. 6.

Fairview must operate exclusively for charitable purposes to maintain its tax-exempt status. Fairview must have charity care programs for needy patients, *see* Rev. Rul. 56-185, and these programs must be advertised and promoted to patients. *Allina Med. Clinics v. County of Meeker*, 2005 WL 473908 at *10 (Minn. T.C. Feb. 18, 2005) (no charitable purpose where the charity care program was not advertised in the local paper or radio, a majority of patients pay for services, all patients are asked to pay, and charity care not available until all other avenues of payment are exhausted); *see also, Riverside Med. Ctr. v. Dep't of Revenue*, 795 N.E.2d 361, 365-366 (Ill. Ct. App. 2003) (nonprofit clinic not entitled to property tax exemption where 97 percent of revenues came from patients and clinic did not advertise charity care). As the Illinois Court of Appeals in *Provena Covenant Medical Center v. Dep't of Revenue* said: "Charity is more than rhetoric. The term 'charitable purpose' signifies 'concrete, practical, objective charity,

manifested by things actually done for the relief of the unfortunate and the alleviation of suffering or in some work of practical philanthropy.'" *Provena Covenant Med. Ctr. v. Dep't of Revenue*, 894 N.E.2d 452, 470 (Ill. Ct. App. 2008), *aff'd by Provena Covenant Med. Ctr. v. Dep't of Revenue*, 925 N.E.2d 1131 (Ill. 2010) (citing *In re Estate of Schureman*, 8 Ill.2d 125, 132-133 (Ill. 1956)).

A charitable organization may jeopardize its tax-exempt status by entering into ventures with for-profit corporations that cause the charitable organization not to operate exclusively for a charitable purpose. A charity can lose its tax-exempt status if it becomes part of a for-profit "franchise system which is operated for private benefit in [that] its affiliation with this system taints it with a substantial commercial purpose." *Est. of Hawaii v. IRS*, 71 T.C. 1067, 1080 (1979). A charity may not be an "instrument to subsidize" a for-profit corporation, nor may a for-profit corporation "trad[e] on such [non-profit] status." *Id.* at 1081-82. A joint venture with a for-profit company that allows a for-profit company to control a hospital may put the hospital's tax-exempt status at risk. *See, e.g., St. David's Health Care Sys. v. United States*, 349 F.3d 232 (5th Cir. 2003). In *St. David's*, a tax-exempt healthcare organization partnered with a for-profit company that operated hundreds of hospitals nationwide. The IRS revoked St. David's tax-exempt status, claiming its partnership with the for-profit caused it to no longer exist for a charitable purpose. *Id.* at 234-235. The Fifth Circuit held that providing a community benefit alone is not sufficient, stating:

> "It is important to keep in mind that § 501(c)(3) confers tax-exempt status only on those organizations that operate *exclusively* in furtherance of exempt purposes. As a result...we do not simply consider whether the organization's activities further its charitable purpose, we must also ensure that those activities do *not* substantially further other (non-charitable) purposes."

*Id.* at 236-237 (emphasis in original). The court further stated, "St. David's cannot qualify for tax-exempt status under § 501(c)(3) if its activities via the partnership substantially further the

private, profit-seeking interests of [the for-profit partner]." *Id.* at 237. The court also noted that a for-profit which manages the day-to-day operations of the facilities is not likely to serve the nonprofit's charitable interests. *Id.* at 242.

**Conclusion.** The RCA and QTCC contracts go to great lengths to try to make their terms confidential and hidden from public scrutiny. Both contracts recognize that their terms and existence could draw adverse regulatory scrutiny and may be terminated if they jeopardize the status and/or reputation of Fairview. As noted in this and subsequent volumes, the activities of Accretive have not been undertaken in a manner that is consistent with the mission of a charitable hospital.

AG: #2991497-v1

# STATE OF MINNESOTA

## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

### Volume 2
### Culture Wars



### LORI SWANSON

### ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME TWO

# CULTURE WARS

Executive Summary ...................................................................................................................1

2.1    Introduction .................................................................................................................1

2.2    The Fairview Mission...................................................................................................1

2.3    A "Numbers Driven" Culture with "Bedside Collections" .................................................2

2.4    Prior Balance Collections .............................................................................................3

2.5    Pre-Service Collections; Point of Service (POS) Collections; Bedside Collections ...........4

2.6    Carrots and Sticks......................................................................................................10

2.7    Emergency Room Tactics: Viewpoint of a Patient Advocate ...........................................12

2.8    Boiler-Room Tactics ...................................................................................................12

2.9    Operation Blue Balls ..................................................................................................12

2.10   GOMER....................................................................................................................13

2.11   Patient Access and Stop Lists........................................................................................14

2.12   Pre-Registration Blue Balls ..........................................................................................17

2.13   Fairview's Staff Perspective .........................................................................................18

2.14   Patient Perspective......................................................................................................19

Conclusion .............................................................................................................................20

# VOLUME TWO

## CULTURE WARS:
## THE EMERGENCY ROOM MEETS *GLENGARRY GLEN ROSS*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"I've been doin' this job for 17 years, honey. Doctors come and go, but nurses make this place run. We don't get much credit or pay. We see a lot of misery, a lot of dyin', but we come back every day. I've given up bein' appreciated, but I sure as hell won't let any of us be taken for granted."

*Nurse Haleh Adams, The television show "E.R."*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"We're adding a little something to this month's sales contest. As you all know, first prize is a Cadillac Eldorado. Anybody want to see second prize? [*Holds up prize.*] Second prize is a set of steak knives. Third prize is you're fired."

*Blake, The movie "Glengarry Glen Ross"*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"There are some attorneys who aren't skilled enough for an actual practice that work for these stupid fricken non-profit organizations who help the poor in Detroit. Now we have to waste our time with this low life patient and some dumbass attorney all because the patient didn't show up to the DHS office to renew her benefits."

*Accretive debt collector: August 16, 2011*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# VOLUME TWO

# CULTURE WARS

**Executive Summary**:  **Accretive Health, Inc. ("Accretive") engages in aggressive collection of hospital bills.  Accretive imposes quotas on hospital personnel to collect money before treatment is sometimes provided, even in the Emergency Room.  The imposition of collection quotas on hospital employees through chalk talks, prizes, and other tactics, which are commonly utilized in high-pressure boiler-room-style sales atmospheres, is in conflict with the purpose of a charitable health care organization, whose mission is to provide treatment to its patients.  Hospital employees are required to participate in what they call a "Blue Balls" computer program, where a patient cannot be fully registered unless the employee collects money from the patient or enters a written explanation as to why money was not collected.**

**2.1     Introduction.**  Several other volumes describe a variety of laws violated by Accretive and Fairview Health Services.  These include the Minnesota Debt Collection Agency Act, the federal Fair Debt Collection Practices Act (FDCPA), the Health Insurance Portability and Accountability Act (HIPAA), and the Minnesota charitable organization laws, among others.  This volume is about the changes in Fairview's culture as a result of Accretive's activities.  The following describes the scope and depth of the culture change imposed by Accretive.  Perhaps the most damaging act by Accretive was to undermine the basic premise that a hospital is a sanctuary to treat the sick and infirm.

**2.2     The Fairview Mission.**  Hospitals should be sanctuaries that welcome and care for those in the dawn of life, the eve of life, and the shadows of life.  Over 20 percent of American families encounter a life-changing event in a hospital.  The people who work in hospitals necessarily must maintain a culture that above all else respects human dignity.

Fairview was formed when several Norwegian citizens organized the Norwegian Hospital Association in 1905.  It later changed its name to the United Christian Hospital Association and,

by 1908, opened the Thomas Hospital, thereafter changing its name to Fairview in 1916.  (Ex. 1.)

Fairview lists the following as its cultural values:

> "***Dignity***:  We value the uniqueness of each person and work to ensure everyone's **right to privacy**.  We respect the cultures, values, beliefs and traditions of others and honor their talents and contributions."

> "***Integrity***:  We say what we mean and do what we say.  We communicate openly and honestly and **behave ethically**.  We demand the best of ourselves and accept shared accountability for our actions."

> "***Service***:   We work to **make a difference** in people's lives and in our communities.  We strive for excellence by anticipating, meeting and exceeding expectations.  We continually improve our programs and skills through learning and innovation.  We responsibly manage our resources."

> "***Compassion***:  We recognize and respond to the emotional, spiritual and physical needs of all the people we serve.  **We create a caring environment**, conducive to healing, growth and well-being for all."

(Ex. 2, emphasis added.)

**2.3** **A "Numbers Driven" Culture with "Bedside Collections."**  After landing the Fairview revenue cycle agreement ("RCA") in 2010, Accretive decided to make Fairview's culture "numbers driven."  (Ex. 3.)  Accretive used "Chalk Talks" to change the Fairview culture.  A "Chalk Talk" is a "daily operational meeting designed to develop, energize, and engage a work team." (Ex. 4.)  At the daily "Chalk Talks" (Ex. 5), Fairview's emergency room and patient registration staff were required to talk about their collection quotas, tossing a ball around to each speaker as they discussed their collection performance.  (Ex. 6.)  Accretive's revenue cycle work for Fairview was led by an individual Accretive calls "Andrew 'I Am Not A' Crook." (Ex. 7.)  As early as September, 2010, Mr. Crook reported to the Accretive home office in Chicago (in preparation for an upcoming presentation to the Fairview CEO), "We've started firing people that aren't getting with the program." (Ex. 8.)  Fairview emergency room workers

state that they got the message that if they don't collect money in the ER, they would be fired. (Ex. 9.)

Once it landed the Fairview RCA, Accretive set up a 100-day plan, to aggressively focus on collecting money from patients. (Ex. 10.) The Fairview pre-registration team was to take an "assertive collections approach." (Ex. 11.)

**2.4    Prior Balance Collections.**    Accretive and Fairview attempt to collect prior balances at three separate stages at the front end of the revenue cycle:

- Scheduled patients during **pre-registration**;
- Unscheduled patients during **registration**; and
- Customer service during inbound calls (**account inquiries**).

(Ex. 12.)

Accretive emphasizes that the primary role of a hospital employee is to collect money:

"***Addressing the patient's balance is an imperative part of your role.***"

(Ex. 13, emphasis on original.)

To create a *Glengarry Glen Ross*-type hospital culture, Accretive engages in a number of different methods to change the sanctuary culture of a hospital to that of a "numbers driven" collection agency. Accretive induces Fairview emergency room and "front end" personnel (pre-registration and registration staff) with prizes for collecting the most money in daily, weekly and quarterly contests. (Ex. 14.) Accretive assigns the names of NFL teams (Chargers, Jaguars, Steelers, Giants, etc.) to Fairview hospital shift teams, instilling a competitive effort to raise more money. (Ex. 15.) In September of 2010, an employee at Fairview Ridges noted that the competition became quite intense, with employees claiming that the "Steelers" were so named because they "steal" wins. (Ex. 16.) Accretive managers exhort the Fairview teams to victory by promising that, if they make their quotas, the Accretive leaders will wear a clown outfit (Ex. 17), a Colonel Sanders outfit, or a Waldo outfit to the hospital. (Ex. 18.) Another Accretive

manager promises that, if a quota is attained, he will shave his head. (Ex. 19.) Another Accretive team leader said he will dress up like a turkey if Fairview employees reach their collection quotas. (Ex. 20.) Many Fairview employees blanched at the inducements. On one occasion, the emergency room staff at the University of Minnesota Medical Center filed a complaint with the Attorney General, asking her to "save" the staff. On another occasion, an employee apparently wrote:

> "Patients are harassed mercilessly until their Community Care is finally approved, and one can only speculate on the heartache, mental anguish and worse that these kinds of practices cause."

(Ex. 21.)

**2.5      Pre-Service Collections; Point of Service (POS) Collections; Bedside Collections.**  If the patient makes it through the "prior balance" stage, she faces the **"pre-service collections"/point of service (POS)** gauntlet, where hospital personnel are told by Accretive to collect from patients the likely fee that will be incurred *prior* to treatment being rendered. (Ex. 22.) The pre-service, or POS, phase begins with the so-called "Blue Balls" computer program, which estimates the total amount of the patient's likely deductible and co-payment under the patient's health insurance policy. If the patient is uninsured (self-pay), the patient will also be advised of the likely cost of the hospitalization. This **pre-service, or POS,** collection effort is undertaken at the pre-registration office for scheduled visits, the Emergency Room for unscheduled visits, and at the registration office, with the object being that the patient pays his/her estimated share before treatment is provided. (Ex. 23.) Accretive rigorously tracks each Fairview employee's pre-service or POS collections performance on a daily basis. (*Id.*) For example, each day they track the "[t]otal remaining days we have to collect" and "[h]ow much is needed per day for the remaining part of the month for us to meet our goal." (Ex. 24.) By June,

4

2011, Accretive began to post the point-of-service collections of Fairview's emergency room workers each day. (Ex. 25.)

One of the self-described "innovative" techniques of Accretive is to instruct hospital attendants to engage in collection efforts at the patient's bedside. Calling bedside collections a "'Front' Future Initiative" (Ex. 26), Accretive describes bedside collection efforts as "Bedside financial counseling for patient liability" (*id*.) or as "Bedside collection for unscheduled inpatient visits." (Ex. 27.) When the University of Minnesota Medical Center (UMMC) fell behind on patient collection efforts, Accretive cracked down by dedicating specific personnel to collections in both the emergency department (ED) and at the bedside. (Ex. 28.) Fairview acute care intake workers at the University of Minnesota Medical Center were told they must "identify and ask for residual and prior balance[s] 100% of the time" and that their job performance would be measured by whether they did so. (Ex. 29.)

The **Pre-service/POS** and **Prior-balance** collection efforts are carefully tracked in a "rack and stack" weekly presentation (Ex. 30), where each Fairview employee is listed and graded by Accretive. The chart does not evaluate them on medical knowledge, humanitarian work, compassion, or successful treatment parameters. Rather, the scorecards list employees by the "residuals" (the patient's estimated share of the bill) they collect each week. (*Id.*) The areas of gradation are listed as follows, sorting each employee by:

- PB [prior balance] collection knowledge
- Adaption to change in culture
- Team influence on collection efforts
- Response to collection coaching
- Average PB [prior balance] accounts touched per day
- Total $ collected

(*Id.*) Staff Productivity Results are prepared on a weekly basis to gauge the improvement in collection efforts. (Ex 31.) The Fairview staff is expected to respond to these charts by

preparing their "*OWN PERSONAL Yearly – Monthly – and Weekly GOAL for prior balance and point of service collections*…."  (Ex. 32, emphasis in original.)

In early 2010, at Accretive's 45-day "milestone" review, the Accretive team leaders reported upstream to other Accretive executives, saying that they have implemented the following:

- Individual and team incentive programs;
- Required 100 percent "asks" for payment by Fairview staff on patients with prior balances;
- A rigorous "dashboard" to measure each employee's performance in each collections zone; and
- An exception-based registration process to decrease "low yield touches" and increase the higher yield ones.

(Ex. 33.)

By July 16, 2010, the "numbers driven" culture of Accretive appeared to be gaining ground, with Brandon Webb, an Accretive manager, telling Fairview staff that, in terms of driving up collection numbers, "OB [obstetrics] is probably going to help us a lot."  (Ex. 34.) Fairview's response was twofold:  "We need to get cracking on labor and delivery.  There is a good chunk to be collected there…," and "I don't believe we have hardwired the fact that staff need to look at prior balances for EVERY patient, especially in the ED [Emergency Department].  That needs more work."  (Ex. 35.)  Mr. Webb's response is reaffirming:  "Great ideas and points…!"  (Ex. 36.)

It appears that the University of Minnesota Medical Center was slow in implementing Accretive's collection quotas.  Accretive created a "heat map" of delinquent collections activity, with the University's "heat map" declaring that each Fairview employee at the University must be "monitored" to make 100% "asks" on patients and "incentivized" to make point of service collections.  (Ex. 37.)

Accretive not only prepares a weekly "dashboard" of collections by each Fairview employee (Ex. 38), it also prepares a weekly "dashboard" of collections on certain patient categories, including for the emergency room, outpatient surgery, inpatient surgery, high-dollar diagnostic, and unscheduled inpatient admissions. (Ex. 39.) Other Accretive charts determine which Fairview divisions perform "in scope," dividing the collection efforts on each of Fairview's seven campuses. (Ex. 40.)

The daily collections are tracked, with individual Fairview employees recognized in e-mails and provided with gifts if they are aggressive collectors. (Ex. 41.) On June 3, 2011, Accretive sent an e-mail to Southdale Hospital employees after one of them collected a past-due balance from a patient. Accretive wrote: "I witnessed the entire event and it was like poetry." (Ex. 42.) The publication of employee collection tallies was so demeaning that Accretive and Fairview personnel jointly noted the negative impact on staff morale and the marginal impact it had on collection efforts. (Ex. 43.)

The response from Accretive management to this concern was as follows:

"…we'll continue with it as-is. Our experience is that collections performance just doesn't get to target performance without this level of rigor."

(*Id*.)

A Fairview employee expressed concern that the Accretive collection goals are "extremely aggressive." (Ex. 44.) Another, however, having embraced the Accretive "numbers driven" culture, responds:

**"Our goals should be the first thing you think about every day. All the other work comes after that**."

(*Id.*, emphasis added.)

7

At the beginning, Accretive hit some bumps when it encountered the Fairview culture. In August of 2010, Mr. Webb, the Accretive manager at Fairview, announced that: "These numbers look awful this month." (Ex. 45.) In September, Fairview announced: "Staff is struggling with prior balance collections." (*Id.*) Mr. Webb followed this up with an e-mail: "[T]hese numbers do not look very good." (*Id.*) On September 20, he noted to Fairview staff: "I have not heard one word from anyone today regarding whether we collected any additional prior balances last week. I hope everyone understands these are not my numbers, Accretive's numbers, or Jena's numbers, these are our numbers…." (*Id.*)

Finally, on September 20, 2010, Mr. Webb sent out an e-mail to Fairview employees:

> "OUCH! Prior balance numbers looked BAD last week….Before I have a minor panic attack about the numbers can everyone please let me know if you had any accounts last week that you assisted in a rebill situation, etc., that we can count in our PB [prior balance] numbers?"

(Ex. 46.)

Hearing no response, on September 21, 2010, a memo was sent to all management personnel with the following instruction: "Any free time…should be spent rounding with staff and making sure they are…asking for money from EVERY patient they can!" (Ex. 47.) The memo also demanded that the daily surgery and services schedules be scoured to highlight any patient who has a balance due. (*Id.*) On October 6, 2010, Mr. Webb sent this e-mail to Fairview staff:

> "Very disappointing results. What do you plan to do to make October a better month?"

(Ex. 48.)

On October 11, 2010, a Fairview manager parroted Mr. Webb's e-mail by sending out the following demand to her staff:

> "It's noon and we are only at $5,000…not so very good for where we are typically."

(Ex. 49.)  The Fairview staff responded to Accretive's demand to book numbers.  By 7:00 p.m., the Fairview manager reported back to Mr. Webb that:

> "Prior balance collections have increased in all areas.  The biggest improvement has been the Main Admitting and ED [Emergency Department]."

(Ex. 50.)

In order to reward aggressive collections, on October 28, 2010, Accretive sent a mass e-mail which advised Fairview employees that the top collectors are posted on a white board near the business office.  (Ex. 51.)  The Accretive manager also declared that the "top collectors" are in a close race for the top collector award for October.  (*Id.*)  The next day, an e-mail went out recognizing particular employees for their collections and telling them to come by the business office to pick out a gift from the "kudos box."  (Ex. 52.)  The competition ended on November 1, 2010, when a mass e-mail from Accretive was distributed to the Fairview staff proclaiming:

> "We had an UNDERLINE October….Great work.  Here is where we closed the month:  **GRAND TOTAL POS Collections of $353,797.17 and Prior Balance Collections of $27,291.57**
>
> This blows all prior records Out Of The Water!!! Nice work!"

(Ex. 53, emphasis in original.)  The e-mail promises a "thank you" for the employees and then sets out the November collection-goal quotas.  (*Id.*)  The e-mail concludes by noting that:  "the highest collector in each area on each shift will win a gift card."  (*Id.*)

The Fairview and Accretive staff also intensified their collection efforts by training birthplace registrars on how to collect off newborns and their mothers.  (Ex. 54.)  One chart dated November 11, 2010 is entitled:

"**Opportunity: Labor and Delivery represents excellent opportunity to increase cash collections**"

(Ex. 55, emphasis in original.)

On January 17, 2011, Mr. Webb chastised Fairview employees with this threat: "Do we need to look at having all of the PB's [patients with prior balances] that can't pay to start seeing Bruce [an Accretive employee] again?" (Ex. 56.) On January 25, 2011, Mr. Webb chastised another Accretive employee:

"You guys collected $60 in PB [prior balance] yesterday. Unacceptable. How are you going to fix this?"

(Ex. 57.)

On January 27, 2011, the Fairview and Accretive staff exchanged mass e-mails which recognized the biggest collectors for November and December and promised to provide a "recognition reward." The e-mail's author wanted "to CONGRATULATE the ENTIRE ED [Emergency Department] team" for "**a RECORD month**," collecting $62,501. (Ex. 58, emphasis in original.)

Another example of the *Glengarry Glen Ross* culture is the agenda for a "Patient Share Engagement" meeting sent on August 9, 2011. The agenda states that the "focus area" for Fairview employees is as follows:

"Are your focus areas the entity's highest opportunity areas (opportunities in dollars and ease of collections)?"

"Are the following Best Practices implemented in these focus areas?"

(Ex. 59.) The agenda then itemizes the "best practices" as incentives, chalk talks, and "100% ask" rates. (*Id*.)

**2.6    Carrots and Sticks.**  Accretive was very creative in implementing a contest and prize strategy. These strategies included pizza parties (Ex. 60), gift cards (Ex. 61), movie tickets

10

(Ex. 62), candy, wearing jeans to work (Ex. 63), free lunch, parking space, fake flowers (Ex. 64), putting makeup on a manager (*id.*), throwing a pie in a manager's face (*id.*), painting a manager with a fake tattoo (*id.*), and a Golden Gopher collections competition (Ex. 65), as well as cash payments (Ex. 66).

To underscore its incentive program, on November 12, 2010, Accretive sent out a mass e-mail with the heading:

> "***Cliffs notes:  You can receive between $130 - $280 per month by meeting your collections and PFA goals, starting now!***"

(*Id.*, emphasis in original.)  The e-mail describes a variety of prizes, including $25 per pay period for screening patients for pre-service/POS collections, $40 per pay period for meeting the employee's collection goal, and $150 for being the top collector.  (*Id.*; Ex. 67.)

Daniel Fromm, the Chief Financial Officer of Fairview, responded to the e-mail, telling Accretive that the gifts violated Fairview's corporate policy.  (Ex. 68.)  In response, on January 7, 2011, an employee sent out an e-mail stating that:

> "We need to get the incentives out asap.  That would include the $150 ones for Radiology, Riverside ER and UER."

(Ex. 69.)  At the same time, in November of 2010, an Accretive manager sent an e-mail to Fairview stating that the "carrots" aren't good enough and that Fairview needed to start using the "stick":

> "I hope the 'carrot' of the gift cards gets things moving a bit more – but I think we'll need to institute the 'stick' as well – can Colin and Colleen start writing folks up for not screening accounts when they're the registrar."

(Ex. 70.)

It is apparent that the prizes were still being offered in the four months after the Fairview CFO said that the gifts violated corporate policy.  On March 2, 2011, a Fairview employee

confronted an Accretive employee and said that the Fairview staff thought the prizes were a "slap in the face." (Ex. 71.)

Finally, on February 20, 2012, after the Attorney General filed a lawsuit against Accretive, Accretive drafted a statement which failed to disclose the team dinners and recognitions. (Ex. 72.)

**2.7    Emergency Room Tactics: Viewpoint of a Patient Advocate.**  The impact of the Accretive philosophy on Fairview is perhaps best stated by an employee at Fairview Ridges Hospital.  She described her Fairview experience prior to Accretive as fulfilling.  She considered herself an advocate for patients, trying to give some comfort at a time of a medical crisis.  Prior to the appearance of Accretive, she had never heard of "chalk talks" and never attended a "boiler room" meeting.

**2.8    Boiler-Room Tactics.**  The hospital employee states that, after Accretive arrived on the scene, she was required to attend "chalk talk" meetings where Accretive "team leaders" engaged in high pressure tactics to induce emergency room personnel to view their primary mission to be the collection of money as opposed to the well-being of the patient.  Groups of workers in the Fairview hospital emergency rooms were given team names, and each week the person and team who collected the most money from emergency room patients would be recognized, sometimes with a raffle prize, sometimes a cake, sometimes an e-mail "shout out." Those who performed poorly on collections were ignored.

**2.9    Operation Blue Balls.**  The Ridges emergency room worker said that Accretive told her the "cue" to collect money from the patient was after the physician entered the vestibule, made an introduction, and left to attend to another patient, even if treatment was not yet fully rendered or completed.  Accretive established an electronic data system where a patient's

registration was not complete until the patient advocate made an attempt at collection. Accretive installed on the EPIC hospital software its own software program known as AHtoAccess, or A2A, derisively described by hospital personnel as "Operation Blue Balls."

Under the Blue Balls program, a Fairview registration employee could not process a patient electronic record (all patient records are now electronic) unless she completed four informational "blue balls" that popped up on the screen. The first ball demands that she fill out patient demographic data, such as name, address, contact numbers, and the like. Not until this "ball" is completed may the employee go to the second "ball," where the employee must undertake a "real time" validation of the patient's insurance coverage and description of the insurance benefits. Employees are also required to screen "self-pay" patients (a euphemism for the uninsured) for alternative types of coverage, such as Medicaid. Once the second ball is completed, a third ball appears, where the employee must enter the health care services to be provided as well as predict the corresponding diagnosis codes so that the software can generate a bill. After this "ball" is completed, a fourth ball appears, in which the employee must determine the amount of the likely financial responsibility for the insured patient (as it relates to co-pays, deductibles, and any residual amount owed after insurance is applied), or the total cost to the uninsured patient, and try to collect the amount owed from the patient. The employee had to report on the computer how much money she collected and, if she didn't collect any money, she had to explain the effort she made to get money and why it was not successful.

2.10    **GOMER.** Before the enactment of the federal anti-patient dumping statute, called the Emergency Medical Treatment and Active Labor Act, or EMTALA, "GOMER" was an acronym used in hospitals. It stands for "Get Out of My Emergency Room." Accretive prepared a variety of scripts for emergency room attendants, and employees were told to follow

the scripts. The scripts can lead a patient or her family to believe the patient will not receive treatment until payment is made. The fourth blue ball prints an invoice that tells the family that they are responsible for a deductible, co-payment, or residual amount based on the likely treatment code for the patient. The Fairview Emergency Room workers are told to request payment on the balance by requesting a credit card. If someone says they don't have a credit card, the employee is choreographed to say: "[I]f you have your check book in your car I will be happy to wait for you…." (Ex. 73.) If the patient says she doesn't have cash, the employee is scripted to say: "[I]f you want to make a call we will accept credit card over the phone." (*Id.*) If the patient's family questions the amount of the charge, states that they already have paid the deductible, or questions why they were never asked about a pre-payment in the past, the hospital employee is instructed to say that the policies of the hospital have changed. If the patient says that she doesn't have time to negotiate the likely fee, the hospital employee is instructed to say: "I understand that you are running late for your test but this will not take more than 5 minutes…." (*Id.*) Finally, if the patient says that she can't pay, the hospital employee is supposed to remind the patient that "once the account is with [a] collection agency that can affect your credit score…." (*Id.*)

**2.11 Patient Access and Stop Lists.** In 2011, Accretive rolled out a "Patient Access Strategic Roadmap" with six "patient access" initiatives for the year. (Ex. 74.) The six initiatives underscore that "patient access" is a euphemism for "*restricted* access," with the principal initiatives being to achieve a pre-service/POS (point of service) target of 30% collections and a higher target for prior balance (PB) collections. (*Id.*) The "patient access" restrictions are outlined in an Accretive "Solution Overview" presentation, which brands the

restrictions as the "Accretive Secret Sauce," or "ASS." (Ex. 75.) The cover of the Solution Overview has a slogan perhaps fitting for a collections agency but not so much for a hospital:

"You've never seen ASS like ours!"

(*Id.*)

The "Patient Access" strategy appears to have succeeded, not just with increased collections but in chasing patients away from the hospital. At least one memorandum says that "stop lists" have been successful. (Ex. 76.) A "stop list" is described as a "front end" denial, where the patient is essentially stalled by "financial counselors" into paying a prior balance or a "POS" treatment. (Ex. 22.) Accretive's guidelines indicate that registration personnel should:

"Pull together PB [prior balance] stop list [the] night before for patients appointments [the] next day."

(Ex. 77.) On April 19, 2011, Accretive added "stop lists" for breast cancer patients. (Ex. 78.)

On November 5, 2010, the Accretive managers were advised that Fairview staff desired to change the registration process in the Emergency Room so that it occurred *after* treatment was rendered to the emergency patient. (Ex. 79.) A Fairview employee trained by Accretive criticized the proposal, claiming that they would lose "hundreds of thousands of dollars in patients walking out the front door." (*Id.*) She also reported that Radiology was unhappy with the collection process and that the Neonatal Intensive Care Unit (NICU) complained about the aggressive collection activities. (*Id.*)

The "stop list" strategy continued throughout the year. On March 31, 2011, three University of Minnesota physicians complained that patients were foregoing treatment because of the Accretive collection practices. (Ex. 80.) Accretive dismissed the doctors' complaints as "country club" talk. (*Id.*)

On April 1, 2011, a Fairview employee suggested that a meeting be held to discuss complaints about patients being asked for "co-pays, deductibles, etc." by the financial service counselors prior to procedures being performed.  (Ex. 81.)

In March, 2011, Accretive described 22 Fairview emergency room patients who left the emergency room without being registered or who were uncooperative with the "Patient Access" process.  (Ex. 82.)  On April 8, 2011, Accretive noted that two patients left the Southdale emergency room without being registered and that three patients were uncooperative with the "Patient Access" process at the Ridges emergency room.  (Ex. 83.)  On June 16, 2011, Accretive noted that three emergency room patients in Fairview's North Region were "uncooperative" with the process.  (Ex. 84.)  In November of 2011, a Twin Cities spine surgeon complained that Accretive's financial clearance process was delaying treatment for patients at Ridges Hospital. (Ex. 85.)

Finally, in December of 2011, an incident at the University of Minnesota Amplatz Emergency Room caused the Risk Management team at Fairview to question whether Accretive was violating the federal Emergency Medical Treatment and Active Labor Act (42 U.S.C. §1395dd), or EMTALA, by withholding treatment and seeking to collect money from emergency room patients prior to completion of a medical screening.  (Ex. 86.)  EMTALA, the anti-patient-dumping statute, requires hospitals that receive federal benefits to provide medical treatment to stabilize a patient in the emergency room.  The incident apparently involved the child of uninsured parents, and the parents awaited treatment of their child while the Accretive "financial counselor" explained the opportunity of the parents to enroll in a COBRA program, which the parents said they could not afford.  The Accretive "financial counselor" then told the family that treatment of more than an hour in an emergency room was more expensive.  (Ex. 87.)  The father

apparently complained about the "stop list" effort. The Fairview Risk Manager, an attorney named Bonnie Johnson, told the Fairview and Accretive "financial counselors" that EMTALA requires that medical screening must be provided before any discussion about payment, and that emergency stabilizing treatment, if any, must be provided before payment options are discussed. (Ex. 86.) A front end collector at the University of Minnesota's Acute Care and Transplant Office who works closely with Accretive, "lost her composure" at the attorney, labeling her the "EMTALA police." (Ex. 88.) The collector e-mailed Peter Van Riper, a Vice President at Accretive, and said that the attorney's advice on EMTALA is "a bunch of bull…." (*Id.*) Mr. Van Riper agreed, and volunteered to talk to the Fairview staff. (*Id.*)

 **2.12**  **Pre-Registration Blue Balls.** "Operation Blue Balls" not only takes place in the Emergency Room, but also in the pre-registration process for patients whose physicians are admitting a patient to the hospital. The pre-registration process is generally undertaken by telephone prior to the patient being admitted to the hospital, and generally occurs at the Stinson Boulevard office of Fairview or at Accretive's collection center in Kalamazoo, Michigan. The pre-registration process is common for planned pregnancy deliveries, orthopedic surgeries, back surgeries, cancer surgeries, and the like.

 One Fairview employee, who considers herself a professional, works with patients to navigate the financial process prior to being admitted to the hospital. She says that in many cases, the patient and her family are worried about the upcoming treatment, and the burden of working through a financial pre-registration telephone call can be stressful.

 She states that, after Accretive came on the scene, she was told to attend the "chalk talk" meetings and implement Operation Blue Balls on new patients. She described the process as tense, where an Accretive manager walks behind pre-registration personnel with a stop watch,

demanding that they complete a registration within five to eight minutes. During this period of time, employees are expected to work through Operation Blue Balls and get the credit card information from the patient. The Fairview pre-registration personnel are graded on how many patients they can talk to in an hour, with personnel rewarded if they achieve a six patient per-hour production and penalized if they only have a four person per-hour production.

During the pre-registration process, the Blue Balls program appears, and the patient again goes through the "stop list" script about pre-payment/POS and prior balance collections. The patient must make it through 14 levels of inquiry before being told that she can still get "emergent" treatment even if she has to pay for it on an installment basis. (Ex. 73; *see also*, Ex. 89.)

**2.13    Fairview's Staff Perspective.**  Accretive took a survey of Fairview employees to determine their acceptance of the Accretive culture. The survey indicated that 40% of Fairview staff were uncomfortable with the collection activity. (Ex. 90.) Some of the employee comments in the survey included the following:

> "PB [prior balance] collections should be done at the backend not the front. We are giving the image that we are money hungry and that we don't care about the overall person."

> "As far as the Accretive initiatives, all we really know is that it is about money and how much we can collect."

> "In fact I am greatly distressed when I think about coming to a FV [Fairview] hospital and if I have a past due being presented with it multiple times until I pay the bill or make payment arrangements etc. Let's face it sometime[s] when people are in crisis the last thing they are thinking about [is] the cost that they will eventually owe."

> "But we are pushing that envelope too much when we are focusing on collecting it all up front."

"I have encountered patients that are very upset with calls from previous teammates regarding how they were approached about copay/prior payments. I think we need to listen to the patient more carefully."

(Ex. 91.)

An agenda for an Accretive/Fairview management meeting in November of 2011 noted that "Front End employees" are concerned that they will be investigated for patient collections due to a *Star Tribune* article regarding the collections process. (Ex. 92.) As recently as January 25, 2012, Mr. Barry, the president of Accretive Quality, was advised by Mr. Crook, the head of Fairview operations for Accretive, that:

"Fairview line staff has expressed concerns regarding collecting patient share at the time of registration….The impact has been most felt at the Fairview management level - there have been some emotional responses."

(Ex. 93.)

This underscores the culture clash between the Accretive *Glengarry Glen Ross* culture and the culture normally embraced by a charitable, non-profit hospital.

**2.14    Patient Perspective.**  Accretive distributes scripts to its employees which make it clear that the objective of patient contact is to get money, and that to get the money, the Accretive employee should be aggressive in prodding the money out of the patient. For instance, a multi-page memorandum entitled "Collections Call Flow" instructs the Accretive callers to learn from the "heavy hitters" at the company. (Ex. 94.) The memorandum tells the callers to never take an answer of "no" from the responsible party ("RP"), to threaten that collection calls will continue unless payment is made, and that the company will report the RP to the credit bureau and have their credit score lowered. (*Id*.) The memorandum instructs the collector to pry into whether the RP gets child support, unemployment, welfare, or other supplements and that, if so, the collector should tell the RP to direct that supplemental payment to them. (*Id*.) The memorandum instructs the caller to ask if the RP can get help from a relative. (*Id*.) The

memorandum is silent about one aspect of medical debt, however: the patient is not told that Fairview is required by law and by an agreement with the Minnesota Attorney General to have a charitable giving policy. Indeed, it appears that Accretive was even contemplating requiring patients who qualified for charity care to set up credit card payment plans. (Ex. 95.)

An example of deceptive patient contact is Ms. Marcia Newton's experience with Accretive. Ms. Newton filed a complaint with the Attorney General's Office, stating that her physician scheduled a surgery to install ear tubes in her child, who was at risk to have a ruptured ear drum if the surgery was not performed. She appeared at the hospital with her child on the day of the scheduled surgery. She states that the admissions (registration) employee looked her up on the computer and advised her that the hospital charge for the surgery was going to be about $9,000, and that she would be obligated to pay $876 before the surgery could take place as the patient's share under her policy. Because she had the balance available on her credit card, she charged it. As it turns out, the actual cost of the procedure was about $4,200, and her responsibility under her insurance was only $200. She couldn't get the hospital to give her overpayment back. (Ex. 96.)

Accretive and Fairview claim that if the treatment is "emergent," they don't demand pre-payment. The term "emergent," however, seems to be narrowly defined by Accretive and Fairview. In the above case, the need of a child to have ear tubes inserted to avoid a ruptured ear drum was apparently not determined "emergent."

These practices can lead patients to believe that they will not get access to necessary treatment if they have to pay on an installment basis.

**Conclusion.** Accretive and its "numbers driven" culture have undermined Fairview's mission-driven culture. The Accretive culture has converted the hospital culture from that of a

charitable organization to that of a collection agency. Perhaps more important than the description of legal violations identified in other volumes, it is the *Glengarry Glen Ross* culture that necessitates remedial action.

AG: #2986875-v1

# STATE OF MINNESOTA

## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

**Volume 3**
**The Attorney General Agreement**



## LORI SWANSON

## ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME THREE

# THE ATTORNEY GENERAL AGREEMENT

Executive Summary .................................................................................................1

3.1    The Attorney General Agreement.........................................................................1

3.2    Fairview Contracts with Accretive Health, Inc., a Licensed Debt Collector, to Manage Its "Revenue Cycle"..........................................................................................2

3.3    Requirements of the Attorney General Agreement ..............................................3

3.4    Accretive Incorrectly Summarizes the Attorney General Agreement, and then Ignores Its Own Summary ...............................................................................................4

3.5    Medical Financial Solutions Gets Engaged ........................................................5

3.6    Multiple Violations of the Attorney General Agreement .....................................8

3.7    May, 2011 Negative Fairview Audit Report.........................................................9

3.8    Fairview Distances Itself from Accretive and MFS ...........................................10

3.9    December, 2011 Audit of Accretive ...................................................................12

3.10   Termination of Accretive by Fairview...............................................................13

Conclusion ...........................................................................................................14

# VOLUME THREE

# THE ATTORNEY GENERAL AGREEMENT

**Executive Summary**:  A compliance review by the Minnesota Attorney General in 2005 found that the collection activities and expenditures of Fairview Health Services were not consistent with the mission and responsibilities of a Minnesota charitable organization. Fairview entered into a remediation agreement with the Attorney General in 2005, and the agreement was renewed in 2007.  Since May, 2010, Accretive Health, Inc. has been the "revenue cycle" manager in charge of collections for Fairview.  Accretive has repeatedly violated the Attorney General Agreement, displaying willful indifference to its requirements.

3.1    **The Attorney General Agreement.**   In 2005, the Office of the Minnesota Attorney General undertook a compliance review of Fairview Health Services ("Fairview") pursuant to Minnesota Statutes sections 317A.821, *et seq*., 309.533, *et seq*., and 501B.35, *et seq*. The compliance review found numerous problems with and deficiencies in Fairview's collection activities, billing practices for uninsured patients, and the administration of charity care.  In an effort to avoid litigation under the above statutes, Fairview and the Minnesota Attorney General entered into a two-year remedial agreement, which was filed with the Ramsey County District Court ("Attorney General Agreement").

The Attorney General Agreement between Fairview and the Attorney General was reviewed by the Minnesota Hospital Association and, by the end of 2005, all 125 hospitals in Minnesota, had executed similar agreements with the Attorney General relating to their debt collection, charity care, and uninsured billing practices (collectively, "Attorney General Agreements").  The Attorney General Agreements were all for a duration of two years.

In 2007, the Attorney General and all 125 Minnesota hospitals renewed the Attorney General Agreements, this time for a duration of five years.  Fairview signed the Attorney

1

General Agreement in 2007. (Ex. 1.) The Attorney General Agreements were filed in the Ramsey County District Court, with their terms constituting a court order.

In the recitals to the Attorney General Agreement, the hospitals acknowledge their obligations as charitable organizations to meet certain standards of conduct imposed by their charitable mission and that the Attorney General Agreement sets forth appropriate standards for a non-profit hospital. (Ex. 1.) Among other things, the Attorney General Agreements require the hospitals' boards of directors to establish policies regarding and ensure compliance with the following:

1. The boards of directors must monitor the hospitals' debt collection activity and ensure that they abide by the directives of the Attorney General Agreement.

2. The hospitals may not charge an uninsured patient for a particular treatment more than they charge the insurance company that delivers the most revenue to the hospital (and thus receives the steepest discounts).

3. The boards of directors must establish a charity-care program that fulfills the hospitals' charitable mandate by giving patients who lack the ability to pay a reasonable opportunity to receive free or discounted care.

The Attorney General Agreements have been in effect for seven years. They reflect a standard of commercial reasonableness for the collection conduct of a non-profit hospital.

**3.2 Fairview Contracts with Accretive Health, Inc., a Licensed Debt Collector, to Manage Its "Revenue Cycle."** Accretive Health, Inc. ("Accretive") became licensed with the Minnesota Department of Commerce as a debt collector on January 20, 2011, listing "Medical Financial Solutions" as an assumed name. (*State of Minnesota v. Accretive Health, Inc.*, No. 12-145-RHK-JJK (D. Minn. 2012), First Amended Complaint, ¶ 11.) It became registered as a foreign corporation with the Minnesota Secretary of State in December, 2010. (*Id.*)

Nine months earlier, on March 29, 2010, Accretive entered into a Revenue Cycle Operations Agreement ("RCA") with Fairview. (Ex. 2.) Under the RCA, Fairview provided

Accretive with a copy of the Attorney General Agreement, and Accretive agreed to abide by the Attorney General Agreement in its collection activity. (*Id.*, pp. 2, 14.) The RCA provides that: "Accretive Health shall deliver all Services in accordance with all applicable laws, rules and regulations, *including, but not limited to, [Fairview's] agreement with the Minnesota Attorney General*…." (*Id.*, p. 2, emphasis added.)

**3.3    Requirements of the Attorney General Agreement.** The Attorney General Agreement requires the hospitals to adhere to numerous collection requirements and to establish detailed collection policies. The Attorney General Agreement makes it clear that the hospital cannot delegate authority or responsibility for its collection activity. Indeed, the Attorney General Agreement requires a *hospital employee designated by the Board of Directors* of the hospital—not a collection agency—to administer the collection process. (*See, e.g.*, Ex. 1, ¶¶ 2, 6, 8, 10, 11, 14, 18.) The standards imposed by the Attorney General Agreement include the following:

1.    The hospital cannot **collect debt** from a patient unless the applicable insurance company has first been billed and given an opportunity to pay the claim and there is a reasonable basis to believe the patient owes the bill. (Ex. 1, ¶ 17(a) and (b).)

2.    The hospital must offer a **reasonable payment plan** to patients who express an inability to pay the full amount in one payment. (*Id.*, ¶ 17(c).)

3.    The patient must be given a reasonable opportunity to submit an application for **charity care.** (*Id.*, ¶ 17(d).)

4.    The **hospital employees** empowered to carry out the above functions must be so designated by the Board of Directors. (*Id.*, ¶ 18.)

5.    A **hospital employee** must authorize any individual garnishment proceeding and make sure that the above steps have been met. (*Id.*, ¶ 10.)

6.    The CEO (*id.*, ¶ 15) and board of directors (*id.*, ¶ 38) of the hospital must determine on an **annual basis whether to renew a debt collection agency contract**, and may only do so if the agency has complied with the Attorney General Agreement and the mission of the hospital.

7.  Contracts with debt collection agencies must be in **writing** and must require the agency to operate in compliance with the Attorney General Agreement.  (*Id.*, ¶ 16.)

8.  **Contingency fee arrangements** with collection agencies are permitted only if the hospital has established sufficient controls to monitor the collection agency.  (*Id.*, ¶ 21.)

9.  The hospital must require its collection agency to **log all complaints** made by patients, and failure to do so may result in termination of the agency's contract.  (*Id.*, ¶ 22.)

10. The hospital must require its collection agency to **forward** all patients who object to the collections activity to the hospital and must include a disclosure notice of this right in all of its bills and collection letters.  (*Id.*, ¶ 24, 26.)

11. The hospital must **advise patients** of their right to contact the Attorney General if they encounter any problems with billings or the collection agency.  (*Id.*, ¶ 26.)

12. The hospital must **train** outside collectors on the principles of the hospital's charity-care policy.  (*Id.*, ¶ 25.)

13. Patients may not be reported to a **credit reporting agency** for failure to pay a bill.  (*Id.*, ¶ 27.)

14. The collector **must cease collection efforts** if the patient states that: 1) she doesn't owe the bill; 2) a third party payer is obligated to pay the bill, or 3) a patient needs documentation of the bill.  (*Id.*, ¶ 30.)

15. The hospital may not refer debt to a collection agency if the patient has made payments in accordance with a payment plan agreed to by the hospital.  (*Id.*, ¶ 19.)

16. The hospital must suspend all collection activity if a patient submits a charity-care application until the application has been processed and the patient notified of the decision.  (*Id.*, ¶ 20.)

17. The hospital board of directors must adopt a zero tolerance policy for false, deceptive, or misleading collections conduct.  (*Id.*, ¶ 37(a).)

**3.4     Accretive Incorrectly Summarizes the Attorney General Agreement, and then Ignores Its Own Summary.**  In April of 2010, Accretive prepared a summary of the Attorney General Agreement.  (Ex. 3.)  The summary is incomplete and riddled with errors.

Four obvious points required by the Attorney General Agreement, but omitted from the summary, are:

- that a hospital is prohibited from forwarding a patient account to a third-party collector until the applicable insurance policy has provided coverage and paid for its share of the treatment. (*See* Ex. 1, ¶ 17(a) and (b).)

- that if the patient indicates an inability to pay, the hospital must offer a reasonable payment plan. (*Id.*, ¶ 17(c).)

- that the patient must be given a reasonable opportunity to submit an application for charity care. (*Id.*, ¶ 17(d).)

- that the hospital itself must decide whether to refer an account to a third-party debt collector. (*Id.*, ¶ 17.)

Accretive's summary also contains several provisions from the Attorney General Agreement that have nevertheless been ignored by Accretive. For instance, the Attorney General Agreement requires: (1) the collection agency to log all communications made to patients; (2) the collection agency to include a disclosure notice in all patient communications; (3) the hospital to train outside collectors on the principles of the hospital's charity-care policy; (4) the hospital not to report patients to a credit reporting agency for failure to pay a bill; and (5) a collector to cease collection activities if the patient states that she does not owe the bill, that a third-party is obligated to pay the bill or that the patient needs documentation of the bill. (Ex. 3.)

**3.5     Medical Financial Solutions Gets Engaged**. In July of 2010, Accretive prepared a chart entitled "MFS Overview." (Ex. 4.) "MFS" stands for Medical Financial Solutions, an assumed name for Accretive. The chart contains a variety of collection letters. The letters notify the patient that Fairview believes the patient's bill is past due and that the debt has been assigned to MFS. The letter also states that, if the patient does not contact MFS within 30 days, the collection agency will assume the debt to be valid. The chart includes a variety of scripts in which the collector is told to leave a dunning message on the patient's voicemail.

5

The chart is problematic in several respects. First, it appears that MFS, not a hospital employee, is determining whether the patient owes a debt. Second, while the MFS letters attached to Exhibit 4 include the federally required "Mini-Miranda" notice (namely, that the letter is an attempt to collect a debt), letters actually utilized by MFS do not contain the "Mini-Miranda" warning. (Ex. 5.) Third, debt collection activity should not be discussed with third parties, something that is likely to occur when a dunning message is left on a voicemail.

The scripts also direct the collector to make the following misstatements:

- "In the long term this account could be passed to an agency that could report to credit bureaus." (The Attorney General Agreement prohibits the reporting of a medical debt to credit bureaus. (Ex. 1, ¶ 27.))

- "[B]y not paying, this account could possibly go to further collection activity." (Ex. 4.) (The debt is already in debt "collection activity" by the time Medical Financial Solutions is involved.)

- The scripts indicate that Medical Financial Solutions will continue to send bills even if there is an insurance claim pending. (Ex. 4.) (The Attorney General Agreement restricts collection activity while an insurance claim is being processed. (Ex. 1, ¶ 17(b).))

- The scripts indicate that if the patient applies for charity care, the collection agency will continue to dun the account. (The Attorney General Agreement restricts collections activity while a charity-care application is being processed.)

Another Accretive chart indicates that MFS will begin calling patients within 17 days after referral (Ex. 6, p. 2), and that, after completion of collection attempts, it will send the patient account to a legal team if the patient's FICO score (a credit score) exceeds 595. (*Id.*) The chart also indicates that MFS will make the determination of the "validation of the debt and review of [the] guarantor's credit information…." (*Id.*, p. 4.) The Attorney General Agreement requires a hospital employee appointed by the board of directors—not a collection agency—to make this determination. (Ex. 1, ¶¶ 1, 2, 37.)

On September 2, 2010, Accretive prepared and distributed sample scripts to respond to patient questions. (Ex. 7.) The scripts contain a number of proposed replies for collectors which are in violation of the terms and spirit of the Attorney General Agreement. For instance:

- If the patient says, "I don't have any money on me," the collector is directed to say: "We do accept credit card and checks, if you have your checkbook in your car I will be happy to wait for you…." (*Id.*, p. 1.) This statement is often made at a time that the patient is in the emergency room or waiting for treatment.

- If the patient says, "Go ahead and send me to collections," the collector is directed to say: "we do not want our patients to receive letters / calls from [a] collection agency. I hope you understand that once the account is with [a] collection agency that can affect your credit score as well." (*Id.*) The Attorney General Agreement prohibits reporting to a credit bureau.

- If the patient has no insurance, the collector is directed to offer a "cash flat rate" or discount. (*Id.*, p. 2.) The script states: "Mrs. Smith, my name is ___ and I'm the Financial Counselor (Admitting Rep) at [Fairview]. As a courtesy, we can offer you a discounted rate of $____ for today's services. We accept cash, check, debit or credit card. How would you like to pay for that?" (*Id.*) The script then indicates: "The discounted rate is only available today and that it is hospital policy that the amount is paid in full prior to receiving services." (*Id.*) This violates the Attorney General Agreement. Uninsured patients are to receive the same discount available to the hospital's "most favored insurer" (*e.g.*, the insurance company that delivers the most revenue to the hospital and therefore has the steepest discounts). The discount rate for uninsured patients under the Attorney General Agreement is not contingent upon same-day payment.

- The script indicates that the offer of a hospital payment arrangement should be the last option, and that a collector should never offer a hospital payment plan unless the patient does not have credit or debit cards. (*Id.*, p. 4.) This violates the Attorney General Agreement, which requires the hospital to offer and enter into a reasonable payment plan with patients who indicate an inability to pay the full amount in one payment.

In November of 2010, Accretive modified the chart, including several additional references to the Attorney General Agreement. (Ex. 8.) The chart states that MFS will closely monitor compliance with the Attorney General Agreement. (*Id.*, p. 9.) The chart again notes that the MFS legal team will complete the *initial* scoring and debt validation of all accounts for attorney placement. (*Id.*, p. 10.) As noted above, the Attorney General Agreement requires that

a hospital employee designated by the hospital's board of directors make the determination as to debt validation and referral of a patient's account to a collections attorney.

**3.6    Multiple Violations of the Attorney General Agreement.**  Five months later, on March 28, 2011, Fairview notified Accretive that the Minnesota Hospital Association had met with the Attorney General, who indicated that there were increased complaints about collection attempts in violation of the Attorney General Agreement.  (Ex. 9.)  The notice emphasized that:

> "We need to make sure that our processes are following the AG agreement to the letter."

(*Id.*)

Thereafter, on April 5, 2011, Fairview asked the Accretive collectors to execute a form attesting that they read and understood the Attorney General Agreement.  (Ex. 10.)  The next day, Thomas Merritt, an Accretive manager, doused cold water on the attestation by telling the collectors:

> "Very little of this will drive collector behavior – it's just so we can say we have it."

(Ex. 11.)

Approximately one month later, Fairview prepared a "Partnership Issues Log" that delineated problems with Accretive.  (Ex. 12.)  The "log" notes the following problems:

- MFS statements do not mention Fairview's financial assistance and payment arrangement programs.

- MFS statements do not include the required contact information for the Attorney General's Office.

- Patients with active payment arrangements with Fairview have received collection calls from MFS threatening to send the patient to bad debt collections.

- Patients with active payment arrangements have erroneously been sent to bad debt collections.

- MFS refuses patients' requests for itemized statements.

- MFS waited three months before sending Fairview a backlog of patient requests for itemized statements.

- MFS referred 6,000 accounts to bad debt collections without ever having sent the patients a letter for collection.

- Another 4,500 accounts were sent to bad debt collections after the patients received only one "welcome" letter.

- MFS sat on 300 payments and did not advise Fairview of the payments, resulting in artificially high statements sent to patients.

- MFS does not send patient disputes and complaints to Fairview and does not maintain a complaint log.

- The Attorney General Agreement is not understood by the MFS staff.

(*Id.*)

**3.7    May, 2011 Negative Fairview Audit Report.**  On May 5, 2011, Fairview issued an audit report of Accretive's compliance with the Attorney General Agreement.  (Ex. 13.)  The audit indicates that the following issues were identified:

- MFS staff, including the manager, stated that they were not familiar with the Attorney General Agreement.

- MFS staff, including the manager, stated that they were not familiar with Fairview's charity-care policy.

- MFS did not maintain a patient complaint log.

- MFS did not cease collection efforts when insurance claims were pending.

- Patients were referred to bad debt without proper patient identification.

- MFS collection notices did not contain disclosure language required by the Attorney General Agreement.

- MFS did not forward patient complaints to Fairview.

(*Id.*)  While the above items were highlighted in the audit report, several other deficiencies were noted in its attached schedule.  (*Id.*)

On May 10, 2011, an Accretive employee perhaps best exemplified the attitude of Accretive about the Attorney General Agreement. His response:

"What is the Attorney General Agreement?"

(Ex. 14.) He followed up this e-mail with another question:

"Could you please explain what is meant by 'violation of attorney general agreement?' What is/is not happening and how does it affect the client?"

(Ex. 15.)

On the same day, Andrew Crook, the Accretive executive in charge of the Fairview revenue cycle, noted that Fairview was upset about MFS's conduct and that Accretive was at risk of having the contract terminated. (Ex. 16.) He specifically referred to Accretive's violations of the Attorney General Agreement. (*Id.*)

**3.8     Fairview Distances Itself from Accretive and MFS.**  On September 23, 2011, Fairview notified Mr. Crook that MFS continued not to follow the checklist of items required by the Attorney General Agreement. (Ex. 17.)

On September 30, 2011, Fairview warned Mr. Crook that the vendor who undertook collection efforts prior to MFS was terminated for performance issues, and that the problems with MFS were substantially worse. (Ex. 18.)  The memorandum notes that MFS failed to comply with the Attorney General Agreement or with the hospital's community (charity) care policies.  Fairview again advised Accretive that patients in active payment arrangements continued to improperly receive collection notices and phone calls. (*Id.*)

In November, 2011, Accretive prepared a presentation concerning the complaints by Fairview. (Ex. 19.) It noted the following problems:

- MFS does not respond with appropriate diligence.

- MFS has not been open with complaints, as evidenced by patient lawsuits against MFS for Fairview collection activity that it did not disclose to Fairview.

10

- MFS placed Fairview at risk for Attorney General-related complaints due to its ignorance of the Attorney General Agreement.

- MFS has contacted patients in active payment arrangements, through calls and letters.

- MFS is unable to find a viable solution to fulfill the requirements of the Attorney General checklist.

- Fairview employees are concerned that they will be investigated for their patient collections activity due to *Star Tribune* articles about debt collection practices.

- Unions representing Fairview employees posted items critical of Accretive.

- Fairview employees are dissatisfied with the degradation in the revenue cycle.

- Theft of the Accretive laptop continues to cause ripples in the Fairview community.

- Matt Doyle (the Accretive employee whose laptop was stolen) should not have had access to patient data.

- The stolen laptop of another Accretive employee (Brandon Webb) was not reported to Fairview.

(*Id.*)

Again, on October 3, 2011, Accretive sent to Mr. Crook a performance chart which noted

that:

- MFS continues to call and send letters to patients who have active payment arrangements with Fairview.

- MFS fails to timely notify Fairview of disputes from patients.

- MFS's practices are viewed by Fairview as those of a "bad debt collection agency" and that MFS needs to refine its scripts.

(Ex. 20.)

On October 10, 2011, Mr. Crook was notified of another patient current on a payment

arrangement who received a letter from Accretive requesting payment. (Ex. 21.) Fairview noted

that "no breach or lapse in the payment arrangement…would create a reason for MFS to generate

a letter to the patient requesting payment." (*Id.*) The same day, Mr. Merritt of Accretive received another notice from Fairview that a patient making regular payments on a payment arrangement had received a collection letter from MFS that the patient found to be "embarrassing, a slap in the face" and that "he did not appreciate the letter in the least." (Ex. 22.)

On October 11, 2011, Accretive received yet another memo from Fairview noting that MFS had demanded payment from a patient even though no payments had been missed on his account. (Ex. 23.) The Fairview staff noted: "I have to call this gentleman back and apologize. No payments have been missed…." (*Id.*)

In late October of 2011, another chart was prepared noting the following Fairview concerns:

- Any deviation from the Attorney General guidelines will result in strict sanctions from the Attorney General.

- MFS continues to call and send letters to patients with active payment arrangements with Fairview.

- Consistent reminders are needed to have MFS notify Fairview of disputes from patients.

(Ex. 24, p. 3.)

On October 24, 2011, an exchange between Fairview and Accretive let it be known that some of the Accretive collection procedures should not be set out in charts because they might be picked up as a violation of the Attorney General Agreement. (Ex. 25.) What is noteworthy about the e-mail is that the issue wasn't whether anyone should follow the Attorney General Agreement; the issue was how to avoid it.

**3.9    December, 2011 Audit of Accretive.** On December 30, 2011, Fairview issued another audit report concerning Accretive's compliance with the Attorney General Agreement.

(Ex. 26.)   The draft states that "[w]e identified potential violations, on the part of MFS, of various regulatory standards including Health Insurance Portability and Accountability Act (HIPAA), Fair Debt Collections Practices Act (FDPA), Payment Card Industry (PCI), and Minnesota State Statutes."   (*Id.*, p. 2.)   The draft stated that the control over the collection process was unsatisfactory, and that Accretive employee dissemination of patient health and credit card information over the internet was conducted in an unsecure manner.  (*Id.*, p. 3.)

   **3.10   Termination of Accretive by Fairview.**   On January 6, 2012, Fairview notified Accretive of the December 31, 2011 audit results, which were "not favorable."  (Ex. 27.)   On January 10, 2012, Fairview notified Accretive that the audit revealed poor customer satisfaction, inappropriate handling of accounts, potential regulatory violations, and noncompliance with multiple regulatory standards.  (Ex. 28.)   The notice stated that Fairview was transitioning the business away from Accretive effective January 31, 2012.  (*Id.*)   On February 23, 2012, Mr. Crook, who was involved in almost all of the substantive correspondence described in this volume, responded to a report about the Attorney General Agreement on February 23, 2012, by saying:

> "Here is the audit from earlier this year – by the way, I wish I had this earlier this year."

(Ex. 29.)

   After the Attorney General filed a lawsuit against Accretive on January 19, 2012, the collection office of Accretive, located in Kalamazoo, Michigan, ceased any further collection activity with Fairview.  (Ex. 30.)   Accretive was in violation of Minnesota debt collection laws for, among other things, engaging in unlicensed activity.  Accretive signed a Consent Order in February of 2012 in which it agreed to cease any further collection efforts in Minnesota. (Ex. 31.)

**Conclusion.**   The conduct of Accretive constitutes multiple separate violations of the Attorney General Agreement, whose terms are ordered by a court of law.   Accretive engaged in a series of willful and deceptive acts in violation of the terms of the Attorney General Agreement. The cavalier and indifferent actions of Accretive, repeated time and again over a two-year period, show a blatant disregard for the law.

AG: #2991480-v1