# EXHIBIT J

# STATE OF MINNESOTA

## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

**Volume 4**
**Privacy Violations**



## LORI SWANSON

### ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME FOUR

# PRIVACY VIOLATIONS

Executive Summary ...................................................................................................................1

4.1   The Right to Privacy .........................................................................................................1

4.2   The Disclosure of Medical Data Causes Real Harm ...........................................................2

4.3   The Health Insurance Portability and Accountability Act (HIPAA) ..................................4

4.4   Minnesota Privacy Laws....................................................................................................6

4.5   Accretive's Promises Under Its Business Associate Agreement.........................................7

4.6   "Smash and Grabs"............................................................................................................8

4.7   Collection Agents Have a Straw into Fairview's Computer System..................................11

4.8   Unencrypted E-mails .......................................................................................................13

4.9   Inadequate Encryption .....................................................................................................14

4.10  Password Breach in India.................................................................................................14

4.11  Other Security Breaches ..................................................................................................15

4.12  Transparency on Data Breaches.......................................................................................17

Conclusion ............................................................................................................................17

# VOLUME FOUR

# PRIVACY VIOLATIONS

**Executive Summary:** **Accretive Health, Inc. has violated state law by inappropriately disseminating private patient information without disclosure to or consent from patients. Accretive has violated HIPAA in the use of patient health data for purposes of collection activity. These acts have resulted in multiple violations of patient privacy rights under federal and state law.**

**4.1    The Right to Privacy.**  As long ago as the fifth century B.C., the ancient Greeks recognized the right to privacy in one of the oldest canons of western civilization, the Hippocratic Oath for doctors:

> "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of men … I will keep to myself …."

The U.S. Supreme Court has defined privacy as follows:

> "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe…."[1]

The federal courts have extended the right to privacy to areas such as marriage,[2] procreation,[3] contraception,[4] family relationships,[5] child rearing, and education.[6]  Congress further extended the right to privacy to video tape rentals,[7] cable television records,[8] drivers' license data,[9] social security numbers,[10] credit bureau information,[11] telephone records,[12] and bank financial data.[13]

The Minnesota Supreme Court has also recognized the right to privacy:

> "The right to privacy is an integral part of our humanity; one has a public persona, exposed and active, and a private persona, guarded and reserved. The heart of our liberty is choosing which parts of our lives shall become public and which parts we shall hold close."[14]

The Minnesota Legislature also passed numerous laws to recognize the right to privacy for drug abuse programs,[15] welfare data,[16] library book selections,[17] sexual assault victims,[18] pharmacist data,[19] insurance data,[20] clergy/parishioner communications,[21] and information

provided to mental health and chemical dependency therapists.[22]  At the state level, the right to privacy has also been extended to attorney-client communications,[23] domestic abuse records,[24] bank data,[25] and business customer lists.[26]  The privacy right in a patient's communication with her health professional is also protected by Minnesota law.[27]

**4.2    The Disclosure of Medical Data Causes Real Harm**.  Medical information is among the most personal and private types of information about a person.  Medical privacy is not only a legal, moral, and ethical obligation, but also an important part of patient treatment.  Patients share the most intimate confidences with their physicians, assuming the conversations to be confidential.  Health care confidentiality is designed to encourage the full and frank sharing of information between patients and their health care providers.  If health records are not confidential, patients will not be candid and might forego treatment, compromising public safety, personal health, and human dignity.

A quick look at recent incidents shows why health privacy matters.

In 2001, a University of Minnesota researcher accidentally posted the names and psychological evaluations of children on the University of Minnesota's website home page.[28]  In 2002, the parents of a dead child whose kidney was donated to another child were contacted by the recipient's parents, asking whether the dead child's family had any history of cancer.[29]  This happened because the University of Minnesota erroneously included anonymous donor names in a mass mailing.[30]  In 2009, a patient of a Fairview clinic was tested for a sexually transmitted disease because she had a new sex partner.  A clinic employee copied the patient's medical records and then published a photo of the patient, her medical records, and the name of the patient's husband on a *MySpace* website entitled "Rotten Candy."[31]  In 2010, six employees of the Fairmont Medical Center accessed, without authority, the medical records of a patient.[32]  In

2011, approximately three dozen employees of Mercy Hospital and Unity Hospital accessed, without authority, medical records involving the hospitalization of eleven teenagers who overdosed on synthetic drugs.[33]

Medical data breaches are on the rise. The United States Department of Health and Human Services established a "Wall of Shame" in February, 2010, which now lists over 370 major incidents involving over 10 million people where medical data was breached.[34] Anecdotal examples of data breaches include an employee of the Florida Department of Health who used a list of 4,000 AIDS patients to screen potential sexual partners for himself and his friends.[35] In 2010, 20,000 emergency room patients at Stanford Hospital had their names and diagnostic information posted online for nearly a year.[36] A drug manufacturer revealed the e-mail addresses of individuals who have depression, bulimia, and obsessive compulsive disorder.[37] A congressional candidate's health records of her suicide attempt were faxed to a newspaper.[38] In 2006, a health care worker sold an FBI agent's medical records.[39] In 2007, the owner of a medical claims business submitted false Medicare claims for 1,000 patients whose records he stole.[40] In Seattle, a phlebotomist at a cancer center stole the credit card information of a cancer patient.[41] A hospital billing and collection employee used 400 stolen patient names to perpetrate a tax fraud scheme.[42] In Arkansas, a physician copied the records of a local television anchor who was raped.[43] In California, a collection agency attempting to collect from a patient disclosed the medical history of the patient and her kids to consumer credit bureaus.[44] In Arkansas, a nurse gave patient information to her husband, who attempted to blackmail the patient with it.[45] In 2003, a cardiothoracic surgeon at UCLA who thought he was about to be disciplined, retaliated by accessing the medical records of his superiors.[46] In 2011, the UCLA

3

Health System paid $865,000 after employees were caught examining celebrity medical records.[47]

The problem is not limited to the United States. In India, transcriptionists sell medical files to businesses. In 2009, a BBC reporter contacted two India salesmen on a website about the purchase of patient records. The salesmen said that they have under contract 17 team managers and 30,000 patient files from which they can identify the names of patients, physicians, diseases, and products desired by the patients.[48] In 2004, a Pakistani medical transcriber threatened to post patient records on the internet unless the San Francisco Medical Center settled a financial dispute.[49] In 2004, Heartland Information Services of Ohio encountered a similar extortion attempt when Bangalore workers threatened to post medical records online.[50]

Recent surveys find that patients overwhelmingly take privacy into consideration when making decisions about health treatment, with over 40% of patients withholding information due to concerns about data breaches.[51] No wonder. A patient's health data, if improperly disclosed, can affect the patient's ability to find a job, to buy insurance, to obtain credit, or even to maintain personal relationships.

As set forth below, Accretive Health, Inc.—which has entered into contracts with Fairview Health Services ("Fairview")—has handled patient data in a cavalier manner. Accretive's mishandling of patient data is not restricted to the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[52] The mismanagement also offends state privacy statutes.[53]

**4.3    The Health Insurance Portability and Accountability Act.** The HIPAA "Privacy Rule" establishes standards for the privacy of Individually Identifiable Health Information ("IIHI"), generally referred to as "Protected Health Information," or PHI. The basic

principle of the Privacy Rule is that "a covered entity" may not use or disclose protected health information, except either: (1) as the Privacy Rule permits or requires, or (2) as the individual who is the subject of the information authorizes in writing.[54] A health care provider that transmits health information in electronic form in connection with a standard transaction, such as the submission of health care claims, is a covered entity.[55]

Fairview is a "health care provider." It is comprised of hospitals and clinics that furnish health care services in the normal course of business.[56] Accretive is also a "health care provider" with respect to Fairview patients. Accretive employs nurses and social workers through its QTCC contract who provide counseling services to Fairview patients.[57]

Accretive and Fairview are "covered entities" under HIPAA because, among other things, they transmit health information in electronic form in connection with standard transactions governed by HIPAA, such as the submission of health care claims to a health plan.[58] Thus, Accretive and Fairview are required to fully comply with the HIPAA standards that govern the security, breach notification, and privacy of protected health information, as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH").[59] Accretive's own records describe the breadth of personally identifying data that qualifies certain health data as PHI:

1. Names
2. All geographic subdivisions smaller than a state
3. All elements of dates
4. Phone numbers
5. Fax numbers
6. Electronic mail addresses
7. Medical record numbers
8. Health plan beneficiary numbers
9. Account numbers
10. Certificate or license numbers
11. Vehicle identifiers and serial numbers, including license plate numbers
12. Device identifiers and serial numbers

13.     Web Universal Resource Locators
14.     Internet Protocol (IP) address numbers
15.     Biometric identifiers, including finger or voice prints
16.     Full face photographic images
17.     Any other unique identifying number, characteristic or code.

(Ex. 1.)

**4.4**     **Minnesota Privacy Laws.**   Minnesota Statutes section 144.293 prohibits the release of medical records without the patient's consent. It provides for a private cause of action against the provider that improperly discloses medical data. Minn. Stat. § 144.298, subd. 2.

On its website, Fairview tells its patients the following with regard to the privacy of their medical data:

> "Fairview is concerned about the privacy interests of consumers and is committed to respecting your privacy by using any personal information gathered in only the most responsible way possible. Fairview does not acquire any more information about customers than is necessary to provide efficient and secure service. **When we collect personal data, we will endeavor to disclose to you how we will use this information. Fairview will also seek to take all appropriate steps to ensure that any personal information given is protected by secure technology, including using digital signatures and other credit card data protection technology.** When Fairview collects your personal data, we may use it for research or to improve our service or website. We will ask if you want us or any of our business partners to use that information to contact you in the future about new products or services that might interest you. If you do not wish to be contacted by Fairview or any of our business partners, you can choose to have your information kept out. **Fairview gives access to personal information about consumers only to employees who require it to perform their jobs. We will take every appropriate step to keep your information secure from other employees.** If you have questions about this privacy policy, please send an e-mail to the Fairview web team."

(Ex. 2, emphasis added.)

Fairview has misrepresented to patients how their health data will be handled as it relates to the hospitals' relationship with Accretive. Minnesota law prohibits misrepresentations, false promises, and fraudulent statements to consumers.[60] Nowhere in the privacy notice does Fairview disclose that patient data will be turned over to Accretive, a third party collection

agency.  Nowhere in the privacy notice does Fairview disclose that Accretive will use the data to further its efforts to collect money.

**4.5    Accretive's Promises Under Its Business Associate Agreement.**  On February 18, 2010, Accretive and Fairview entered into a Business Associate Agreement, as required by HIPAA.[61]  (Ex. 3.)  Under the terms of the Agreement, Accretive agreed to administer health data as required by HIPAA and HITECH.  Accretive also agreed to the following:

- It would only use patient information for the management services required under its other agreements with Fairview.
- All of the patient data shall remain the sole property of Fairview.
- Accretive will use appropriate safeguards to prevent the disclosure of the health data.
- Accretive will take appropriate steps to mitigate any effects of an unauthorized disclosure of patient information.
- Accretive will, within five days of a breach, inform Fairview of a breach.
- Accretive will make available any confidential patient data to Fairview within 10 days of a request.
- Accretive will make prompt disclosure and accounting of any disclosures of confidential patient data upon Fairview's request.
- Accretive will destroy any confidential patient information no longer required to be used in the performance of its agreement with Fairview.
- All patient information shall be kept strictly confidential.
- Accretive will maintain and use appropriate administrative, technical, and physical safeguards to ensure the confidentiality and security of the PHI it creates, receives, maintains, or transmits.
- Accretive will return all protected health information back to Fairview, or destroy such information, upon termination of the Agreement.

Fairview provided Accretive with access to virtually all patient data beginning in the spring of 2010.  The data was initially maintained on the PASS system utilized by Fairview for both patient medical records and patient financial records.  Thereafter, Fairview converted to the EPIC system.

**4.6    "Smash and Grabs."**   Accretive employees operate mostly with laptops. Accretive prepared a slide presentation in February of 2011 which acknowledged that four Accretive laptops had been "smashed and grabbed" out of cars.  (Ex. 4, p. 1.)  In each instance,

an Accretive employee left a laptop in plain view in a locked car, the car was broken into, and the laptop was stolen. The company notes that its laptops often contain "tons of patient health and financial information." (*Id.*, p. 2.)

On June 2, 2010, an Accretive employee named Brandon Webb left an Accretive laptop in plain view in his rental car in the parking lot of an Old Mexico Restaurant in Roseville, Minnesota. A thief broke into the car and stole the laptop. (Ex. 5.) At the time, Mr. Webb was working for Accretive on the Fairview revenue cycle contract.

Accretive failed to notify Fairview that the laptop had been stolen. Fairview instead learned of the compliance breach through a series of anonymous tips and from employees who questioned the wisdom of providing confidential medical data to Accretive when it did not bother to secure the data. (Ex. 6.) In November of 2011, Fairview complained to Stephen Kelly, the Vice President of Compliance at Accretive, that Fairview was disturbed to learn that a laptop had been left in plain sight in a car and stolen. (Ex. 7.) Mr. Kelly suggested that notice was not required because the laptop was encrypted. (Ex. 8.)

About a year after Mr. Webb's laptop was stolen from his car, another Accretive employee had a "smash and grab" of his Accretive laptop from his car. On July 25, 2011, Accretive employee Matthew Doyle parked his car outside a restaurant in the Seven Corners neighborhood of Minneapolis. Once again, Mr. Doyle left the Accretive laptop in plain view of a thief, who broke into the car and stole the laptop. The laptop was not encrypted. (Ex. 9.)

The laptop contained confidential data on approximately 23,000 patients of Fairview and North Memorial Health Care, as well as data of a hospital in Detroit, Michigan. Three months after the laptop was stolen, in late October, 2011, Accretive finally responded with a report prepared by Kroll Consulting. (*Id.*) The Kroll report indicates that the laptop contained 15.4

gigabytes of data, more than 600 files containing PHI or PII, and 20 million records.  The report gives no analysis as to why Mr. Doyle would comingle the patient records of various hospitals on his laptop, why he would need extensive health information about patients as a "revenue cycle" employee, why he would need to store so much patient data on his laptop, or why he would need to keep health records of Fairview patients when he was apparently now working on a revenue cycle contract with North Memorial Health Care.  (*Id*.)

After the laptop theft became public, patients complained to Fairview about the invasion of privacy.  At least one of the patients requested that she be provided a copy of her medical data that was on the computer.  Fairview provided her with this screen shot:

| First Name | Last Name | Mid. Initial | HMO ID | Patient ID | Group Number | Subscriber Number | Dependent Code | Gender | Date of Birth |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0 | ▮ | ▮ |

| Age | Months Enrolled | Active Last Day | Address 1 | Address 2 | City | State | Zip Code | Phone Number | Attributed TIN |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | 12 | Yes | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

| Attributed Clinic | Attributed Provider | Provider (Short) | Predicted Complexity | Total Provider Allowed | Probability of IP Stay | Frail Condition | # Hospital Dominant Conditions | # Chronic Conditions | Macular Degeneration |
|---|---|---|---|---|---|---|---|---|---|
| FAIRVIEW | ▮ | ▮ | 2.287 | $4,584.90 | 0.06 | No | 0 | 4 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | | 1 | 0 | 0 | 1 | 0 | 1 | 0 |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | COPD | Renal Failure | Low Back Pain |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | Good | -- | -- | Good | -- | Good | -- |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | Predicted Complexity (SORTED) | Total Provider Allowed | Probability of IP Stay |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | -- | -- | -- | -- | 1600 | 2136 | 1206 |

| # Hospital Dominant Conditions | # Chronic Conditions | Top - Complexity | Top - Allowed Amt | Top - Both Complexity & Allowed Amount | Top - Either Complexity & Allowed Amount |
|---|---|---|---|---|---|
| 243 | 366 | 0 | 0 | 0 | 0 |

The screen shot contains the following medical data, which is acknowledged by Accretive (Ex. 1) to be PHI under HIPAA:

- Patient's full name
- Gender

- Number of dependents
- Date of birth
- Social Security Number
- Clinic and Doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay by the patient
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- The number of "chronic conditions" the patient has
- A specific listing of certain medical conditions encountered by the patient, including:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma
  - HIV
  - Metabolic disorder
  - Hypertension
  - Hypothyroidism
  - Immune suppression disorder
  - Ischemic heart disease
  - Osteoporosis
  - Parkinson's disease
  - Asthma
  - Arthritis
  - Schizophrenia
  - Seizure disorder
  - Renal failure
  - Low back pain

On October 12, 2011, in response to the complaint by Fairview about employees leaving laptops in plain sight, and at about the same time Kroll was completing its report, Accretive advised its staff to hide their laptops when they leave them in their cars. (Ex. 10.)

**4.7    Collection Agents Have a Straw into Fairview's Computer System.**  In the Kroll report, Mr. Doyle—a revenue cycle employee—acknowledged that he had been given online access to Fairview's databases. (Ex. 9, p. 7.)  He wasn't the only one.

Following the Attorney General's lawsuit, the Minnesota Department of Commerce conducted an examination of Accretive's collection office in Kalamazoo, Michigan. There are approximately 100 collection agents located in the Kalamazoo facility who are in charge of both inbound and outbound telephone calls relating to the accounts receivable due from patients in hospitals under management by Accretive.

While the Minnesota Department of Commerce examination is not yet complete, the examiners have confirmed to the Attorney General's Office that collection agents had access to personal and confidential health data of Fairview patients. Some Accretive debt collectors in Kalamazoo were able to access directly the Fairview PASS system and the patient records contained in it. A screen shot from Fairview's PASS system (attached as Exhibit 11) shows the type of data available to collection agents. The first page of Exhibit 11 indicates that this patient suffered from major depression, alcohol intoxication, migraines, attention deficit disorder, and attempted suicide by cutting his wrist. The second page shows the type of treatment provided to the patient.

Accretive collection agents also have access to Fairview patient medical data through the "WinCollect" software utilized by Accretive. Attached as Exhibit 12 is a screen shot of the "WinCollect" program utilized by Accretive. The screen shot displays a box in the middle of the screen which identifies hospital information such as the patient's diagnosis, treatment, and payment history. In other words, Fairview patient data was imported by Accretive into WinCollect and then used to collect debts.

The Minnesota Department of Commerce examiners conducted interviews of several Accretive collection agents, who felt that patient medical data should not be used to collect debts. The Department of Commerce examiners also listened to recordings of telephone

conversations between Accretive's collection agents in Kalamazoo and Minnesota patients, which confirm that patient health information was used to collect debts. In addition, when Fairview's Internal Audit division asked Accretive's Kalamazoo office to supply a sample of customer calls, MFS management e-mailed a file containing PHI. (Ex. 13, p. 5.) To add insult to injury, the file was apparently e-mailed in an unsecure manner.

HIPAA, as amended by HITECH, requires that Accretive restrict its employees' access to patient protected health information. To the maximum extent possible, the employees are only supposed to have access to a "limited data set"[62] as necessary to perform their duties.[63] Only the "minimum necessary" amount of information is to be supplied to the employee for such intended purpose.[64] The privacy pledge of Fairview to patients underscores that only employees who need to know the medical information should have access to it. (*See* Section 1.4, *supra.*) Similarly, the Business Associate Agreement requires Accretive to use "appropriate safeguards" to prevent the misuse or disclosure of protected health information. (*See* Section 1.4, *supra*; *accord* 45 C.F.R. § 164.314(a)(2)(i)(A).) Accretive also agreed to keep all protected health information "strictly confidential" and to require all of its employees and subcontractors to maintain the confidentiality of protected health information. (Ex. 3.) Additionally, Accretive agreed to develop, maintain, and use all appropriate administrative, technical, and physical safeguards to preserve the confidentiality and integrity of protected health information as required by 45 C.F.R. § 164.306. (Ex. 3.)

The fact that Mr. Doyle—an Accretive revenue cycle employee—had 15.4 gigabytes of data, including protected health data on 23,000 patients of two Minnesota hospitals and data from a Michigan hospital, commingled on his laptop, underscores that Accretive does not restrict access to patient data to a "need to know" basis among its employees. Indeed, at the time his

laptop was stolen, Mr. Doyle was working on a revenue cycle contract with North Memorial, but his laptop still had protected health information about 14,000 Fairview patients. Further, Mr. Doyle supposedly was a revenue cycle employee, yet he had data apparently generated under the Quality Total Cost of Care, or QTCC, contract between Fairview and Accretive.

**4.8** **Unencrypted E-mails.** Accretive has failed to properly encrypt e-mails containing protected health data. In December, 2011, Fairview's internal auditors described an episode in which an employee of Accretive's Medical Financial Solutions (its collection division) sent protected health information and credit card information over the Internet in an unsecure manner. (Ex. 13.) Accretive's own materials describe unencrypted e-mails as a "common Accretive HIPAA incident." (Ex. 19.)

Attached as Exhibit 14 is a transcript of apparently unencrypted e-mail discussions between several Accretive collectors concerning a patient at the University of Minnesota Medical Center. The transcript begins on the morning of June 3, 2011, with a transmission from Accretive's Samuel Johnmeyer about a patient with three upcoming visits to the hospital. He notes that she is uninsured and has an outstanding balance of $179,000. The transcript continues with the collectors discussing the condition of the patient's disease and trying to figure out if her cancer is terminal or simply disabling. The exchange ends with the collectors concerned that the uninsured patient may incur up to $40,000 in radiation bills. (*Id.*) It is troubling that Accretive's revenue cycle collectors would feel the need to discuss a patient's medical condition. It is also troubling that the e-mails do not appear to have been encrypted. The collectors are aware that the patient is uninsured and doesn't qualify for Medicaid. They need not go further in discussing her cancer.

**4.9     Inadequate Encryption.**  It appears that when Accretive began work under the QTCC contract at Fairview, employees, on their own, had to download thirty days of "free trial offer" encryption service from the Internet if they wanted to encrypt their e-mails, because Accretive did not provide applicable encryption software.  (Ex. 15.)  At the end of the thirty day "free trial offer," employees simply tried to download the program again.

**4.10     Password Breach in India.**  On January 26, 2012, at approximately the same time as the Attorney General filed the lawsuit against Accretive, a report was prepared for Accretive in which a hospital, Carondelet, part of Ascension Health, reported to Accretive that there was a password sharing incident in India.  (Ex. 16.)  Because of the limited information produced by Accretive, the extent to which patient information was breached is unknown.  It should be noted, however, that other employees told the Attorney General's Office that Accretive employees used the log-in information of Fairview employees to download files, to which they otherwise might not have access.

**4.11     Other Security Breaches.**  In November of 2011, Fairview and Accretive conferred about a variety of problems that Fairview had with Accretive's performance.  The agenda for the meeting (Ex. 17, p. 10) states that Fairview complained that Accretive was not committed to security and that Fairview employees were able to access contract data of other hospitals under management of Accretive through their software system.  (*Id.*)  If the information includes pricing data with insurers, this could lead to an antitrust violation because the hospitals had access to each other's pricing information.

**4.12     Transparency on Data Breaches.**  When confronted by Fairview about the laptop incident, Accretive is not believed to have disclosed that it had prior problems with laptop thefts.  Rather, it appears that Accretive may have plotted to advise Fairview that the stolen

laptop involving Mr. Doyle was the first such incident in the company's history and that employees have access to only the "minimum necessary" data. (Ex. 18.)

In fact, Accretive's compliance officer recently prepared a PowerPoint which noted the following failures under HIPAA:

"Common Accretive HIPAA incidents:

- Laptops, unencrypted emails, too much access."

(Ex. 19.)

**Conclusion.** Patient privacy is one of the oldest rights known to patients and is a bedrock principle of the doctor-patient relationship. Yet, Accretive treats patient privacy in a loose and cavalier fashion. Even though patients of Fairview are assured that their health records will be protected from dissemination to third parties, Fairview has broadly shared patient data with Accretive, a licensed debt collector. Accretive has used protected patient health information to collect debts from patients; indeed, its debt collectors use the data to build credibility with patients. Accretive, whose employees' laptops contain "tons of patient health and financial information," has had multiple "smash and grabs" of laptops from cars—compromising patient privacy—and has sent unencrypted e-mails containing patient health information. Accretive has shown that it cannot be trusted to maintain the privacy of patient health information.

AG: #2991826-v1

---

[1] *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992).
[2] *Loving v. Virginia*, 388 U.S. 1 (1967).
[3] *Skinner v. Oklahoma*, 316 U.S. 535 (1942).
[4] *Eisenstadt v. Baird*, 405 U.S. 438 (1972).
[5] *Prince v. Massachusetts*, 321 U.S. 158 (1944).
[6] *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).

---

[7] 18 U.S.C. § 2710.

[8] 47 U.S.C. § 551.

[9] 18 U.S.C. § 2721; Minn. Stat. §§ 168.346, 171.12.

[10] 42 U.S.C. § 405 (c)(2)(C)(viii).

[11] 15 U.S.C. § 1681(a)(4).

[12] 18 U.S.C. § 2709.

[13] 12 U.S.C. § 1951.

[14] *Lake v. Walmart Stores, Inc*., 582 N.W.2d 231, 235 (Minn. 1998).

[15] Minn. Stat. § 254A.09.

[16] Minn. Stat. § 13.46.

[17] Minn. Stat. § 13.40.

[18] Minn. Stat. § 13.822.

[19] Minn. Stat. § 151.213.

[20] Minn. Stat. § 72A.502.

[21] Minn. Stat. § 595.02(1)(c); *State vs. Orfi*, 511 N.W.2d 464 (Minn. Ct. App. 1994), *review denied* (Minn. Mar. 15, 1994).

[22] Minn. Stat. § 595.02(1)(g).

[23] Minn. R. Prof. Conduct 1.6.

[24] Minn. R. Juv. Prot. P. 8.04.

[25] *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976).

[26] *Creative Commc'ns Consultants v. Gaylord*, 403 N.W.2d 654 (Minn. Ct. App. 1987).

[27] *See, e.g.*, Minn. Stat. Ch. 144; Minn. Stat. § 595.02, subd. 1(d), (g), and (i).

[28] Maura Lerner and Josephine Marcotty, *Web Posting has Health and University Officials Scrambling*, STAR TRIB., Nov. 8, 2001, at B1.

[29] Mike Hatch, *HIPAA: Commercial Interests Win Round Two*, 86 MINN. L. REV. 1481, 1491 (2002).

[30] Josephine Marcotty, *Names of Donors are Accidentally Included in a Letter to Kidney Patients*, STAR TRIB., Jan. 15, 2002, at A1.

[31] *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 39 (Minn. Ct. App. 2009).

[32] Meg Alexander, *Hospital Fires 6 Over Privacy Breach*, FAIRMONT SENTINEL, Sept. 30, 2010, http://fairmontsentinel.com/page/content.detail/id/510004.html?nav=5003 (last visited Apr. 9, 2012).

[33] Editorial, *Allina's Harsh But Justified Firings*, STAR TRIB., May 14, 2011, at A1.

[34] Breaches affecting 500 or More Individuals, U.S. Department of Health and Human Services, www.hhs.gov/ocr/privacy/hipaa/administrative/breachnotificationrule/breachtool.html.

[35] Sarah Tippit, *AIDS List Leak Causes Concern Over Security of Health Records*, CHI. SUN TIMES, Oct. 14, 1996, at 22.

[36] Kevin Sack, *Patient Data Posted Online in Major Breach of Privacy*, N.Y. TIMES, Sept. 8, 2011, http://www.nytimes.com/2011/09/09/us/09breach.html?pagewanted=all.

[37] Robert O'Harrow, *Prozac Maker Reveals Patient Email Addresses*, WASH. POST, July 4, 2001, at E1.

[38] AMITAI ETZIONI, THE LIMITS OF PRIVACY 141 (1999).

[39] *United States v. Ramirez*, No. 7:05CR00709 (S.D. Tex. 2005).

[40] *United States v. Ferrer*, No. 06-60261 CR-COHN (S.D. Fla. Sept. 7, 2006).

[41] *United States v. Gibson*, No. CR04-374RSM, 2004 WL 2188280 (W.D. Wash. Aug. 19, 2004).

[42] *United States v. Williams*, No. 1:06-CR00129-UNA (D. Del. Nov. 16, 2006).

[43] *United States v. Holland*, 4:09-cr-00168-HLJ (E.D. Ark. 2009).

[44] *Brown v. Mortensen*, 253 P.3d 522 (Cal. 2011).

[45] *United States v. Smith*, 4:07-cr-00378-SWW (E.D. Ark. 2008).

[46] *United States v. Zhou*, No. 08CR01356 (C.D. Cal. 2008).

[47] *California Hospital System Pays $865,000 to Settle Medical Privacy Cases of Two Celebrities*, Pro Publica, July 7, 2011, *available at* http://www.propublica.org/article/ucla-health-system-pays-865000-to-settle-celebrity-privacy-allegations (last visited Apr. 10, 2012).

[48] Chris Rogers, *Tonight* (ITV television broadcast Oct. 18, 2009).

[49] David Lazarus, *How One Offshore Worker Sent Tremor Through Medical System*, S.F. CHRON., March 28, 2004, at A1.

[50] David Lazarus, *Extortion Threat to Patients' Records:  Clients Not Informed of India Staff's Breach*, S.F. CHRON., April 2, 2004, at A1.

[51] Press Release, *Nationwide Survey Reveals Privacy Concerns Impact Healthcare Decisions Among Canadian Patients and Outcomes of Patient Care*, FairWarning, Inc., Jan. 26, 2012, *available at* http://www.marketwatch.com/story/nationwide-survey-reveals-privacy-concerns-impact-healthcare-decisions-among-canadian-patients-and-outcomes-of-patient-care-2012-01-26 (last visited Apr. 9, 2012).

[52] *See* Pub. L. 104-191, §§ 261-64 (authorizing the Secretary of Health and Human Services to issue privacy regulations governing health information); 45 C.F.R. pt. 160, 164.

[53] Minn. Stat. §§ 144.291-.298, 144.651, subd. 16.

[54] *Summary of HIPAA Privacy Rule*, U.S. Department of Health and Human Services, at 1 (May 2003) *available at* http://www.hhs.gov/ocr/privacy/hipaa/understanding/summary/privacy summary.pdf.

[55] 42 U.S.C. §§ 1320d-1(a)(3), 1320d-2(a); 45 C.F.R. §§ 160.102(a)(3), .103.

[56] *See* 42 U.S.C. §§ 1320d(3), 1395x(s), (u); 45 C.F.R. § 160.103.

[57] 42 U.S.C. § 1320d(3); 45 C.F.R. § 160.103.

[58] 42 U.S.C. § 1320d-2(a); 45 C.F.R. § 160.103.

[59] 42 U.S.C. § 1320d-1(a); 45 C.F.R. §§ 160.102(a), .103.

[60] *See* Minn. Stat. §§ 325D.44 (Deceptive Trade Practices Act), 325F.69 (Consumer Fraud Act).

[61] 45 C.F.R. §§ 164.308(b)(4), .502(e)(2).

[62] HIPAA defines a "limited data set" as protected health information that *excludes* the following individually indentifying information: name, address, telephone number, e-mail address, social security number, medical record number, health plan beneficiary number, account number, license number, vehicle identifiers, device identifiers, URLs, IP address, biometric identifiers, and photographs.  45 C.F.R. § 164.514(e)(2).

[63] 42 U.S.C. § 17935(b); 45 C.F.R. § 164.514(d).

[64] *See* 45 C.F.R. §§ 164.502(b), .514(d).

# STATE OF MINNESOTA
## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

**<u>Volume 5</u>
Violations of Federal and State Debt Collection Laws**



## LORI SWANSON
## ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME FIVE

# VIOLATIONS OF FEDERAL AND STATE DEBT COLLECTION LAWS

Executive Summary ........................................................................................................1

5.1    Accretive Is a Collection Agency ........................................................................1

5.2    "Front End" Collections........................................................................................2

5.3    Prior Balance and Point of Service Collections...................................................3

5.4    Pre-Service Collections but no Post-Service Refunds..........................................7

5.5    Bedside Collections .............................................................................................8

5.6    Suggested Scripts for "Point of Service" Collectors...........................................9

5.7    "Back End" Collections and Medical Financial Solutions ................................10

5.8    "Dormant Collections".......................................................................................11

5.9    Debt Collection Legal Violations ......................................................................11

Conclusion ..................................................................................................................18

# VOLUME FIVE

# VIOLATIONS OF FEDERAL AND STATE DEBT COLLECTION LAWS

**Executive Summary**: **Individual third-party collectors who contact Minnesota patients must be registered as collectors by the State of Minnesota. Accretive Health, Inc. employs unlicensed third-party collectors who misrepresent themselves as "financial counselors" to patients of Fairview Health Services. The unlicensed collectors, located in Kalamazoo, Michigan, are improperly given access to private medical information of Fairview patients, which they use to gain the trust of patients. The collectors use deceptive and unlawful collection tactics, which violate state and federal debt collection laws.**

**5.1    Accretive Is a Collection Agency**.  Accretive Health, Inc. ("Accretive") and Fairview Health Services ("Fairview") entered into a complex collection agreement, styled as a Revenue Cycle Operations Agreement ("RCA"), in March, 2010.  *See* Vol. 1, Ex. 4.  Fairview delegated substantial authority to Accretive to manage its debt collection activity.

Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, about eight months *after* the Fairview contract became effective and *after* Accretive began to collect debts for Fairview.  Accretive listed "Medical Financial Solutions" as an assumed name.  Accretive initially registered only one individual collector, Steve Walters, with the State of Minnesota as a collector even though Minnesota law requires all individual collectors to be registered with the State.  The Minnesota Department of Commerce has examined Accretive's collection call center in Kalamazoo, Michigan.  While the examination is not complete, examiners indicate that up to 100 collectors are employed at the office, each of whom is assigned a rotational patient call list or queue.  The collectors attempt to collect from patients that owe debts to approximately 60 hospitals located in at least a dozen states, including Minnesota.  At times, Accretive has expanded and then narrowed the list of which collectors contact Fairview patients.  Over time, dozens of collectors have contacted Fairview patients.

**5.2** **"Front End" Collections.** Accretive divides the collection process into stages: "front end," "middle," and "back end." (Ex. 1.) Each stage involves different employees performing different tasks. At the "front end" stage, Accretive collects money from patients at five different "front office" departments:

- Pre-Registration/Financial Clearance
- Emergency Department
- Hospital Admitting
- Financial Counseling
- Customer Service

(Ex. 2, p. 5.)

Six types of employees are engaged in "front office" collection activity at these departments. They are either directly employed by Accretive or are employed by Fairview, but managed by Accretive. The positions include the following:

- Registrar
- Financial Counselor
- Medicaid Eligibility Specialist
- Patient Access Supervisor
- Social Worker/Case Manager
- Clinical Area Administrative Directors

(*Id*. at 6.)

Every patient entering a Fairview hospital—whether for scheduled surgery, unscheduled inpatient admission, or emergency room treatment—will encounter one of these employees shortly after entering the hospital. (Ex. 3.) Every patient is screened with a process called "patient financial advocacy," or "PFA," a euphemism for determining how the patient pays for treatment that was already given (prior balances) or that is about to be given (point of service). The front-end employees must "screen" 100 percent of patients they encounter, filling in information that a prior PFA "screening" may have missed. (Ex. 2, pp. 15-17.) The first step is to view the patient's electronic record and identify all patient demographic information, such as

name, address, telephone numbers, physicians, and other types of diagnoses. (*Id.*, p. 7.) The second step is to obtain information about third-party coverage, such as insurance, COBRA, Medicaid eligibility, automobile coverage, and the like. (Ex. 4, p. 7.) The third step is to determine whether the patient owes any prior balance amount from a previous service, as well as to determine the "current balance," which is the co-pay, deductible, or other residual amount to be paid by the patient for the likely cost of the upcoming treatment. (*Id.*, pp. 7-10.) In the fourth step, the Fairview or Accretive employee must attempt to collect the prior balance and/or current balance amount from the patient, and fill out a screen identifying the amount of money collected from the patient or the type of payment schedule that has been completed. (*Id.*, p. 22.)

**5.3      Prior Balance and Point of Service Collections.** The "front end" employee must also determine if the patient has a "prior balance" (*id.*, p. 5) for services performed at an earlier time. (*Id.*, p. 11.) If so, the employee is instructed to follow three phases of negotiation with the patient. (*Id.*, p. 13.) The first step is to "educate" the patient about his responsibility to make the payment. (*Id.*, p. 15.) The second step is to request payment. (*Id.*, p. 17.) The third step is to enroll the patient in a payment plan, if the patient does not pay in full. (*Id.*) At the "education" phase, the Fairview employee is supposed to get the patient to confirm that a prior balance is due and to discover any options the patient might have to pay for the treatment. (*Id.*, p. 16.) The Fairview or Accretive employee is supposed to adopt an "informative" posture during this phase of negotiation. (*Id.*) In the second phase, the Fairview or Accretive employee is supposed to obtain payment and should adopt a "stern" posture in which this question should be presented: "How would you like to take care of that balance today?" The employee is told to ask questions that end with "today." (*Id.*, p. 17.) The final stage is to look for a "solution," which is basically to tell the patient:

> "It is very important that you put a plan in place today to make progress towards
> settling your open balance and avoid having your account sent to collections
> and/or having these balances show up on your credit report."

(*Id*, p. 18.)  Accretive describes the typical "residual balance" encounter to be as follows:

> "Mr. [Patient], when reviewing your account, I noticed that you have $432.29 in
> charges due from past visits to this hospital.  We accept cash, check, or credit card
> to take care of these balances today.  How would you like to pay for that today?"

(*Id*., p. 17.)

If the patient indicates she is unable to make payment on that day, Accretive instructs the

employee to determine the appropriate payment plan, in which the monthly payment must be at

least 10 percent of the bill or $50, whichever is higher, and with the payment plan not going

beyond 10 months.  (Ex. 5.)  A typical script reads as follows:

> "If you are able to pay 25 percent of your balance today, I can enroll you in a
> three month, interest free installment program.  Is this something you can commit
> to paying?"

(Ex. 4, p. 18.)   In determining the appropriate payment plan, the Fairview employee is to

determine the credit score of the patient and verify if the patient has any open lines of credit.

(*Id*., p. 18.)

The "front end" employees are then measured by an "employee scorecard."  (*Id*., p. 24.)

Accretive instructs its managers to set "aggressive stretch goals" for the Fairview employees to

collect money.  (*Id*.)  This evaluation process applies to all "front end" employees at Fairview,

including those that hold positions of patient trust in the hospital setting, like emergency room

registration personnel, financial counselors, and the like.

Accretive takes pride in using collectors in the emergency room.  The company has a

presentation on its success, entitled "Accretive Secret Sauce," and captioned:  "Check out our

ASS!"  and "You've never seen ASS like ours."  (Ex. 6.)  In the presentation, Accretive states

that a "typical hospital" does not undertake "financial counseling" in the emergency room.  In

contrast, Accretive claims that its "secret sauce" results in a 15% collection rate from patients in the emergency room. (*Id.*)

The Fairview "front end" collectors have had mixed results in the emergency room. Employees complained to the Attorney General about prizes given out at "chalk talks" for emergency room employees. Staff at the University of Minnesota Emergency Room apparently drafted and sent a complaint to the Attorney General stating that:

> "We are told that if we don't get money from patients in the Emergency Room, we will be fired."

(Ex. 7.) In 2010, to escalate collections, Accretive prepared a "heat map" for various hospital departments, noting that the University of Minnesota Medical Center was particularly poor in collecting prior balances in the Emergency Room. (Ex. 8.) By September of 2010, Andrew Crook, the highest Accretive official in charge at Fairview, advised the President of Accretive Quality that:

> "We've started firing people that aren't getting with the program."

(Ex. 9.) At about the same time, Accretive prepared a chart noting that the "Bottom 10" performers are being identified and that they will be placed on watch status within the first 45 days. (Ex. 10.)

Perhaps the most successful "front end" collection technique is to give the patient the impression that she may not receive adequate treatment unless payment is made. For instance, Accretive prepared the use of "stop lists" where the "front end" collectors visit patients who are scheduled for surgery. (Ex. 11.) Patients with prior balances who check in with the main registration desk are told they must first be seen by a "financial counselor," who is, in fact, a collector who will demand payment of past balances by credit card or, if that is unsuccessful, a short term payment plan. (Ex. 12.) The Accretive guidelines state that, to be an "effective front

end operator," the employee must put together a "pre-balance stop list" the night before patient appointments so that the patient can be stopped for payment before treatment is rendered. (*Id.*) Employees must track the length of time spent talking with each patient, the prior balance outstanding, and the amount collected. (Ex. 13.)

The "front end" initiative created some blowback in some parts of Fairview. In the first week of April, 2011, Fairview complained that two patients walked out of Southdale Hospital without being registered, two patients left Ridges Hospital without being registered, and three patients at Ridges would not cooperate with the registration process. (Ex. 14.) The week before, Accretive was advised that a major employer was considering a different network because of the demand that patients produce credit cards before treatment is rendered. (Ex. 15.) The complaints continued through November, when Accretive was advised that the wait times for surgeries was much higher (Ex. 16), and that a doctor at Ridges Hospital was upset about how his patients were managed. (Ex. 17.) The complaints varied by department, with collectors apparently reaching into the neonatal intensive care unit (NICU) to "counsel" parents on the money they owed. (Ex. 18.)

Looking for vulnerable patients, Accretive discovered that pregnant women in delivery were most concerned with getting treatment, and therefore were most vulnerable in getting a pre-balance paid:

> "We need to get cracking on labor and delivery. There is a good chunk to be collected there, and we just haven't had the time and manpower to get it done. We are getting close."

(Ex. 19.)

In another e-mail, an Accretive employee was told to draw up a report each morning to "identify moms that admitted yesterday" into labor and delivery and collect money from them. (Ex. 13.) Several documents prepared by Accretive underscore the importance that Accretive

placed on having the Fairview employee participate in the collection activity. Fairview employees were required to attend daily "chalk talks" and "stand-ups" as part of the "front end" initiative. (Ex. 20.) At these "chalk talks," the employees were told that:

> "Every patient with a prior balance who visits the hospital must be approached about settling their account:
>
> - Scheduled patients during pre-registration,
> - Unscheduled patients during registration (Emergency Room),
> - Customer service during inbound calls (account inquiries)."

(Ex. 21.)

Other presentations included the following imperative:

> ***"Addressing the patient's balance is an imperative part of your role."***

(Ex. 22.)

**5.4     Pre-Service Collections but no Post-Service Refunds.**   In addition to prior balance collections, Accretive requires the "front end" personnel to determine the "pre-service" or "point of service" balance. This is the portion of an anticipated medical bill that is not covered by third-party insurance. (Ex. 4, p. 4.) The goal of Accretive is to collect this "point of service" balance prior to the service being rendered. This pre-service amount, sometimes called the "patient share," is the total of the anticipated copayment, coinsurance, and the deductible of the patient's insurance coverage. (*Id*., p. 4.) Accretive tells the Fairview front end employee to enter the likely diagnosis and treatment codes into the Accretive "AHtoAccess" or "A2A" program, which will then determine the likely patient share that the employee is required to collect. (*Id*., pp. 9-11.)

The "patient share" determinations made for future services are not always accurate. For example, Marcia Newton is the mother of a son, Maxx, who needed ear tube surgery in late November, 2011. (Ex. 23.) When she brought Maxx to the hospital, the registration staff told

her that she had to make a "prepayment" for the services. She was told the surgery would cost $9,615, and that her "patient share" was $876. Fortunately, Ms. Newton was able to pay the "prepayment," and Maxx had the surgery. Thereafter, Ms. Newton received the explanation of benefits from Blue Cross Blue Shield, her insurer, which stated that the bill was $4,267, and that her portion was only $200. She contacted Fairview to complain about the false pretense under which the "prepayment" was obtained. (*Id.*) She also asked for her money back. She had trouble getting Fairview to refund the money.

As it turns out, Fairview does not appear to pay timely refunds to patients. Instead, Fairview appears to have taken a "don't ask, don't tell" approach. At least one script prepared by Accretive instructs the Fairview employee that, if she observes a credit balance for a patient, not to ask the patient about it. (Ex. 24.)

For the AHtoAccess program to work, "front end" staffers must know the patient's diagnosis or likely diagnostic code. They often don't. In March of 2011, an Accretive employee stated the obvious, complaining that neither the staff nor the AHtoAccess program has a clue as to the treatment to be rendered. (Ex. 25.) Not only does the AHtoAccess program not work when this happens, but Fairview does not appear to properly refund patient overpayments. In February of 2012, the Fairview Board of Directors directed the staff to get current on refunding the overpayments. One Fairview employee noted that patient refunds were improperly held, some going back over 3,000 days, or about 8 years. (Ex. 26.)

**5.5 Bedside Collections.** Accretive sends Fairview employees to the bedside of patients to collect money. One of the "chalk talks" indicates that, under the "Accretive Health Model," workers in the Emergency Room are supposed to "collect at bedside post patient

assessment." (Ex. 27.) Another Accretive chart instructed Fairview employees that "front initiatives" should emphasize "bedside financial counseling for patient liability." (Ex. 28.)

In many places, a hospital is deemed to be a sanctuary, going so far as to protect patients from being served with legal process while in the hospital. In other places, the laws presume that legal documents signed in a hospital setting are questionable because of the vulnerability of the patient. Accretive, on the other hand, has no problem sending collectors to patients' bedsides. (Ex. 29.)

**5.6    Suggested Scripts for "Point of Service" Collectors.** The introductory script recommended by Accretive states as follows:

> "Hello Mrs. Smith, my name is _____ and I am the Registration (Admitting) Associate here at [Fairview]. Your insurance plan shows you have a co-pay of $_____. We accept cash, check, debit, and credit. How would you like to pay for that today?" ("LISTEN FOR A RESPONSE…")

(Ex. 30.) Employees are told that if the patient can't pay the full amount, they should request a deposit and repeat the different forms of payment described above. If the patient still can't pay the full amount, she is to be provided a self-addressed, stamped envelope and told to mail payment within five days. Accretive instructs that this conversation should occur at pre-registration, which is seven days before treatment is rendered. (*Id.*)

If, on either of these occasions, the patient indicates that he has no insurance, the employee is permitted to offer a "cash flat rate" or discount. The suggested script is as follows:

> "Mrs. Smith, my name is _____ and I'm the Financial Counselor (Admitting Rep) at [Fairview]. As a courtesy, we can offer you a discounted rate of $_____ for today's services. We accept cash, check, debit or credit card. How would you like to pay for that?" ("LISTEN FOR A RESPONSE…")

(*Id.*) If the patient requests that a bill be sent out, the hospital employee is told to advise the patient that the discounted rate is only available that day. (*Id.*)

9

If the patient is already in a hospital bed, the employee is told to do a bedside visit.  The employee is to state the following:

> "Mrs. Smith, my name is _____ and I'm the Financial Counselor (Admitting Rep) at [Fairview].  According to your insurance company you have a deductible of $500 and a 10% co-insurance.  Based on a 3-day stay, your **estimated** amount due is $770.  How would you like to pay for that today?  We accept cash, check, debit or credit card." ("LISTEN FOR A RESPONSE…")

(*Id*, emphasis in original.)  If the patient responds negatively, the employee is to say the following:

> "We really DO need to collect your co-pay/co-insurance/deductible today.  Which method you prefer to pay by?  Cash, check, debit or credit card?"  ("LISTEN FOR A RESPONSE…")

(*Id*.)  If the patient still states that they don't have money, the employee is supposed to say:

> "Perhaps the person who will come to pick you up can bring the payment."

(*Id*.)  If that doesn't work, the employee is supposed to state:

> "Do you have a family member you can borrow from?"

(*Id*.)

**5.7    "Back End" Collections and Medical Financial Solutions.**    There are two phases of the "back end" collection stage:  so-called "Pre-Collect" and "Dormant Collect."  The "pre-collect" phase begins about two days after the patient has been billed.  (Ex. 31, p. 4.)  During the first 90 days after treatment has been rendered, the "pre-collect" operation is undertaken by Accretive employees in Kalamazoo, Michigan, using the name "Medical Financial Solutions," or MFS.  As noted above, up to 100 collectors work out of Accretive's MFS office in Kalamazoo, rotating calls to patients at over 60 hospital locations around the country.  As discussed in Volume 4, some collectors have access to health information about Fairview patients through Fairview's PASS system (Ex. 32), while others have access through WinCollect (Ex. 33).  For the first three months, a letter is sent out by MFS, where the collector

10

implies he is a financial counselor and not a debt collector.  The collector tries to create the impression that he wants to counsel the patient so as to avoid being referred to a debt collector. (Ex. 34.)  MFS's letter to patients instructs the patients to deal with MFS or their "account may be turned over to a collection agency."  (*Id*.)  The letters do not tell patients that MFS is *itself* a collection agency.  An MFS manager has stated that, "I could see how it would intentionally make us seem like we aren't one" [a collection agency] and has called the language "deceptive." (Ex. 35.)

At the time of the filing of the State of Minnesota's lawsuit against Accretive, only one individual collector was registered by Accretive with the State of Minnesota.  Under Minnesota law, a collector is defined as follows:

> "'Collector'" is a person acting under the authority of a collection agency under subd. 3, and on its behalf in the business of collection for others an account, bill or other indebtedness except as otherwise provided in this chapter."

Minn. Stat. § 332.31, subd. 6.  Each individual collector is required to be registered.  Minn. Stat. § 332.33, subd. 1.

**5.8** **"Dormant Collections."**  The final stage for "back end" collections are the so-called "dormant collections."  A "dormant collection" is an account that has received three letters from Medical Financial Solutions.  A letter is then sent out from Accretive, which now identifies itself as a collection agency.  (Ex. 36.)  The collector then makes a variety of calls and sends letters to the patient in an attempt to collect the money.

**5.9** **Debt Collection Legal Violations.**  A violation of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, is a violation of the Minnesota Debt Collections Act.  Minn. Stat. § 332.37(12).

a. **Accretive may have engaged in "conduct which is designed to harass, oppress, or abuse" the patient in violation of the FDCPA and Minnesota law.**

The FDCPA prohibits conduct designed to harass, oppress, or abuse. 15 U.S.C. § 1692d. Attached as Exhibit 37 are a series of e-mails between collectors at the Kalamazoo office. One of the Accretive "financial counselors" sent out an e-mail to other collectors asking for tips on getting money out of patients. He states that:

> "I have never had any luck with being a hard ass or winning arguments, but I know that at least a few of you do. How do you do it? Shortcuts, work arounds, and (legal) cheats?"

(*Id.*)

In response, another collector described his strategy as follows:

> "I make the deadbeats feel like s…, talk nicely to women who sound education/have money, and am firm with dumb f…. If they say something stupid, I make sure they know they've said something stupid. Eventually the people who can pay will grow tired of us continually calling and just pay to get us off their backs. I don't mention that Henry Ford is a teaching hospital because a majority of these people are plebeians who couldn't give a flying f… one way or another so long as they have Medicaid. I really take the approach of being stern and calling people out for being stupid because if they keep hearing it, they eventually may realize their stupidity and possibly feel just a hint of guilt for being such a schmuck. However, on the rare case that I do get someone who is nice and actually listens to what I am saying, I will bend over backwards for them and be so nice, mainly out of gratitude for them actually having common decency."

(*Id.*)

Later in the day, when told that a lawyer had left a message on behalf of a particular patient, the Accretive collector wrote:

> "Thanks. I went through the hospital notes and this is what pisses me off the most. The patient is pissed because Medicaid didn't cover this and told the hospital that she never is going to pay this. There are some attorneys who aren't skilled enough for an actual practice that work for these stupid fricken non-profit organizations who help the poor in Detroit. Now we have to waste our time to deal with this low-life patient and some dumbass attorney all because this patient didn't show up to the DHS office to renew her benefits. Ugh. I'll make sure they get a call though…"

(Ex. 38.)

### b.   Accretive contacted third parties stating that the consumer owes a debt, in violation of the FDCPA and Minnesota law.

Accretive has not always followed the law when contacting patients about debts.

Accretive states that the following message should be left on a patient's answering machine:

> "Hello, this is a time sensitive message from Medical Financial Solutions, a debt collector, attempting to collect a debt. Please call us back at your earliest convenience…."

(Ex. 39.) In *Risinger v. Accretive Health*, No. 11-cv-03744-PAM-FLN (D. Minn. 2011), plaintiff *Susan* Risinger received messages from Accretive collectors on her voicemail system, stating that *Laura* Risinger has an unpaid medical debt. Laura does not reside with Susan, and the lawsuit alleged an improper communication in violation of the FDCPA, 15 U.S.C. §§ 1692b(1)-(3), 1692c(a)(1), 1692d, and 1692e(11). Accretive's messages to Susan Risinger disclosing Laura Risinger's debt also appear to be an impermissible communication with a third party in violation of 15 U.S.C. § 1692c(b). Other lawsuits in Minnesota federal district court that allege voicemail violations are *Sinigaglio v. Accretive Health*, 11-cv-02102-DSD-FLN (D. Minn. 2011), *Bell v. Accretive Health*, 11-cv-02112-JNE-JJK (D. Minn. 2011), and *Hartley v. Accretive Health*, 11-cv-01528-JRT-LIB (D. Minn. 2011). These suits allege that Accretive failed to make the proper disclosures to consumers under 15 U.S.C. §§ 1692d(6), 1692e, and 1692e(11).

### c. Accretive may not threaten to take any action that cannot legally be taken or that is not intended to be taken.

The FDCPA prohibits a collector from threatening an action it cannot lawfully take. 15 U.S.C. § 1692(e)(5). The FDCPA also prohibits debt collectors from using any false, deceptive, or misleading representations or means in connection with the collection of a debt. 15 U.S.C. § 1692e. Accretive scripts appear to instruct employees to tell patients that if the patient does not resolve the bill, the company may send the debt to a collection agency, where the patient's credit score can be affected. A sample script states as follows:

> "I hope you understand that once the account is with a collection agency, that can affect your credit score as well."

(Ex. 40.) In fact, Fairview entered into a court-ordered agreement with the Minnesota Attorney General not to refer patient debts to credit reporting agencies. (Ex. 41, ¶ 27.) It is therefore misleading for it to threaten to do so, because that act cannot legally be taken.

### d. Accretive fails to properly identify itself as a Minnesota-licensed collection agency or to make the required federal disclosures.

Minnesota law requires a collection agency to identify itself as such. Under Minnesota Statutes section 332.37(21), when initially contacting a Minnesota debtor by mail, a collection agency must state the following:

> "This collection agency is licensed by the Minnesota Department of Commerce."

Many letters sent out by Medical Financial Solutions do not identify MFS as a collection agency. (Ex. 34.)

In addition, the FDCPA requires a debt collector to disclose in its initial communication, whether written or oral, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the debt collector must disclose in subsequent communications that the communication is from a debt collector. 15 U.S.C.

14

§ 1692e(11). Accretive routinely fails to identify itself as a debt collector in its collection letters. Indeed, during the first three months of collection on an account, MFS sends letters to the consumer in which MFS deliberately gives the false impression that it is a financial counselor and not a debt collector.

### e. Accretive's aggressive collections approach may constitute a threat to withhold medical treatment in violation of Minnesota Statutes sections 332.37(14) and 325D.44(12).

Under Minnesota law, a debt collector cannot imply that medical treatment will be withheld in an emergency situation. Minn. Stat. §§ 332.37(14) and 325D.44(12). As noted in Volume 2, prior to enactment of the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), hospital emergency rooms engaged in a practice known as "patient dumping." Patients without insurance coverage or the means to pay for treatment were simply told by hospital staff to leave the premises. After several well-publicized scandals, Congress enacted EMTALA, which requires that patients who need emergency treatment be provided such treatment in the emergency room.

It appears that some patients with prior balances may be deterred by Accretive's collection practices. Exhibits 15-18 are e-mail transmissions which suggest that some patients "walked off" due to the arduous front end registration/collection process. Another exchange of e-mails in December, 2011 refers to an uninsured father who made a "scene" at the University of Minnesota Medical Center Emergency Room after an Accretive collector warned that, if the son received more lengthy treatment, the bill would be higher. (Ex. 42.) The risk manager at Fairview warned that the action by the collector may have violated EMTALA, and instructed the collectors to back off until medical screenings had been conducted. (Ex. 43.)

**f.      Accretive refused to stop collection efforts when patients requested documentation of a bill and refused to confirm payment when patients stated that they had already paid the bill.**

Fairview and the Attorney General signed a consent agreement in Ramsey County District Court.  (Ex. 41.)  The Attorney General Agreement requires Fairview to cease collection attempts on a debt if the patient:  (1) asks for documentation of the debt; or (2) claims the debt has been paid.  Under the terms of the order, the hospital, before resuming collection efforts, must verify that the patient owes the money.  (*Id.*)  Because of this order, Fairview advised Accretive that it should suspend collection activity on patients who disputed the amount of the debt until Fairview could ratify the existence and amount of the debt.  In May of 2011, Fairview conducted an audit and determined that Accretive was violating the terms of the order.  (Ex. 44.) In addition, federal and state law require that collection efforts cease until verification is provided, 15 U.S.C. § 1692g, and that collectors not pursue people for money they do not owe. 15 U.S.C. §§ 1692e(2) and 1692f(1); Minn. Stat. § 332.37(12).

The scripts and FAQs distributed by Accretive indicate that collectors may not contact the hospital if the patient disputes the bill:

"Q.     If an rp [responsible person] is disputing the bill and we put it in dispute status, do they still need to contact the hospital and dispute it in order to get any sort of resolution?

A.      Disputes need to be forwarded to a Team Lead for review.  Putting an account in dispute status doesn't actually do anything because there is nobody that checks accounts in dispute.  As much information for the dispute as possible should be notated and if the rp can provide any documentation they should be advised to do so."

(Ex. 45.)

### g. Accretive may have violated State law when it told collectors to keep mum about credit balances due to patients. Minn. Stat. § 332.37(17).

Accretive appears to have instructed employees not to inquire if the patient has a credit balance with the hospital. (Ex. 24.) As discussed earlier in this volume, Accretive and Fairview appear not to have implemented a process to issue refunds. (*See* Section 5.4.) Such a practice may violate both the Minnesota debt collection laws, Minnesota Statutes section 332.37(17), as well as the consumer protection laws.

### h. Accretive improperly gained access to patient medical records to gain trust with patients and boost its collection efforts.

As explained in Volume 4, HIPAA, as amended by HITECH, requires Accretive to only disclose the bare minimum amount of private medical information to its employees that is necessary for them to perform their designated job functions. *See, e.g.*, 45 C.F.R. §§ 164.502(b), .514(d). Debt collectors in Accretive's MFS office in Kalamazoo, Michigan, however, are given access to vast quantities of private medical information about Fairview patients. Some collectors can log directly into Fairview's PASS system without restriction, while others gain access to Fairview patients' private medical information through the WinCollect software. Accretive collectors do not need this information to perform collection activities. They use such private medical information to deceptively gain patients' trust and bolster their collections performance. These practices violate HIPAA, as amended by HITECH. *See* 42 U.S.C. § 17935(b); 45 C.F.R. § 164.514(d). Moreover, the illegal use of private medical information to deceptively gain the trust of patient-debtors also violates federal and state laws. *See* 15 U.S.C. § 1692e(10) (prohibiting the use of deceptive means to collect debt); 15 U.S.C. § 1692f (prohibiting unfair or unconscionable means to collect debt); Minnesota's Debt Collections Act, Minn. Stat. § 332.37(12) (prohibiting violation of FDCPA to collect debt).

**Conclusion.**   Accretive's debt-collection activity is rife with violations of Minnesota and federal laws.  Accretive has hidden its true identity from patients, aggressively and illegally attempted to collect debts from patients, improperly used patient health information to collect debts, and failed to follow basic laws regarding the registration and conduct of its collectors.

AG: #2992041-v1

# STATE OF MINNESOTA

## OFFICE OF THE ATTORNEY GENERAL

**Compliance Review of Fairview Health Services'
Management Contracts with Accretive Health, Inc.**

**Volume 6
Compliance Issues**



## LORI SWANSON

## ATTORNEY GENERAL

April 2012

*Review Conducted Pursuant to Minnesota Statutes Chapters 309, 501B, and 317A*

# VOLUME SIX

# COMPLIANCE ISSUES

6.1    Introduction ..................................................................................................1

6.2    Accretive and Patient Scoring...........................................................................4

    6.2.1   Willingness to Pay (WTP) Scores and the Discrimination Laws ...........................4

    6.2.2   Willingness to Pay Scores and the Fair Credit Reporting Act ...............................8

    6.2.3   The Quality Total Cost of Care (QTCC) Program:  Introduction...........................8

    6.2.4   QTCC and Acuity Risk Scores ......................................................................9

    6.2.5   QTCC and Predicted Complexity Score .........................................................11

    6.2.6   QTCC and Total Provider Allowed Amount ...................................................11

    6.2.7   QTCC and Compliance Issues .....................................................................11

    6.2.8   QTCC and Managed Health Care Regulations and Consumer Laws .................. 12

6.3    Exchange of Fairview and North Memorial Business Operational Data...........................14

    6.3.1   Overlapped Accretive Employees.................................................................14

    6.3.2   Exchange of Competitive Business Data and the Antitrust Laws.........................17

6.4    Charity Care.................................................................................................19

Conclusion ........................................................................................................23

# VOLUME SIX

# COMPLIANCE ISSUES

**6.1 Introduction**.   Health care is one of the most regulated industries in America. Virtually all participants in the health care delivery system are regulated by the federal or state governments, or both.   States regulate health care organizations under a myriad of laws, including, to name a few, the laws governing health care plans,[1] utilization review organizations,[2] health maintenance organizations,[3] community integrated service networks (CISNs),[4] accountable provider networks,[5] hospitals,[6] medical practitioners,[7] third party administrators,[8] and nonprofit health service plan corporations.[9]   Health care organization are typically accredited by pertinent self-regulatory organizations, such as the National Committee for Quality Assurance, the Utilization Review Accreditation Commission, or the Joint Commission on Accreditation of Healthcare Organizations.

In October of 2011, the Minnesota Attorney General's Office began an inquiry regarding the management of charitable Minnesota hospitals by Accretive Health, Inc. ("Accretive").  This review was conducted pursuant to the Office's authority under Minn. Stat. § 8.31, subd. 1, the Charitable Trust and Trustees Act (Minn. Stat. § 501.B.33-45), the Minnesota Nonprofit Corporation Act (Minn. Stat. § 317.821), and the Regulation of Charitable Solicitations (Minn. Stat. § 309.533).

---

[1] Minn. Stat. ch. 62Q.
[2] Minn. Stat. ch. 62M.
[3] Minn. Stat. ch. 62D.
[4] Minn. Stat. ch. 62N.
[5] Minn. Stat. ch. 62T.
[6] Minn. Stat. §§ 144.50-.55.
[7] Minn. Stat. ch. 147.
[8] Minn. Stat. § 60A.23
[9] Minn. Stat. § 62C.

The Minnesota charitable organization laws require Fairview Health Services—and any manager of its revenue stream—to properly administer charitable assets. As discussed in Vol. 1, charitable organizations must operate in a manner that justifies continued support from the State of Minnesota through exemptions on property taxes, income taxes, sales taxes, and dividends on bonds, among other things.

In undertaking a compliance review, the Attorney General's Office must consider the charitable organization's relationships with for-profit corporations. *See, e.g.*, State of Minnesota Compliance Review of Fairview Health Services, 2005 (reviewing Fairview's relationships with debt collection agencies); State of Minnesota Compliance Review of Allina Health System, 2001 (reviewing substantial relationship between Medica Health Plans and United HealthGroup). In the case of Accretive, issues have been raised relating to compliance with a myriad of laws in such areas as collections, privacy, health management, credit scoring, and credit discrimination. These include:

- The Health Insurance Portability and Accountability Act ("HIPAA"), 29 U.S.C. §1181(a)(2).
- The Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §1396dd.
- The Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692.
- The Equal Credit Opportunity Act, 15 U.S.C. 1691, *et. seq.*
- The Fair Credit Reporting Act, ("FCRA"), 15 U.S.C. §1681, *et. seq.*
- The Fair and Accurate Credit Transaction Act of 2003 ("FACT Act"), 15 USC §1681 – 1681y.
- Minnesota consumer protection laws.
- State privacy laws as it relates to medical data.
- State debt collection laws.
- Minnesota Human Rights Act, Minn. Stat. § 363A.001 *et seq.*
- Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*

As part of the Compliance Review, Accretive produced over 100,000 pages of documents and provided written statements concerning Accretive's performance at Fairview. Fairview also provided documents and statements concerning Accretive's activities at Fairview. The

Minnesota Department of Commerce also provided information regarding its examination of the company.

It is customary for a company to produce licenses, regulatory opinions, or compliance opinions that give assurance that the company operated in compliance with applicable laws and regulations in this highly-regulated industry. Accretive did not.

The first five volumes discuss problems under Minnesota's charities and other laws regarding such topics as: 1) Fairview's pre-payment to Accretive of millions of dollars in charitable assets for base fees at the beginning of each quarter, 2) Fairview's prepayment to Accretive of millions of dollars in uncalculated and potentially unearned incentive payments, 3) Accretive's apparent failure to deposit into an escrow or trust account the "round trip" salary obligations of Fairview employees, 4) violations of state and federal debt collection laws, 5) violations of the agreement between Fairview and the Minnesota Attorney General relating to patient billing and collections practices, and 6) violations of state and federal privacy laws.

This volume discusses a variety of other compliance issues that Accretive does not appear to have thoroughly addressed. Lack of regulatory compliance appears to be a chronic problem with the company. For instance, Accretive did not register as a foreign corporation with the Minnesota Secretary of State until December 20, 2010—approximately eight months *after* it signed the revenue cycle agreement with Fairview. A company doing business in a foreign state should generally be familiar with such basic state-based corporate registration requirements. Accretive became licensed as a collection agency in Minnesota on January 20, 2011, a number of months *after* it began collection activity in Minnesota. Accretive also failed to license its individual collectors, contrary to Minnesota law. Accretive's debt collector license is believed to be the only license issued to the company for doing business in Minnesota.

**6.2    Accretive and Patient Scoring.**

**6.2.1    Willingness to Pay (WTP) Scores and the Discrimination Laws.**  Accretive

states in its 2010 Annual Report that it has developed a risk score on patient accounts:

> "Our service offerings employ a variety of proprietary data analytics and
> predictive modeling algorithms.  For example, we identify patient accounts with
> financial risk by applying data mining techniques to the data we have collected."

(Ex. 1.)

An Accretive manual, entitled "Analytics Techniques and Process," states that it uses the

risk score to further its collection of debt.  Accretive states that the purpose of the risk score is to

select the optimal methodology to contact the patient:

> "After scoring the entire eligible population with Willingness/Capacity to Pay
> Score (WTP) various strategies are developed in combination with additional
> financial and demographic data of the patient.  These strategies are then used to
> apply ***differential treatments*** across various segments….Some of the differential
> treatments include:
>
> a.    Discounts and Letters:….High WTP and High Operating Margin
>       segments might receive lower discounts than medium WTP and High
>       Operating Margin.  Medium WTP accounts will also be accelerated
>       through the process and move to legal sooner than accounts in other
>       segments.
>
> b.    Special Patient Financial Counselors:…to ensure right collector style
>       matching.
>
> c.    Dialer and IVR Strategy:….Small Balances are dealt with a special team
>       and IVR Blast Messaging leveraged."

(Ex. 2, emphasis in the original.)

Accretive states that its data mining technique starts with 142 data elements for each

patient.  (Ex. 3.)  In response to an inquiry from Fairview, an Accretive manager stated that

Accretive combines these 142 elements with census and demographic data such as

socioeconomic zip coding, credit history and the like:

4

"To calculate, we take the data provided by Fairview via the RETRO04D file (contains 142 different data elements straight from host system) combined with census data and push through a model. Some of the data points we use are demographics (zip code, **gender, marital status, religion,** insurance type, age of debt), **socio-economic data** (average household income, average dependents in a zip code), payment history (past paying performance gathered over time), and opportunity margin (what % of total balance will be paid and the value that corresponds to). Once these data points are obtained, we apply a positive or negative coefficient to each that determines the final score…."

(*Id*., emphasis added.)

It is not clear when in the "revenue cycle" Accretive uses the WTP score in connection with Fairview patients. Accretive states that its technology allows the "Willingness/Capacity to Pay," or WTP, scoring to be automatically applied to any account after the third statement is sent to the patient. (Ex. 4.) Other documents, however, indicate that Accretive can apply the WTP score the minute an accounts receivable (AR) is created. (Ex. 5.)

Still other documents suggest that Accretive not only uses the WTP score in back-end collection work, but that it also at least sometimes applies risk scores to patients on the front end. (Ex. 6.) Its Standard Operating Procedure Manual notes:

"One of the examples of using statistical modeling within DMAIC framework is development of Willingness/Capacity to Pay Score. This score predicts patient's willingness/capacity to pay the debt and is being used across different touch points for patient over the lifecycle of debt (**including pre-service**, early out and bad debt collections)."

(Ex. 7, emphasis added.) A different chart seems to contemplate the integration of the WTP score into the front-end process. (Ex. 8.) Another chart refers (as "a work in progress") to having the WTP score integrated into the front-end work of registering a patient:

"Provide charity scoring and targeted financial counseling at point of service in order **to mitigate risk on low scoring accounts**."

(Ex. 9, emphasis added.)

A major concern involves the type of hospital information that Accretive utilizes in formulating the WTP credit score. As noted above, in Ex. 3, Accretive states that it takes "142 different data elements straight from host [Fairview] system." Mark Eustis, the President of Fairview, sent a letter to the Attorney General, which states that Accretive denies such use of patient data:

> "As part of its services under the Revenue Cycle Agreement, Accretive Health calculates a "propensity to pay" score with respect to accounts. The purpose of this score is to estimate the responsible party's willingness and capacity to pay. We understand that the index takes into account several factors, such as patient demographics, payment history, available consumer credit data, debt age, debt type and outstanding balance….*We have been told that no patient diagnostic information is used in the calculation of the score.*"

(Ex. 10, emphasis added.) Other Accretive charts seem to suggest that its "data mining" may sometimes include diagnostic information, at least for some hospitals. Accretive notes that the use of this data differentiates it from other companies that score debtors:

> "Accretive Health's Development team developed an algorithm which uses a multi-variant correlation data-mining analysis of historical facility data to predict probability of accounts receivable risk from day one of an account going unpaid."

(Ex. 11.) The diagram accompanying the above statement has two overlapped circles, with one circle entitled "Data Mining." Underneath this title are the words: "diagnosis," "physician," and "service" rendered to the patient. (*Id.*)

Chengny Thao is a manager at Accretive in charge of patient financial collections at the Stinson Boulevard office of Fairview. (Ex. 12.) The Fairview personnel involved with current balance collections and pre-balance collections (pre-registration and registration personnel) report to her. (*Id.*) Attached as Ex. 13 is an e-mail chain between Fairview and Accretive which keeps the collections staff notified of changes in diagnostic code and utilization data. The February, 2012 email starts: "**Attached please find a file that merges the Diagnostic Code and utilization data provided by Dave to Risk Score information.**" (Ex. 13, emphasis added.)

Mr. Thomas Merritt, one of Accretive's managers, stated in an email to Fairview that Accretive uses several demographic elements, including **religion, gender, and marital status**, to calculate the propensity to pay score. (Ex. 3.) The federal Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit transactions based on religion, sex, or marital status. 15 U.S.C. § 1691. The Board of Governors of the Federal Reserve System issued Regulation B under the ECOA, which states that the ECOA covers "every aspect" of a credit transaction, including "collection procedures." 12 C.F.R. § 202.02(n). "Discrimination" occurs under Regulation B when a person is treated "less favorably" than others. *Id*. If Mr. Merritt is correct that religion, gender, and marital status are used in Accretive's WTP score, serious compliance issues appear to be raised under the federal Equal Credit Opportunity Act.

If Accretive uses of religion and gender as bases for treating Fairview patients differently, the Minnesota Human Rights Act ("MHRA") may also be implicated. The MHRA broadly prohibits discrimination on the basis of religion and sex in the provision of "public accommodations." Minn. Stat. § 363A.02. The term "public accommodations" is a broad term, and includes any "business" whose "facilities" are "made available to the public." Minn. Stat. § 363A.03, subd. 34. The Act also broadly defines "discriminate" to include "separate" and "segregate." The MHRA also contains a section specifically devoted to credit discrimination. This section prohibits "discrimination" "in the extension of personal or commercial credit... or in the requirements for obtaining credit" based on religion, sex, or marital status. Minn. Stat. § 363A.16. If Accretive uses religion, sex and marital status in calculating its WTP or other scores, and uses the WTP as a basis to treat Fairview patients unequally, serious compliance issues would be raised under the MHRA. The use of a patient's medical diagnosis in determining whether to extend credit or make collections decisions may also be a violation of the

Americans with Disabilities Act, 42 U.S.C. § 12101, depending upon the type of diagnosis that is considered.

**6.2.2   Willingness to Pay Scores and the Fair Credit Reporting Act.**  Accretive states that it has created "massive repositories with financial and operational data." (Ex. 14.)  By preparing the WTP score, Accretive may become a credit reporting agency under the Fair Credit Reporting Act ("FCRA"), 15 USC §1681, *et. seq.*  A credit report includes reports that are used for "collection of an account," 15 U.S.C. §1681b(a)(3)(A), as well as reports that are used as a factor in establishing the consumer's eligibility for credit.  15 U.S.C. §1681a(d)(1)(A).  If Accretive, as an agent for Fairview, has used the WTP scores to treat certain patients less favorably than others, as indicated in Ex. 2, it appears that Fairview and/or Accretive may be required to send the patient that was treated less favorably a notice of "adverse action."  15 U.S.C. §1681m, *et seq.*  In addition, Fairview and Accretive may be required to send notices to patients regarding consumer rights summaries, credit scoring notices, risk-based pricing notices, and affiliate sharing marketing notices.  See 15 U.S.C. §1681g, *et seq.*  The FCRA also has extensive procedural requirements that allow consumers to dispute inaccurate information that led to the unfavorable score.  15 U.S.C. § 1681i, *et seq.*  It does not appear that these dispute procedures have been followed by Accretive or Fairview, and they should review their compliance with the above laws.

**6.2.3   The Quality Total Cost of Care (QTCC) Program:  Introduction.**  As discussed in Vol. 1, Accretive entered into a "Quality Total Cost of Care" ("QTCC") agreement with Fairview in 2010.  It was the first, and remains the only, hospital in the country to do so.  Mary Tolan, the CEO of Accretive, has predicted that the QTCC program will cut health care costs by 25% in three years.  (Ex. 15.)  Accretive at one point predicted to its Board of Directors

8

that the QTCC program may cut almost *one half billion dollars* in health care costs at Fairview by 2015. (Ex. 16.)

The essence of the QTCC program is the economic profiling of primary care physicians ("PCPs"). In other words, Accretive will measure the PCP's actual cost for services performed or ordered (including referrals to specialists) on behalf of patients. It will then compare these actual costs to the "predicted" costs for similar health events with similar patients. PCPs whose actual costs for a patient are less than the "predicted" costs are considered "cost efficient," while those whose actual costs exceed the "predicted" values are viewed as cost inefficient.[10] Based on this measured cost efficiency, PCPs who are deemed "efficient" are rewarded with incentive payments.

**6.2.4 QTCC and Acuity Risk Scores.** Because patients vary in complexity, the QTCC program proposes to measure each patient in a particular program by risk. In December, 2011, Accretive made a presentation to Fairview that discussed three risk models currently used for predictive modeling. (Ex. 17, pp. 10-11.) One is the Adjusted Clinical Group (ACG), used by Johns Hopkins University. The program evaluates disease management and predictive risk of each member of a contained population. The ACG case-mix system divides each patient into 82 discrete, mutually exclusive categories. (Ex. 18.) It is primarily used to identify high risk/high resource patients. Another program referenced by Accretive was OPTUM's Episode Risk Groups (ERG) model. This model assigns each patient to one or more of 120 possible medical condition categories based on diagnostic and procedural information available on medical and pharmacy claims. (Ex. 19.) The third program cited in the Accretive presentation is

---

[10] Thomas, "Should Episode-Based Economic Profiles be Risk Adjusted to Account for Differences in Patient's Health Risks?," Health Services Research, April, 2006.

the Diagnostic Cost Groups (DCG) program developed by Boston University, Health Economics Research and DxCG, Inc. (Ex. 17.) This program attempts to predict the cost of each patient by grouping diagnosis codes into 781 clinically homogeneous groups, thereafter arranging the groups according to 184 condition categories and 32 age/gender categories. (Ex. 19.)

According to Accretive's "Standard Operating Procedures" Manual, each Fairview patient will be assigned an acuity level by a member of the Accretive Acuity Care Coordination Team. (Ex. 20.) The acuity rating will have five levels of potential risk, ranging from 0-4, with 4 being the highest risk patient. (*Id.*) The Manual does not describe which of the above modeling programs, if any, will be utilized to make this predictive score, although it does say that the following domains are considered in measuring the patient:

- Utilization
- Disease state
- Medication
- Functional
- Psychosocial

(*Id.*)

In a separate document, Accretive describes the considerations it will use in assigning an acuity score to a patient, such as whether the patient has chronic conditions, is non-English speaking, or has psychosocial challenges. (Ex. 21.) In a presentation to Fairview, Accretive described the risk score as follows:

"The risk assessment process entails feeding claims data submitted by physicians and other health care professionals (which may be supplemented by data from pharmacies, laboratories, and member-reported information) into risk-modeling computer programs. The methodology that these models use to predict and/or determine costs of care varies, but all modeling software produces a relative risk score for each member in a population. *The relative risk score demonstrates what the populations predicted risk or predicted cost of care will be to a payer. A relative score of 1.0 means the member is predicted to incur average health care costs for the next year. A score above 1.0 means the member is at risk for*

*incurring higher than average costs, and score lower than 1.0 means the member has lower than average risk."*

(Ex. 22, p.3, emphasis added.)

In other words, each patient is given a "handicap" when it comes to the predictive cost to be incurred by a PCP during the year. The PCP overall financial performance during the years is adjusted by each patient's acuity score and the overall acuity scores of his or her clinic. The profitability of the QTCC program is dependent upon the efficiency of each PCP. One chart, headed "Which PCP is most efficient?," discusses the performance evaluation of each physician, with a large incentive payment for the PCP who can bring down the costs of treating the patient. (Ex. 23.)

**6.2.5    QTCC and Predicted Complexity Score.** In January 2011, Accretive made a presentation to Fairview about the QTCC program. (Ex. 24.) A patient care plan on page 7 of the presentation points to an additional score--labeled a "Predicted Complexity" score--being assigned to each patient. Additionally, on page 15, the physician is provided a running score as to his efficiency and the costs incurred on a per patient per month (pm/pm) basis.

**6.2.6    QTCC and Total Provider Allowed Amount**:  Matt Doyle's lost laptop computer contained a screenshot of various scores maintained by Accretive on patients. The screenshot, attached as Exhibit 25, identifies the following scores or data:

- Predicted Complexity Score
- Probability of Inpatient Stay Score
- Total Provider Allowed Dollar Amount

**6.2.7    QTCC and Compliance Issues.** Regardless of which score is used, regulatory issues are raised for the complexity score, the acuity score, the probability of inpatient admission score, and the total provider allowed score or amount. These scores appear to be utilized to incentivize PCPs as it relates to treatment of patients. Accretive and hospitals, prior to utilizing

11

the scores, should determine regulatory compliance as it relates to disclosure and use of patients' medical information, including under the following laws, among others:

- *Equal Credit Opportunity Act,* 15 U.S.C. §1691a, in that Accretive's scoring may improperly rely on religion, sex, and marital status as a basis for differential treatment of Fairview patients.
- *Fair Credit Reporting Act*, 15 USC § 1681, *et seq.*, and the *FACT Act* 15 USC §1681 – 1681y, in that patients appear to be scored as it relates to the cost of treatment to be provided, Accretive does not send a notice of "adverse action" to patients, and medical information may be used or furnished in connection with patient credit scores.
- *Americans with Disabilities Act*, 42 U.S.C. § 12101, to the degree that a patient's disability status and resultant score influences the type of treatment that the primary care physician (PCP) is induced to provide.
- *The Federal Anti-Kickback Law,* 42 U.S.C. § 1320A-7b(b), to the degree that the QTCC financial inducement to the PCP influences the PCP to refer services paid for under Medicare or a state health care program.
- *The Minnesota Human Rights Act*, Minn. Stat. § 363A.01 *et seq.*, to the degree that the patient's health treatment is being rated by the disability of the patient, or to the extent that gender, religion, and/or marital status are factors that influence patient's scores.

### 6.2.8 QTCC and Managed Health Care Regulations and Consumer Laws.

Accretive describes the QTCC program as an Accountable Care Organization in which Accretive, the insurer, Fairview hospitals, and the Fairview Health Network (doctors) establish what is in essence a managed care organization effectively managed by Accretive.

The QTCC contract raises a host of public policy issues as it relates to the delivery of health care. Perhaps most disturbing about the 100,000 pages of documents produced by Accretive is that they do not discuss these regulatory issues. The most plausible explanation for this is that Accretive, licensed solely as a debt collector, styles itself as a "Revenue Cycle Manager." It entered the managed health care field with Fairview as its "inaugural" QTCC client, and no other hospital has retained it to provide QTCC services. Being a debt collector, Accretive perhaps is unfamiliar with the extensive regulatory infrastructure in the managed care environment.

The accuracy and reliability of the QTCC scoring methodology is beyond the scope of this compliance review. It is noted, however, that several articles raise concerns about the predictability of medical scores. One article notes that it is difficult to predict with great accuracy the highest cost members of a health plan. (Ex. 26, p. 73.) Another article notes that the ACG program may separate the very healthy from the very sick but does not distinguish well among persons with different degrees of illness. (Ex. 27, p. 59.) Another article points out the need to use large samples, larger than a small HMO, to conduct a validated profile analysis. (Ex. 28.) It appears that the Fairview population is similar to that of a small HMO.

The accuracy of the QTCC scores is significant not only to the PCP but also to the patient. The PCP is given a significant inducement by the QTCC program to contain health costs below a predicted score for each patient. (Ex. 23.) If the credibility of the predicted score is flawed, then so is the eventual efficiency ranking of the PCP. If the PCP believes he is "inefficient," the negative score could have a negative impact on the patient's treatment, particularly as it relates to diagnostic tests, specialty referrals, or prescriptions provided a patient. In short, the accuracy of the medical scores, and the credibility of the scoring program, becomes material to services delivered to the patient. Accretive and Fairview should review and determine the degree to which disclosure should be made under state and federal consumer laws to patients and physicians about, at a minimum: (1) implementation of the QTCC program, (2) the use of medical scores, and (3) the impact the medical scores could have on patient treatment.

### 6.3    Exchange of Fairview and North Memorial Business Operational Data.

**6.3.1    Overlapped Accretive Employees.**  Accretive has revenue cycle contracts with both Fairview and North Memorial Health Care, two Twin Cities hospital groups.  The contracts emphasize the importance of keeping their respective operations segregated.

Volume 4 discusses the theft of Matthew Doyle's laptop computer.  It is significant that Mr. Doyle's computer was not encrypted.  Perhaps even more significant is that Mr. Doyle's computer had confidential patient and hospital data on two hospitals where he no longer was deployed:   St. John's Hospital of Michigan and Fairview in Minnesota.  It appears that the confidential data of St. John's Hospital was still on Mr. Doyle's computer almost a year after he left the site.

Accretive was aware that North Memorial and Fairview were concerned about the exchange of personnel between the two hospital systems.  Andrew Crook, a Vice President of Accretive, became the company's site lead at Fairview in 2010.  (Ex. 29.)  Accretive knew that North Memorial would be concerned about Mr. Crook's involvement at North, and so Accretive appears to have hidden his involvement from the North Memorial executives.  On January 11, 2011, Etienne Deffarges, the Senior Vice President at Accretive, said that he didn't want Mr. Crook at a dinner with North Memorial executives.  (Ex. 30.)  Instead, he wanted North Memorial executives to believe the Accretive managers at Fairview and North Memorial were at an "arm's length distance."  (*Id*.)  This continued through the year.  On October 4, 2011, for example, Mr. Crook told staff that they must take a "muted approach" when traveling between sites.  (Ex. 31.)

Accretive apparently was only concerned about the appearance of impropriety, not the impropriety itself.  In December of 2010, Mr. Crook prepared a Powerpoint presentation for

North Memorial about the benefit of the Accretive revenue cycle program. (Ex. 32.) In the accompanying email, he shares with the President of Accretive Quality, Tim Barry, information about Fairview's performance. While site lead at Fairview throughout 2011, Mr. Crook was continuously involved with critical issues facing North Memorial, ranging from preparation of a 100-day business plan for North Memorial in April (Ex. 33) to processing a credit balance backlog in May (Ex. 34) to preparation of high-level cost deck presentations for North Memorial in July (Ex. 35) to presiding over a team meeting to discuss North Memorial in October of 2011 (Ex. 31).

The convoluted relationship between Accretive, North Memorial, and Fairview is exemplified by the theft of Mr. Doyle's laptop on July 25, 2011. At the time of the theft, Mr. Doyle's laptop had substantial medical data on about 14,000 Fairview patients and 9,531 North Memorial patients. Accretive states that Mr. Doyle began employment with the company on August 9, 2010, starting at St. John's Hospital in Detroit. He was then transferred to Fairview on October 4, 2010 to work on "special projects" and remained there until April 14, 2011, when Accretive claimed that he was transferred to North Memorial as the site lead. (Ex. 37.)

While Mr. Doyle arguably was transferred to North Memorial effective April 15, 2011, he was substantially involved with Fairview after that date. On July 15, 2011, Mr. Doyle reviewed a "Base Fee Adjustment Summary" for Fairview sent to him by Mr. Crook. (Ex. 38.) Three days later, on July 18, 2011, Mr. Doyle prepared a "high level cost deck" for North Memorial that he sent to Mr. Crook. (Ex. 39.) Two days after that, he switched back to Fairview, receiving a summary of the "Fairview/Accretive Health Partnership Revenue Cycle Improvements" Powerpoint. (Ex. 40.) On July 20, 2011, Mr. Doyle received Fairview's performance scorecards. (Ex. 41.) In a presentation to North Memorial on September 14, 2011,

however, Mr. Doyle is identified as the site lead for North Memorial operations. (Ex. 42.) Seven days earlier, he was reviewing Fairview deck charts. (Ex. 43.) On October 13, 2011, Mr. Doyle obtained from Mr. Crook (the Accretive lead at Fairview) a copy of a presentation made to the Fairview CEO, and then shared it with his Accretive coworkers on the North Memorial account. (*Id.*) Later in October 2011, Mr. Doyle's dual role came to an end when, in the midst of the investigation over his stolen laptop, he was transferred to Accretive's Chicago headquarters. (Ex. 37.)

While Accretive executives may have been concerned about a "muted approach" when employees traveled between the two hospitals, they were not troubled about continuing the exchange of staff between the two hospital systems. Adam Toppin was working on North Memorial's credit backlog in May 2011 as a North Memorial operations lead. (Ex. 44.) Later, Mr. Toppin was the lead for back-end operations at Fairview, where he coordinated day-to-day efforts between Fairview's central business office and Accretive's India offices. (Ex. 45.) Matthew Olson was identified by North Memorial as its Operation Lead (Ex. 46), yet he is also identified as an Operations Lead at Fairview. (Ex. 47.) Thomas Hickey also appeared to take a "round trip" between the two hospitals. Mr. Hickey was employed at the Fairview site in July 2011. On July 18, 2011, Mr. Hickey was transferred to North Memorial as a back-end lead. (Ex. 48.) In January 2012, he apparently returned to Fairview, being identified by it as an Operations Lead at the Fairview site. (Ex. 47.) Anne Winter, a manager of back-end collections, also appears to have round-tripped from Fairview (Ex. 47) to North Memorial (Ex. 49), and back to Fairview.

Another Accretive employee, Stacey Sogard, is listed as a manager at North Memorial in September 2011 (Ex. 49) and also listed as a manager on the Fairview roster in January 2012.

(Ex. 47.) Similar transfers between the hospitals occurred with Natalie Au. Ms. Au was transferred from Fairview to be a Credit Balance Lead at North Memorial (Ex. 50) and thereafter seemingly transferred back to Fairview as an Operations Lead. (Ex. 51.) Harry Crane also was deployed to North Memorial (Ex. 52) and then to Fairview. (Ex. 47.) Similarly, Kathy Ragusa was deployed to North Memorial (Ex 53) and then became a director of front-end work at Fairview. (Ex. 54.)

There is an inevitable knowledge transfer when so many management level employees transfer back and forth between two competing hospitals. It is not known whether Accretive disclosed the inherent conflicts created with these transfers or obtained the consent of the two hospitals before making the transfers.

**6.3.2 Exchange of Competitive Business Data and the Antitrust Laws.** The exchange of data between competing hospitals seems to have been a persistent problem for Accretive. The exchange of such data can lead to problems under the antitrust laws and potentially could impact and raise the rates that patients and managed care companies pay for treatment. Under the antitrust laws, "unreasonable restraints of trade or commerce" are prohibited. Minn. Stat. § 325D.51 (2010). Accretive's sharing and facilitation of the exchange of non-public and competitively-sensitive information and financial data among competitors potentially could lead to price fixing, market allocation, production control, and other related violations of law. *See* Minn. Stat. § 325D.53 (2010) (listing non-exclusive violations constituting per se violations of Minnesota antitrust law).

Under the agreements entered into between the Minnesota Attorney General and Minnesota hospitals, including Fairview and North Memorial, the hospitals must charge uninsured patients a price no more than they would charge their "most favored insurer" for the

17

same treatment. (Vol. 3, Ex. 1, p. 14.) The "most favored insurer" is the non-governmental third party payor that provides the most revenue to the hospital. Thus, the discount rate charged to uninsured patients under the Attorney General Agreement not only reflects the prices charged to uninsured patients, but also reflects the competitive prices charged to the managed care company that delivers the most revenue to the hospital. The discount rate is generally closely guarded by insurance companies and hospitals because it can impact the prices charged or demanded by others, leading to an increase in health care prices.

On September 13, 2011, an Accretive employee at Fairview, Jonathan Clark, asked Mr. Doyle, an Accretive employee at North Memorial, for information about North's inpatient admissions, outpatient visits, and patient revenue. (Ex. 55.) Later that night, Mr. Doyle responded, asking Mr. Clark to provide him with the price charged by Fairview to uninsured patients. (*Id.*) Mr. Doyle wrote:

> "Can you return the favor? **Pat Boran (NM CFO) is trying to determine the proper uninsured discount to use at NM. He wants to compare it to other hospitals.** Can you tell me what FV's uninsured discount rate is, and how its determined."

(*Id,* emphasis added.) The next morning, Mr. Clark replied: "You bet:…That discount amount is ██%." (*Id.*) Later that week, Michael Grand, an Accretive employee working for North Memorial, emailed an Accretive employee who appears to work at Columbia St. Mary's Hospital in Milwaukee, Wisconsin (part of Ascension Health). Mr. Grand posed the following question: "I am researching our AG agreement for our CFO who is trying to determine the proper uninsured discount to use at North Memorial. He wants to compare it to other hospitals. Can you tell me what CSM's uninsured discount rate it, and how its [sic] determined." (Ex. 56.)

Earlier in the year, in May, Matthew Olson, an Accretive employee who was described to the Attorney General's Office as an "operations lead" by both Fairview and North Memorial,

prepared a collections script for North Memorial. (Ex. 57.) In it, he tells uninsured patients that they will receive a particular percentage discount on their bills pursuant to the Attorney General Agreement. (*Id.*) The discount he wrote into the script is the exact same discount Fairview had recently used for uninsured patients. (Ex. 58.)

The revelation of this type of information seems to be an ongoing problem for Accretive. As noted in Vol. 4, at one point it appears that Fairview employees may have been able to access the contract data of other Accretive hospital clients, and vice versa. (Ex. 59.) Other competitive data was similarly exchanged. On August 24, 2011, an Accretive manager working for Fairview supplied to an Accretive manager for North Memorial what appears to be a spreadsheet of discounts applied to patients who were rebilled for prior balances. (Ex. 60.) In July 2011, Mr. Crook provided Fairview "scorecards" to Mr. Doyle (working for North Memorial) who then provided them to Mr. Ducharme (working for North Memorial). (Ex. 61.) The scorecards appear to contain detailed Fairview information by entity of its payor yield, case management earnings, enrollment of uninsured patients in government programs and the like. (*Id.*) It is curious that Mr. Crook, the top Accretive official at Fairview, would provide Fairview information to Accretive's North Memorial representatives. He told the President of Accretive Quality that North Memorial is "**the north side hospital in the worst part of town…where we defer some of our uninsured patients.**" (Ex. 62, emphasis added.)

**6.4    Charity Care.**  Perhaps more than anything else, the delivery of charity care to patients in need is a core mission of a non-profit hospital.

This is how the courts define "charity care" for a non-profit hospital:

"…dispensing charity to all who need it and apply for it and placing no obstacles in their way—are more than guidelines; they are essential criteria; they go to the heart of what it means to be a charitable institution."[11]

This is how the MBA-types at Accretive define charity care:

| "Metric | Definition |
|---------|-----------|
| Charity | Gross AR [accounts receivable] lost due to insufficient assets from patients" |

(Ex. 63.)  The culture clash between the mission of Accretive—a for-profit corporation that makes money by cutting costs at client hospitals—and the mission of the hospitals themselves is exemplified in the way Accretive views charity care.

To qualify for exemptions from income taxes (Minn. Stat. § 290.05, subd. 2), sales taxes (Minn. Stat. § 297A.70, subd. 7), and property taxes (Minn. Stat. § 272.02, subd. 7) under state law, a nonprofit organization must prove that it operates for a "charitable purpose."  *N. Star Research Inst. v. Cnty. of Hennepin*, 236 N.W.2d 754, 757 (Minn. 1975).  In addition to having a charity care policy, a nonprofit hospital must advertise and promote the policy to patients in need of help.  *Allina Med. Clinics v. Cnty. of Meeker*, 2005 WL 473908, at *10 (Minn. Tax Div. 2005) (state tax exemption did not apply where "all patients are first asked to pay.  Charity care is not made available until all other avenues of payment are exhausted."); *Riverside Med. Ctr. v. Dept. of Revenue*, 795 N.E.2d 361, 365-66 (Ill. Ct. App. 2003) (non-profit clinic not entitled to tax exemption where 97 percent of revenue came from patients and clinic did not advertise charity care).  The administrative write-off of bad debt after collection efforts fail is not a charitable activity; rather, it is "no more than writing off uncollectable bills, a business practice…." *Chisago Health Servs. v. Comm'r of Revenue*, 462 N.W.2d 386, 391 (Minn. 1990); *Provena*

---

[11] *Provena Covenant Med. Ctr. v. Dept. of Revenue*, 894 N.E.2d 452, 468 (Ill. Ct. App. 2008) (upholding denial of non-profit hospital's property tax exemption application in part because of its deficient charity care and collection practices).

*Covenant Med. Ctr. v. Dept. of Revenue*, 925 N.E.2d 1131, 1149 (Ill. 2010) (hospital not entitled to property tax exemption where "there was little to distinguish the way in which [it] dispensed its 'charity' from the way in which a for-profit institution would write off bad debt"). As one court held: "Charity is more than rhetoric. The term 'charitable purpose' signifies 'concrete, practical, objective charity, manifested by things actually done for the relief of the unfortunate and the alleviation of suffering….'" *Provena Covenant Med. Ctr. v. Dept. of Revenue*, 894 N.E.2d 452, 470 (Ill. Ct. App. 2008).

As noted in Volume 3, Fairview and North Memorial entered into agreements with the Minnesota Attorney General regarding their debt collection policies. (Ex. 64.) The agreements were filed in the Ramsey County District Court, which entered an order requiring the hospitals to comply with their provisions. The agreements require the board of directors of the hospital to adopt a charity care policy "that takes into consideration the financial ability of the patient to pay a medical bill." The hospital may not send an account to a collection agency unless the patient has been given a reasonable opportunity to submit an application for charity care. The hospital must train its own staff and its outside collection agencies about the hospital's charity care policies and how a patient may submit an application. Debt collection agencies must refer patients who may be eligible for charity care back to the hospital. If a patient submits an application for charity care after an account has been referred to collections, the hospital must suspend all collection activity until the charity care application has been processed and the patient has been notified of a decision.

Accretive's involvement in the delivery of charity care at Fairview prompted a complaint to the Attorney General that Accretive, "a for-profit corporation, which owns Fairview's revenue

stream" "has no interest in giving any sort of care away for free," making "it really difficult on patients who need it." (Ex. 65.)

As noted above, the Attorney General Agreement requires Fairview's collectors to be trained in the hospital's charity care policy and refer patients who need charity care to the hospital. In a May 5, 2011 audit prepared by Fairview, the hospital found that Accretive was not familiar with Fairview's charity care policy. (Ex. 66.)

On September 13, 2010—after Accretive imposed requirements that patients be aggressively pursued for payments—a Fairview employee noted that patients on charity care were still facing collections activity. The hospital employee wrote: "They will ask the patient to pay and if the patient self discloses that they are on pending and/or approved [charity care] then they are not going to collect." (Ex. 67.) When another employee responded that the Attorney General Agreement prohibited patients on charity care from being pursued for collections, an Accretive manager minimized the problem by asking her if she was "aware of any penalties we will incur" for not identifying charity care accounts as exempt from collections activity. (*Id*.)

On September 23, 2011, Fairview told Andrew Crook, the Accretive executive in charge of the Fairview account, that because Accretive had failed to follow the Attorney General Agreement, "we have not been writing off accounts to charity care." (Ex. 68.) On October 24, 2011, Fairview told Accretive that its requirement that charity care patients set up a credit card payment plan is "not very practical, and may even be in violation of the AG agreement - in fact I'm pretty sure it is." (Ex. 69.)

In a 2011 report to Fairview, Accretive called charity care a "form of leakage." (Ex. 70.) In a March 2011 Leadership Update, Accretive told Fairview that it was aiming for a

"1/4 reduction in annual charity write-offs." (Ex. 71.) Accretive's goal of restricting the "leakage" seems to have succeeded, if this chart presented by Accretive to Fairview is accurate:



(*Id.*)

**Conclusion.** Accretive is at the center of one of the most highly regulated industries in America. Its activities directly impact the health and financial well-being of patients, many of whom are sick and infirm. Despite this, it has shown a persistent lack of attention to matters of regulatory compliance.

AG: #2998474-v1